**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**CHARLESTON DIVISION**

---

| | |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | MDL No. 2:18-mn-2873-RMG |

**This Document Relates to *Security Water Dist., et al. v. United States of America*, No. 2:19-cv-02187-RMG**

*SECURITY WATER DISTRICT and*
*PIKES PEAK COMMUNITY FOUNDATION v.*
*UNITED STATES OF AMERICA; THE 3M COMPANY (f/k/a Minnesota*
*Mining and Manufacturing Co.); and TYCO FIRE PRODUCTS, L.P.,*
*successor-in-interest to The Ansul Company; CHEMGUARD;*
*NATIONAL FOAM, INC.; KIDDE FIRE FIGHTING, INC., f/k/a*
*CHUBB NATIONAL FOAM, INC., f/k/a NATIONAL FOAM, INC.,*
*individually and as successor in interest to NATIONAL FOAM, INC.;*
*KIDDE PLC, INC., f/k/a WILLIAMS US INC., f/k/a WILLIAMS HOLDINGS, INC.,*
*individually and as successor in interest to NATIONAL FOAM, INC.;*
*KIDDE-FENWAL, INC., individually and as successor in interest to*
*NATIONAL FOAM, INC.; and UTC FIRE & SECURITY AMERICAS CORPORATION, INC.,*
*f/k/a GE INTERLOGIX, INC., individually and as successor in interest to*
*NATIONAL FOAM, INC., Defendants, Case No. 1:19-cv000649-WJM-KMT (District of*
*Colorado)*

---

**FIRST AMENDED COMPLAINT**

---

**SUMMARY OF CLAIM**

1.     Plaintiffs SECURITY WATER DISTRICT ("Security") and PIKES PEAK

COMMUNITY FOUNDATION ("Foundation"), by and through their undersigned counsel, file

this action against the UNITED STATES OF AMERICA pursuant to the Federal Tort Claims

Act ("FTCA"), 28 U.S.C. §§ 2671-2680, and against THE 3M COMPANY (f/k/a Minnesota

Mining and Manufacturing Co.)("3M");  TYCO FIRE PRODUCTS, L.P., successor-in-interest to THE ANSUL COMPANY ("TYCO"); CHEMGAURD; NATIONAL FOAM, INC.; KIDDE FIRE FIGHTING, INC., f/k/a CHUBB NATIONAL FOA, INC.; KIDDE PLC, INC., f/k/a WILLIAMS US INC., f/k/a WILLIAMS HOLDINGS, INC., individually and as a successor in interest to NATIONAL FOAM, INC.; KIDDE-FENWAL, INC., individually and as a successor in interest to NATIONAL FOAM, INC.; and UTC FIRE & SECURITY AMERICAS CORPORATION, INC., f/k/a GE INTERLOGIX, INC., (collectively referred to herein as the "Manufacturers") (the United States and the Manufacturers collectively are referred to herein as the "Defendants").

2.      Plaintiffs seek to be made whole for the property damages they have suffered as a result of Defendants' contamination of groundwater relied upon by Plaintiffs.

3.      Manufacturers manufactured and/or distributed and sold a fire suppressant known as Aqueous Film Forming Foam ("AFFF") to the United States Air Force which was used as intended at locations including Peterson Air Force Base in El Paso County, Colorado ("Peterson AFB"). Manufacturers manufactured and/or distributed and sold these chemicals with knowledge of, and with inadequate warning of, the toxic effects these chemicals would cause if they contaminated the environment, and did so without regard to property interests of Plaintiffs, which would foreseeably be damaged once these chemicals infiltrated the environment, including the groundwater.

4.      Manufacturers manufactured and/or distributed and sold AFFF to the Air Force that contained perfluorinated compounds ("PFCs"), such as perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid ("PFOA") and/or certain other PFCs, including those that can degrade into

other PFCs. PFCs are a group of toxic, extremely persistent, and bioaccumulative synthetic chemicals. When consumed, PFCs can cause numerous and serious health impacts.

5.     As the manufacturers and/or distributers and sellers of AFFF, Manufacturers knew or should have known that the inclusion of PFCs in AFFF presented an unreasonable risk to human health and the environment. Defendants also knew or should have known that PFCs are highly soluble in water, highly mobile and highly persistent in the environment, and highly likely to contaminate water supplies if released to the environment.

6.     Manufacturers marketed and/or distributed and sold their AFFF with knowledge that large quantities of toxic AFFF would be used in training exercises, in fire control, in fire sprinkler systems, in emergency situations, and in other ways at Air Force bases in such a manner that PFCs and other contaminants would be released into the environment.

7.     The United States, through the United States Air Force, used PFC-containing AFFF on Peterson AFB for many decades. The United States discharged and disposed of AFFF on land and water at Peterson AFB until at least 2018. The PFC component of the AFFF has entered the groundwater and migrated, and continues to migrate, from Peterson AFB downgradient to groundwater wells owned by the Plaintiffs and historically used by Plaintiffs to serve approximately 19,000 municipal water customers for household and commercial use and to irrigate vegetable crops.

8.     Because of the negligent development, manufacturing, distribution, marketing and sale of AFFF by the Manufacturers, and the United States' release and disposal of PFCs in violation of mandatory Air Force requirements, groundwater relied upon by the Plaintiffs has been contaminated with PFCs and Plaintiffs have incurred, and will continue to incur, significant

expenses and losses associated with shutting down their wells, securing alternative water supplies, ceasing agricultural operations, and otherwise responding to and mitigating the impacts of the contamination.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction to hear Plaintiffs' claims against the United States pursuant to 28 U.S.C. § 1346(b)(1).

10.     This Court has jurisdiction to hear Plaintiffs' claims against Manufacturers pursuant to 28 U.S.C. § 1332(a) because the Plaintiffs are citizens of states different from home states of the Manufacturers, and the aggregate amount in controversy exceeds $75,000.00, exclusive of interest and costs.

11.     Peterson AFB, Security and the Foundation, and the contaminated groundwater, all are located in Colorado and the actions complained of took place in Colorado. Therefore, this Court is the proper venue for this action. 28 U.S.C. §§ 1391(b)(2) and 1402(b).

12.     Plaintiffs discovered the United States' responsibility for the PFC contamination in August 2016 when the Air Force released its Final Preliminary Assessment Report for Perfluorinated Compounds at Peterson Air Force Base, El Paso County, Colorado.

13.     On or about April 18, 2018, Security and the Foundation each submitted an administrative claim to the United States Air Force for damages pursuant to 28 U.S.C. § 2675(a); 28 C.F.R. § 14.2; and 32 C.F.R. §§ 842.4 – 842.7. On September 6, 2018, less than six months prior to filing the Complaint in this action, the United States Air Force issued a denial of both claims. Therefore, the Plaintiffs have exhausted their administrative remedies and timely filed this action. 28 U.S.C. §§ 2401(b) and 2675.

## PLAINTIFFS' CLAIMS SATISFY FTCA REQUIREMENTS

14.     Claims submitted pursuant to the FTCA must meet the requirements set forth in

28 U.S.C. § 1346(b)(1) by being "civil actions on claims against the United States, for money

damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury

or death caused by the negligent or wrongful act or omission of any employee of the Government

while acting within the scope of his office or employment, under circumstances where the United

States, if a private person, would be liable to the claimant in accordance with the law of the place

where the act or omission occurred."

15.     Additionally, under the so-called discretionary function exception, no liability shall lie

for any claim "based upon an act or omission of an employee of the Government, exercising due

care, in the execution of a statute or regulation, whether or not such statute or regulation be valid,

or based upon the exercise or performance or the failure to exercise or perform a discretionary

function or duty on the part of a federal agency or an employee of the Government, whether or

not the discretion involved be abused." 28 U.S.C. § 2680(a).

16.     This "discretionary function" exception is inapplicable if a government employee

violated a mandatory directive or used an impermissible exercise of judgment. *Berkovitz v.

United States*, 486 U.S. 531, 535-37 (1988).

17.     The Plaintiffs hereby assert civil claims against the United States for money damages,

which accrued after 1945, for property damages and losses, which can be shown were

proximately caused by violations of mandatory directives and impermissible exercises of

judgment by employees and officers of the Air Force under circumstances where the United

States, if a private person, would be liable for trespass, nuisance, and negligence under Colorado law.

## PARTIES AND GENERAL ALLEGATIONS

18.     Plaintiff Security is a water district, which was formed as a special district pursuant to the Colorado Special District Act, C.R.S. § 32-1-102. In Colorado, special districts are quasi-municipal corporations and political subdivisions. C.R.S. § 32-1-103(20). The purpose of special districts is to "serve a public use and . . . promote the health, safety, prosperity, security, and general welfare of the inhabitants of such districts." C.R.S. § 32-1-102(1). Water districts have the additional purposes of "supply[ing] water for domestic and other public and private purposes by any available means and provid[ing] all necessary or proper reservoirs, treatment works and facilities, equipment, and appurtenances incident thereto." C.R.S. § 32-1-103(25). To fulfill their purposes, water districts are empowered to "sue," C.R.S. § 32-1-1001(1)(c), and "exercise all rights and powers necessary or incidental to or implied from the specific powers granted to special districts."  C.R.S. § 32-1-1001(1)(n).

19.     Security's principal place of business is located at 231 Security Blvd., Colorado Springs, El Paso County, Colorado 80911. Security's service area encompasses approximately five square miles in El Paso County, Colorado, and approximately 19,000 customers. Approximately eighty-five percent (85%) of Security's customers are residential and use water for drinking and domestic purposes.

20.     Until September 2016, one of Security's primary water sources was groundwater from the Widefield and Windmill Gulch Aquifers. The Widefield and Windmill Gulch Aquifers historically have supplied about half of Security's water requirements.

21.     Security owns Colorado water rights in the Widefield and Windmill Gulch Aquifers that the District Court for Water Division 2, State of Colorado, confirmed and awarded in decrees in Case Nos. W-103 to W-111, Case No. W-112, Case No. 116, Case No. 116, Case No. W-347, Case No. W-400, Case No. W-578, Case No. W-664, Case No. W-1551, Case No. W-3174, Case No. 4212, Case No. W-4766, Case No. 1984CW130, Case No. 1990CW28, Case No. 2001CW149, Case No. 2006CW119, Case No. 2006CW126, Case No. 2006CW117, Case No. 2007CW51, Case No. 2009CW67, Case No. 2009CW92, Case No. 2012CW99. These decrees confirm a priority of appropriation for withdrawal and use of water from the Widefield and Windmill Gulch Aquifers, and set forth plans for augmentation using Security's senior decreed water rights that allow and replace well depletions to Fountain Creek, the main drainage to which the Widefield and Windmill Gulch Aquifers are tributary.

22.     Security owns and operates a water supply system that consists of twenty-four (24) active wells, associated distribution systems, and the land on which those wells and other facilities are located. Pursuant to Security's decreed water rights, this system withdraws, treats and delivers water from the Widefield and Windmill Gulch Aquifers to customers for domestic, commercial, industrial, and other uses. Security's decreed Colorado water rights also include rights to construct additional wells.

23.     The Foundation is a nonprofit Colorado corporation that invests and administers charitable funds for programs dedicated to improving the quality of life in the Colorado Springs area.

24.     The Foundation's principal place of business is located at 102 S. Tejon Street, Suite 530, Colorado Springs, El Paso County, Colorado 80903. The Foundation owns real property in El

Paso County, Colorado, with an address of 5210 US-85, Colorado Springs, Colorado 80911, which is known as the Venetucci Farm.

25.     The Foundation owns Colorado water rights in the Widefield Aquifer that the District Court for Water Division 2, State of Colorado, confirmed and awarded by decree in Case Nos. W-103, W-104, W-105, W-106, W-107, W-108, W-109, W-110, and W-111, and W-568. These decrees confirmed a priority of appropriation for withdrawal and use of water from the Widefield Aquifer.

26.     The Foundation owns and operates groundwater wells located on the Venetucci Farm. Until July 2016, the Foundation, pursuant to its decreed water rights, withdrew water from those wells to irrigate produce and vegetables at the Venetucci Farm, which were sold to the public, and for household use. The Foundation also leases a portion of its groundwater to Security Water District and Widefield Water and Sanitation District ("Widefield"), and those entities sublease a portion of the Foundation's groundwater rights to the City of Fountain, all for use in their municipal water supply systems.

27.     Decreed Colorado water rights are property rights that are afforded legal protection. *Empire Lodge Homeowners' Ass'n v. Moyer*, 39 P.3d 1139, 1146-48 (Colo. 2001); *Santa Fe Trail Ranches Prop. Owners Ass'n v. Simpson*, 990 P.2d 46, 53 (Colo. 1999). Colorado water rights are considered real property. *Dallas Creek Water Company v. Huey*, 933 P.2d 27, 39 (Colo. 1997); *see also* C.R.S. § 38-30-102(2) (conveyance of water rights subject to same formalities as conveyance of real estate). Air Force also treats water rights as real property rights. *See* Air Force Instruction 32-1067, February 4, 2015, Civil Engineering: Water and Fuel

8

Systems, ¶ 3.3.1. (allocating responsibility for water rights asset management to "real property section").

28.     Defendant 3M is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 3M Center, St. Paul, Minnesota 55133. Beginning before 1970 and until at least 2002, 3M manufactured and distributed and sold AFFF. Defendant 3M sold military specification AFFF foam that contained PFCs to the Air Force, which was then distributed and used at Air Force locations, including Peterson AFB.

29.     Defendant Tyco is a limited partnership organized and existing under the laws of the State of Delaware, having a principal place of business at One Stanton Street, Marinette, Wisconsin 54143.  Tyco manufactures the Ansul brand of products and is the successor-in-interest to the corporation formerly known as The Ansul Company (hereinafter "Ansul" and included in any reference to Tyco).

30.     At all times relevant, Tyco manufactured and/or distributed and sold fire suppression products, including AFFF that contained fluorocarbon surfactants containing PFCs.  Defendant Tyco distributed and/or sold military specification AFFF foam to the Air Force, which was then distributed and used at Air Force locations, including Peterson AFB.

31.     Defendant Chemguard is a Texas corporation having its principal place of business at One Stanton Street, Marinette, Wisconsin 54143.

32.     At all times relevant to the present litigation, Chemguard designed, manufactured and sold AFFF containing PFC that was used in training operations and to fight fires at numerous military bases and other locations throughout the country, including at Peterson AFB.

9

33.     Defendant National Foam, Inc. (a/k/a Chubb National Foam) (collectively "National Foam") is a Delaware corporation, having a principal place of business at 144 Junny Road, Angier, North Carolina 27501.

34.     At all times relevant to the present litigation, National Foam Inc. designed, manufactured and sold AFFF containing PFCs that was used for training and to fight fires at numerous military bases and other locations throughout the country, including Peterson AFB.

35.     Defendant Kidde Fire Fighting, Inc., f/k/a Chubb National Foam, Inc., f/k/a National Foam Inc., is a Pennsylvania corporation having a principal place of business at One Carrie Place, Farmington, Connecticut. At all times relevant to the present litigation, Kidde Fire Fighting, Inc. designed, manufactured and sold AFFF containing PFCs that was used in training operations and for emergency fire-fighting situations including at Peterson AFB.

36.     Kidde Fire Fighting, Inc., is sued individually, and as successor in interest to National Foam, Inc.

37.     Kidde Plc, Inc., f/k/a Williams Us Inc., f/k/a Williams Holdings, Inc., is a Massachusetts corporation having a principal place of business at One Carrier Place, Farmington, Connecticut 06302. At all times relevant to the present litigation, Kidde Plc, Inc. designed, manufactured, and sold AFFF containing PFCs that was used in training operations and for emergency fire-fighting situations including at Peterson AFB.

38.     Kidde Plc, Inc., is sued individually, as a successor in interest to National Foam, Inc.

39.     Kidde-Fenwal, Inc. is a Massachusetts corporation with its principal place of business at 400 Main Street, Ashland, Massachusetts 01721. At all times relevant to this litigation, Kidde-

Fenwal, Inc. designed, manufactured, and sold AFFF used in training operations and for emergency fire-fighting situations including at Peterson AFB.

40.     Upon information and belief, Fenwal, Inc. was incorporated on June 21, 1988, and later changed its name to Kidde-Fenwal, Inc.

41.     Upon information and belief, the Canadian Intellectual Property Office has registered the National Foam trademark to Kidde-Fenwal, Inc., formerly registered to Kidde Fire Fighting, Inc.

42.     Kidde-Fenwal, Inc., is sued individually, and as successor in interest to National Foam, Inc.

43.     UTC Fire & Security Americas Corporation, Inc., f/k/a GE Interlogix, Inc., is a North Carolina corporation with its principal place of business at 3211 Progress Drive, Lincolnton, North Carolina  28092.  At all times relevant to this litigation, UTC Fire & Security Americas Corporation, Inc. designed, manufactured and sold AFFF used for training operations and fighting fires including at Peterson AFB.

44.     Upon information and belief, Kidde-Fenwal, Inc. is part of the UTC Climate Control & Security unit of United Technologies Corporation.

45.     UTC Fire & Security Americas Corporation, Inc., is sued individually, and as successor in interest to National Foam, Inc.

46.     National Foam, Inc.; Kidde Fire Fighting, Inc., f/k/a Chubb National Foam, Inc., f/k/a National Foam Inc., individually and as successor in interest to National Foam, Inc.; Kidde Plc, Inc., f/k/a Williams US Inc., f/k/a Williams Holdings, Inc., individually and as successor in interest to National Foam, Inc.; Kidde-Fenwal, Inc., individually and as successor in interest to

11

National Foam, Inc.; UTC Fire & Security Americas Corporation, Inc., f/k/a Ge Interlogix, Inc.; shall collectively be referred to herein as "National Foam."

47.    At all times relevant to the present litigation, National Foam designed, manufactured, and sold AFFF used in training operations and for emergency fire-fighting situations including at Peterson AFB.

48.    Defendant the United States was at all times relevant herein, and still is, the federal government, duly organized, and empowered to form federal agencies, such as the United States Air Force.

49.    Upon information and belief, the United States acting through its agency, the Air Force, and the employees and personnel of that agency, owns, operates and uses Peterson AFB, and is now and has been responsible for activities and operations on Peterson AFB.  The actions and omissions of the United States asserted herein were made by employees and personnel of the Air Force.

50.    Peterson AFB is located in the State of Colorado.

51.    The United States stores and stored toxic PFC-based firefighting foam and PFC-contaminated water at Peterson AFB.

52.    The United States uses and used PFC-based firefighting foam on Peterson AFB and surrounding facilities.

53.    The United States discharged and disposed, and continues to discharge and dispose, of toxic PFCs into the environment, including by spraying, storing, and placing PFC-containing firefighting foam on land and water at Peterson AFB, including irrigating a golf course on the base with PFC-contaminated water, all in violation of mandatory directives.

12

54.     Security, the Venetucci Farm, Peterson AFB, and the Widefield and Windmill Gulch
Aquifers are located in the Fountain Creek Watershed area of Colorado, along Fountain Creek.
Security, the Venetucci Farm, and the Widefield and Windmill Gulch Aquifers are located
downgradient of Peterson AFB.

55.     Groundwater from Peterson AFB flows downgradient to the Windmill Gulch and
Widefield Aquifers. *See* "Final Site Inspection Report of Aqueous Film Forming Foam Areas at
Peterson Air Force Base, El Paso County, Colorado," July 2017, p. 27 [hereinafter "Final SI"],
pp. 9, 12, 15, 18, 25, 27-28; Final Expanded SI Field Sampling Plan, Figure 1.

56.     PFCs from Peterson AFB migrated, and are migrating, from areas of release on Peterson
AFB to the Widefield and Windmill Gulch Aquifers and have entered and contaminated
Plaintiffs' real property, water rights, wells, and systems.

57.     In May 2016, the United States Environmental Protection Agency, pursuant to the Safe
Drinking Water Act, issued separate Drinking Water Health Advisories for two PFC chemicals –
perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonate ("PFOS"). The Health
Advisories contained recommended human exposure limits of 70 parts per trillion (ppt) for
PFOA and PFOS, both individually and in combination.

58.     Because PFOA and PFOS, either individually or combined, in the groundwater at
Plaintiffs' wells exceeded the Health Advisory limits, Plaintiffs shut down their wells in 2016.

59.     Security then pursued alternative surface water supplies, installed new pipelines and other
infrastructure, and modified existing infrastructure in order to receive and then deliver to
customers the alternative water supplies free of contamination from PFOA and PFOS.  Those
costs would not have been incurred but for the PFC contamination.

60.     Security took, and continues to take, delivery of a substitute supply of water through the Southern Delivery System ("SDS") pipeline, which runs approximately forty-five (45) miles from Pueblo Reservoir near Pueblo, Colorado, on the Arkansas River, and connects to Security's water supply system. Security has used the SDS pipeline to take delivery of Security's water reserves that Security stores in Pueblo Reservoir. Security pays for water, storage, and delivery of water received through the SDS, and has paid additional fees and costs to take delivery of water through SDS in partial replacement of its contaminated groundwater.

61.     Security also began taking additional water through the Fountain Valley Authority ("FVA") Conduit.  Water delivered through the FVA Conduit is delivered to Security from Pueblo Reservoir and consists of either Security's stored water reserves or water purchased from other entities when available. Security pays for water, storage, and delivery of water received through the FVA Conduit, and has incurred additional fees and costs to take delivery of water through FVA in partial replacement of its contaminated groundwater.

62.     Security also has obtained, and continues to obtain, substitute supplies of water delivered through a pipeline connection to the Colorado Springs Utilities ("CS-U") water system. Water delivered through the CS-U connection is either water from Security's stored water reserves or is CS-U's water that Security purchases. Security pays for water, storage, and delivery of water received through CS-U, and has incurred additional fees and costs to take delivery of water from CS-U in partial replacement of its contaminated groundwater.

63.     Security cannot rely on the SDS, FVA, or CS-U sources to replace its lost groundwater indefinitely. Use of its own stored reserves reduces Security's ability to weather a drought. In addition, delivery of additional water to Security through each pipeline depends, to some extent,

14

on other pipeline participants making a share of their capacity available to Security. Additional deliveries also depend on the availability of water to purchase from other water rights owners. At times, that capacity and water might not be available.

64.     Because of the groundwater contamination, Security also constructed additional pipelines and system facilities in order to take delivery of the alternative sources and to distribute that water throughout its system.

65.     Similarly, in July 2016, the Foundation ceased irrigating its crops and otherwise using groundwater due to PFC contamination of its groundwater, and has not grown crops since then.

66.     Lease deliveries to Security, Widefield and Fountain also ceased because those entities terminated use of the contaminated water.

67.     Thus, the Manufacturers, through their development, manufacturing, distribution, marketing, and sale of AFFF; and the United States, acting through the Air Force, and their employees and personnel, by its trespass, nuisance, and negligence; proximately caused Plaintiffs' injuries and damages by contaminating the groundwater.

**BASIS OF CLAIM**

**PFCs Are Used in Firefighting Foam**

68.     PFCs are synthetic carbon chain compounds that contain large amounts of the element fluorine. As used in this Complaint, the term "PFCs" includes all PFCs and their precursors, derivatives and/or salts that have been or may be detected in or that are threatening Plaintiffs' water supplies and property, including *inter alia*, PFOA, PFOS, PFBA, PFBS, PFHxA, PFHxS, PFPeA, PFHpA, PFNA, PFDA, PFDS, PFUnA, PFDoA, and PFTrA.

69.     PFCs are used in the firefighting foam known as "aqueous film forming foam" ("AFFF").

70.     AFFF is water-based and used to extinguish fires that involve petroleum or other flammable liquid because PFCs resist heat, oil, grease, and water.

71.     PFCs are not naturally occurring. Thus, the PFCs found in the environment or humans are attributable to human activity.

72.     AFFF that contained PFCs was developed in the 1960s as an alternative to firefighting foams that existed at the time.

73.     3M AFFF, which is produced through a 3M process called electrochemical fluorination, or ECF, contained PFCs including PFOS.  Other formulations of the foam purchased by the Department of Defense manufactured by Defendant Tyco and other Manufacturer Defendants are synthesized through telomerization, and contain PFCs including PFOA.  Both processes include formulations containing chemicals that can break down into other PFCs.

74.     Manufacturers each manufactured and/or distributed and sold AFFF containing PFCs, among other chemicals, for sale to the Department of Defense, and Manufacturers sold and distributed AFFF that was used at Peterson AFB.

75.     In 1969, the United States Department of Defense issued Military Specification MIL-F-24385 for AFFF.

76.     In order for an AFFF manufacturer to sell its AFFF to the Air Force, it was required to meet MIL-F-24385.

77.     MIL-F-24385 covered "the requirements for aqueous film-forming foam (AFFF) liquid concentrate fire extinguishing agents consisting of fluorocarbon surfactants and other compounds as required to conform to the requirements specified hereafter."

78.     If the Department of Defense found that a manufacturer's product satisfied MTL-F-24385 performance expectations, the Department placed the product on the Department of Defense Qualified Product Listing.

79.     In MIL-F-24385, the United States required that "The material shall have no adverse effect on the health of personnel when used for its intended purpose."  This provision remained a part of the specification throughout the time Manufacturers sold AFFF products to the United States.

80.     Manufacturers chose to include PFOS and PFOA as ingredients in the AFFF they sold and delivered to the United States pursuant to MIL-F-24385.

81.     The inclusion of PFOA and PFOS in AFFF sold to the Air Force violated the MIL-F-24385 specification that "The material shall have no adverse effect on the health of personnel when used for its intended purpose."

82.     Manufacturers sold and delivered AFFF to the Air Force for use on its bases, including at Peterson AFB.

83.     Manufacturers knew or should have known that the AFFF they sold and delivered to the United States would adversely affect the health of personnel when used for its intended purpose and did not meet the specifications of MIL-F-24385.

84.     Manufacturers knew or should have known that their harmful and defective products, AFFF, would be used for various purposes on Air Force bases, including, but not limited to, training for firefighting, testing firefighting equipment, actual firefighting, and use in hangar sprinkler fire suppressant systems, which would cause the AFFF to drain into the ground and

17

eventually pollute or contaminate the groundwater beneath the bases and eventually migrate into the drinking water and agricultural water supplies of the Plaintiffs.

**Manufacturers Failed to Provide Notice of AFFF Toxicity**

85.     Upon information and belief, instructions, labels and material safety data sheets were provided with the AFFF by Manufacturers, which, at least at significant times, did not fully describe the health and environmental hazards of AFFF which Manufacturers knew or should have known.

86.     Upon information and belief, Manufacturers had known of these health and environmental hazards for years.

87.     3M knew as early as the mid-1950s that PFCs bio-accumulates in humans and animals.

88.     A 1956 study at Stanford University concluded that the PFCs manufactured by 3M binds to proteins in blood.

89.     By the early 1960s, 3M understood that PFCs are stable, persist in the environment, and do not degrade.

90.     In 1970, the authors of a scientific journal article observed after conducting tests on a 3M product containing PFCs that the product was "highly derogatory to marine life and the entire test program had to be abandoned to avoid severe local stream pollution."

91.     Studies undertaken by 3M in the 1970s demonstrated that PFCs were even "more toxic than was previously believed."

92.     A 1978 study by 3M on PFCs and PFOA confirmed that "these chemicals are likely to persist in the environment for extended periods unaltered by microbial catabolism."

93.     In 1979, a 3M scientist recognized that PFCs posed a cancer risk because they are "known to persist for a long time in the body and thereby give long-term chronic exposure."

94.     In the 1970s, 3M began a major program to review personnel handling of fluorochemicals. 3M's monitoring confirmed that fluorochemicals could bioaccumulate.

95.     The potential loss of tremendous profits from PFAS drove 3M to engage in a deliberate campaign to influence the science relating to PFAS and, according to internal company documents, to conduct scientific "research" that it could use to mount "[d]efensive [b]arriers to [l]itigation."

96.     A key priority of an internal 3M committee was to "[c]ommand the science" concerning the "exposure, analytical, fate, effects, human health and ecological" risks posed by PFAS and for 3M to provide "[s]elective funding of outside research through 3M 'grant' money."

97.     In exchange for providing grant money to friendly researchers, 3M obtained the right to review and edit the drafts of papers on PFAS and sought control over when and whether these papers were published at all.

98.     Under pressure from the U.S. EPA, on May 16, 2000, 3M announced it would phase out production of two synthetic chemicals, PFOS and PFOA, that it had developed more than fifty years earlier. 3M press release, "3M Phasing Out Some Of Its Specialty Materials", May 16, 2000, http://www.chemicalindustryarchives.org/dirtysecrets/scotchgard/pdfs/226-0641.pdf#page=1. 3M, who was the predominant manufacturer of AFFF, ceased production of PFOS based AFFF in 2002.

99.     A U.S. EPA internal memo on the day of 3M's phase-out announcement stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have

a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to

human health and the environment over the long term. [PFOS] appears to combine Persistence,

Bioaccumulation, and Toxicity properties to an extraordinary degree." EPA internal memo,

"Phaseout of PFOS", May 16, 2000,

http://www.chemicalindustryarchives.org/dirtysecrets/scotchgard/pdfs/226-0629.pdf#page=2n

100.     In contrast, 3M's news release insisted that "our products are safe" while extolling their

"principles of responsible environmental management" as driving the cessation of production.

3M press release, "3M Phasing Out Some Of Its Specialty Materials", May 16, 2000,

http://www.chemicalindustryarchives.org/dirtysecrets/scotchgard/pdfs/226-0641.pdf#page=1.

101.     In the 1970s, Manufacturers began making AFFF with PFCs other than PFOS and PFOA,

including shorter carbon chain PFCs. Upon information and belief, those other PFCs also are

highly soluble, persistent, bioaccumulative, and toxic to humans.

102.     Upon information and belief, those other PFCs were sold and delivered to the Air Force

by Manufacturers, were stored, used, released, discharged, and disposed of at Peterson AFB by

Air Force, and have contaminated Plaintiffs' soil and groundwater. For instance,

perfluorohexanesulfonic acid (PfHXS) has been detected in groundwater samples collected from

the Plaintiffs' drinking water supply wells.

103.     Upon information and belief, the Manufacturers continue to manufacture, sell and

distribute AFFF containing PFCs to the Air Force for use on bases, including Peterson AFB.

104.     The concentrations of PFCs found in the Widefield and Windmill Gulch aquifers have

been caused by releases of Manufacturers' AFFF to the environment. As was reasonably

foreseeable by Manufacturers, the training, fire response and other use of AFFF occurred on,

and/or resulted in discharges to, open ground and stormwater systems. As was reasonably foreseeable by Manufacturers, the chemical components of AFFF, including PFCs, migrated into and through the soil and groundwater and from there migrated to and contaminated soil and groundwater on or beneath property owned and operated by the Plaintiffs and contaminated the supply for Plaintiffs' appropriated groundwater rights. The PFC contamination is therefore directly caused by Manufacturers' manufacture and/or distribution and sale of AFFF.

105.    It was and is reasonably foreseeable to Manufacturers that the property interests of Plaintiffs would be damaged by contamination resulting from releases of AFFF, and its chemical components, at Peterson AFB.

106.    Manufacturers knowingly manufactured and/or distributed and sold a dangerous and defective product, failed to provide sufficient warnings to protect bystanders, such as the Plaintiffs, and failed to recall their products when they took them off the market and/or knew them to present a hazard to human health.

107.    Upon information and belief, non-PFC based products were available for fire training that would not have led to contamination of Plaintiffs' property, including their drinking water and agricultural water supplies.

108.    Upon information and belief, Manufacturers control a substantial share of the market in the United States for AFFF containing PFCs and are jointly responsible for the contamination of the groundwater in the Widefield and Windmill Gulch aquifers and for causing the damages and injuries the Plaintiffs have and will suffer.

109.    As a direct and proximate result of the contaminated groundwater near Peterson AFB, Plaintiffs have suffered, and will suffer, damages.

**The United States' Use, Storage, Release, Discharge and Disposal of PFCs from Firefighting Foam at Peterson AFB has Contaminated Plaintiffs' Water Supply**

110.    The United States began using PFC-based AFFF at military installations, including Peterson AFB, in about 1970 to extinguish fuel-based fires. Final SI, p. 1.

111.    It is estimated that 75% of the military AFFF inventory is PFC-based product. During most of the past 30 years, 3M was the primary supplier of AFFF to the Department of Defense ("DoD") stock system. Fire Fighting Foam Coalition, "Estimated Quantities Of Aqueous Film Forming Foam in the United States", August, 2004.

112.    The military Qualified Products Database listed 3M AFFF products as early as 1970, and Tyco products as early as 1976. The other Manufacturer Defendants provided AFFF to the Department of Defense at various times from about 1973 to the present. http://dcppe.org/Systems/AFFF/MIL-F-24385%20QPL%20History%20for%20Type%206%20AFFF.pdf.

113.    According to a 2011 Department of Defense risk alert document, "through 2001, the DoD purchased AFFF from 3M and/or Ansul, Inc. 3M supplied PFOS-based AFFF under the product name, 3M Light Water AFFF." DoD Risk Alert #03-11, "Aqueous Film Forming Foam", http://www.denix.osd.mil/cmrmp/ecmr/ecprogrambasics/resources/chemical-material-emerging-risk-alert-for-afff/.

114.    Thousands of gallons of AFFF manufactured by Manufacturers, containing PFOS and PFOA, among other PFCs, was used and/or stored by the United States at Peterson AFB from approximately 1970 through at least 2018. *See* Final SI, pp. 3-4.

22

115.    The AFFF manufactured by Manufacturers was expected to reach Peterson AFB without substantial change in the condition in which it was distributed and sold to the Air Force, and it did.

116.    Air Force personnel conducted training exercises and other activities at Peterson AFB, including firefighting and explosion training, using AFFF.

117.    The United States discharged and disposed of spent AFFF containing PFCs on Peterson AFB. The United States' discharge and disposal of spent AFFF, and its PFC component, has included, but is not limited to, releases and discharges into soil and water pathways that connect the Peterson AFB to Plaintiffs' property, wells, water rights and systems. U.S. Army Corps of Engineers and Aerostar SES LLC, "Final Expanded Site Inspection Field Sampling Plan, Attachment 1 to Final Uniform Federal Policy (UFP) Quality Assurance Project Plan (QAPP) for Site Inspections of Aqueous Film Forming Foam Areas, Multiple Sites, United Air Force Installations Addendum 8, Field Sampling Plan for Peterson Air Force Base, El Paso County, Colorado," November 2017, p. 2 (hereinafter "Final Expanded SI Field Sampling Plan").

118.    For instance, training, exercises, and fire response activities occurred on open ground at Peterson AFB, causing PFC waste to drain into soil, groundwater, surface waters, wetlands, ponds, and ditches.

119.    PFC-contaminated runoff from AFFF activities has been captured and stored in golf course ponds and re-used to irrigate the Peterson AFB golf course. Final Expanded SI Field Sampling Plan, p. 3; Final SI, pp. 5-6.

120.    The United States discharged and disposed of 10,000 – 20,000 gallons of PFC-contaminated AFFF wastewater into CS-U's sewer system as often as three times a year or more.

23

*See* Final SI, p. 6. Upon information and belief, PFCs cannot be removed by the CS-U sewage treatment plant and were discharged into Fountain Creek.

121.     PFCs discharged to soil, surface waters, wetlands, ponds, and the golf course have migrated into groundwater and contaminated the Widefield and Windmill Gulch Aquifers where Plaintiffs' wells are located, contaminating Plaintiffs' water supply.

**Specific Release, Discharge, Disposal and Storage Locations on Peterson AFB**

122.     The U.S. Army Corps of Engineers identified numerous specific locations on Peterson AFB where the Air Force used, stored, discharged, and/or disposed of PFCs. These locations include, but are not limited to, a current Fire Training Area, former fire training areas including "Site 5" and "Site 8," Hangar 119, Hangar 121, Hangar 133, Hangar 140, Hangar 210, Hangar 214, an underground storage tank, Fire Stations #1 and #2, Pond #3 and its Overflow Pond, a golf course, a former leach field, a former pond and burn pit, Building 104, and off-Base landfills where The United States discharged and disposed of contaminated soil. U.S. Army Corps of Engineers and Aerostar SES LLC, "Revised Final Preliminary Assessment Report for Perfluorinated Compounds at Peterson Air Force Base El Paso County, Colorado", November 2016b pp. 9, 46-48, [hereinafter "Revised Final PA"].

123.     Surface water in the northwest corner of Peterson AFB drains into East Fork Sand Creek, which crosses the Base and then flows into Fountain Creek above Security and the Widefield Aquifer, which is recharged in part from Fountain Creek. Final SI, pp. 28-29, D-1. The current Fire Training Area, Hangar 140, and Hangar 133 are located in the northwest corner of the Base.

124.     Drainage from the rest of the Base flows either through surface ditches into the golf course ponds (Ponds #1, #2, and #3), or through the storm water management system into Pond

24

#3 and/or the Overflow Pond in the southern part of the Base. *Id.* at p. 5. Water in these ponds is used for irrigation. *Id.* at pp. 5-6; Final Expanded SI Field Sampling Plan, p. 3.

125.    Water from inside the Hangars is routed through floor drains to an underground storage tank (UST) near Hangar 210, where it is or was discharged into the CS-U public sewer system. Final Revised PA, pp. 19-24. Peterson AFB connected to the CS-U sewer system in or about 1978. Final SI, p. 5. Prior to this connection, any wastewater was discharged into a leach field at Peterson AFB. *Id.*

126.    Water that escapes outside the Hangars drains through the storm water management system into Pond #3 and the Overflow Pond or percolates into the soil. *See* Revised Final PA, pp. 19-24.

127.    PFC-based AFFF was used in training exercises in the current Fire Training Area from as early as 1989 through as recently as October 2016. Spent PFCs from the Fire Training Area were then stored in a holding tank, which was drained into the CS-U sewer system. Final SI, p. 6.

128.    Upon information and belief, CS-U was unaware of, and did not authorize, The United States's discharge and disposal of PFCs into the sewer. *See* Tom Roeder, Air Force: Toxic wastewater sent into Fountain Creek up to three times a year until 2015, The Gazette, http://gazette.com/air-force-toxic-wastewater-sent-into-fountain-creek-up-to-three-times-a-year-until-2015/article/1588901.

129.    Upon information and belief, PFC-based AFFF was sprayed beyond the perimeter of the Fire Training Area pit in an area where no system of containment existed and where it entered the environment, including soil and groundwater. *See* Final SI, p. 7.

130.    PFC-based AFFF was used in training exercises on Site 5, a former fire training area, from as early as 1970 through as recently as 1977. The burn pit at Site 5 that was used for training exercises did not have a liner to prevent seepage. Upon information and belief, wastewater from training exercises drained into the golf course ponds and has been reused for irrigation or percolated into the surrounding soil and groundwater. *See* Revised Final PA, pp. 11-13.

131.    PFC-based AFFF was used in training exercises on Site 8, a former fire training area, from as early as 1977 through as recently as 1992. Upon information and belief, the burn pit at Site 8 that was used for training exercises was not lined. Upon information and belief, wastewater from training exercises drained into the golf course ponds and was reused for irrigation, or percolated into the surrounding soil and groundwater. Final SI, p.4.

132.    PFC-based AFFF was used and/or stored at Hangar 119, an aircraft maintenance hangar, for an unknown number of years. Hangar 119 has a floor drain that drains into the UST near Hangar 210, which drains into the CS-U sewer system. Revised Final PA, p. 19. AFFF was released during testing of the fire suppression system at least twice since 2009. *Id.* at D-3.

133.    PFC-based AFFF was used and/or stored at Hangar 121, an aircraft maintenance hangar, at least after 1994, and for an unknown number of years before then. Hangar 121 has a floor drain that drains into the UST near Hangar 210, which drains into the CS-U sewer system. *Id.* at p. 20. AFFF was released during testing of the fire suppression system at least twice since 2009. *Id.* at D-3.

134.    PFC-based AFFF was used and/or stored at Hangar 133 at least after 1992, and for an unknown number of years before then. In 2011 or 2012, AFFF was accidentally released into the

mechanical room. Hangar 133 has a floor drain that drains into the UST near Hangar 210, which drains into the CS-U sewer system. *Id.* at p. 21. AFFF was released during testing of the fire suppression system at least twice since 2009. *Id.* at D-3.

135.    PFC-based AFFF was used and/or stored at Hangar 140 at least after 2005, and for an unknown number of years before then. Hangar 140 has a floor drain that drains into the UST near Hangar 210, which drains into the CS-U sewer system. *Id.* at p. 22.

136.    PFC-based AFFF was used and/or stored at Hangar 210 at least after 1985. There have been four reported accidental releases of AFFF in Hangar 210, the latest incident occurring in 2014. Hangar 210 has a floor drain that drains into the UST near Hangar 210, which drains into the CS-U sewer system. *Id.* at p. 23. AFFF was released during testing of the fire suppression system at least twice since 2009. *Id.* at D-3.

137.    PFC-based AFFF was used and/or stored at Hangar 214 at least after 1987. There was one reported accidental release in an unknown year, which may have escaped into a storm sewer, the environment, or a pond. There was another accidental release on October 6, 2015, where AFFF may have escaped into a storm sewer, the environment, or a pond. Hangar 214 has a floor drain that drains into the UST near Hangar 210, which drains into the CS-U sewer system. *Id.* at p. 24. AFFF was released during testing of the fire suppression system at least twice since 2009. *Id.* at D-3.

138.    Upon information and belief, a portion of AFFF released in the hangars entered the storm water system, including ponds on the Base.

139.    Fire Station #1 is an active fire station. AFFF has been stored in drums and equipment at Fire Station #1. Spray testing using AFFF was conducted at Fire Station #1 for an unknown

number of years, including over concrete and a sand-covered volleyball court. Upon information and belief, there was no liner or other containment beneath the testing areas. Runoff from testing went into the storm water system and then into Pond #3, the Overflow Pond, the other golf course ponds, the CS-U sewer system, East Fork Sand Creek, and/or the environment. *Id.* at pp. 25-26; Final SI, pp. 4-5.

140.    Fire Station #2 is an active fire station that opened in 1996. AFFF is stored in drums and equipment at Fire Station #2. Spray testing using AFFF was conducted at Fire Station #2 for an unknown number of years. Runoff from testing drained into surface drainages, Pond #3 and the Overflow Pond, the golf course ponds, and/or the environment. Final Revised PA, pp. 27-28, 42; Final SI, p. 5.

141.    Ponds #1, #2, and #3 are detention ponds that have received storm water runoff since at least 1979. Water from Pond #3 is pumped into Ponds #1 and #2. Water in the ponds is reused to irrigate the golf course, and it is not treated prior to reuse. Prior to 2002, Pond #3 did not have a liner to prevent seepage. It is unclear at this time whether Ponds #1 and #2 have liners. Revised Final PA, pp. 28-31; Final SI, pp. 5-6; Final Expanded SI Field Sampling Plan, p. 3.

142.    The Overflow Pond is adjacent to Pond #3. It does not have a pond liner to prevent seepage. If Pond #3 is too full, water overflows through "Outfall #4" into the Overflow Pond. Water from all of the Hangars also may flow into the Overflow Pond. There is visible "overflow scarring" at the Overflow Pond, indicating that water has overflowed into it and out from it through "Outfall #5". *See* Final Revised PA, pp. 29, B-19, D-4; Final SI, p. 6.

143.    PFC-contaminated wastewater was discharged to a leach field (at the location of the current golf course) at least from 1970 through 1978. The leach field was designed to be an

28

industrial waste drainage system and consisted of a settling tank, an oil water separator, and a gravel envelope leach field. PFC-contaminated effluent from the leach field would have entered the subsurface and groundwater. Revised Final PA, pp. 30-31; Final SI, p. 5.

144.    In addition, a pond formerly was located near the current location of Pond #3. An unknown amount of AFFF was discharged into that pond. *See* Revised Final PA, pp. 29, 41-42.

145.    At Building 104, which is near Pond #3, an unknown amount of AFFF was sprayed into the environment to "irrigate the wildlife." *Id*.at p. 31, D-5, Figure 3-10.

146.    The United States excavated Site #5 and dumped contaminated soil into Landfill 3. Landfill 3 was excavated and placed into another landfill. The landfills are located between Peterson AFB and Plaintiffs' well fields. *Id*. at p. 43.

147.    Several drums that contained AFFF were washed at an unknown location on Peterson AFB. *Id.* at pp. 10, 43.

148.    Until at least 2018, the United States continued to store at least 150,000 gallons of PFC-contaminated water on Peterson AFB, including in a tank, vehicles, and ponds.

149.    As additional information becomes available regarding the United States' handling, release, discharge, and disposal of PFCs at Peterson AFB, additional locations where AFFF was used, stored, discharged, and/or disposed of may be discovered. A Freedom of Information Act Request for additional information and documents was submitted on February 24, 2017, which has not yet been fully processed.  Plaintiffs reserve the right to incorporate additional or revised information as it is discovered.

**Release, Discharge and Disposal of PFCs Is Contaminating the Widefield and Windmill Gulch Aquifers**

150.    The United States preliminarily identified groundwater, surface water, and soil pathways where PFCs from AFFF used on Peterson AFB is or could be migrating to the Widefield and Windmill Gulch Aquifers. The United States analyzed groundwater, surface water, and soil samples from several locations: the current Fire Training Area, former fire training areas "Site 5" and "Site 8," Fire Stations #1 and #2, Pond #3 and its Overflow Pond, the golf course/former leach field, Building 104, and the off-Base landfills where the United States discharged and disposed of contaminated soil. Final SI, pp. 3-4. The United States also expanded the investigation and analyzed Pond #1 and areas identified as possible "paleochannels" where PFCs migrate off Peterson AFB. Final Expanded SI Field Sampling Plan, pp. 1-3.

151.    At the current Fire Training Area, PFCs were detected in the subsurface soil and groundwater. PFOA and PFOS in groundwater in one sample had a combined concentration of over 88,000 parts per trillion ("ppt"). Final SI, pp. 25-26, 29, 32, 36, A-20. EPA's health advisories set forth a maximum combined PFOA and PFOS exposure limit of 70 ppt.

152.    The United States concluded that "[u]se of AFFF at the current [Fire Training Area] has resulted in releases of [PFCs] to the environment," "apparently the result of overspray. . . ." *Id*. at pp. 7, 36. The United States also concluded that "migration of [PFC]-impacted groundwater offsite is possible and downgradient drinking water wells could be impacted." *Id*. at p. 32.

153.    At Site 5, Pond #3 and its Overflow Pond, the golf course/former leach field, and Building 104, PFCs were detected in the surface soil, subsurface soil, groundwater, sediment from the ponds, and surface water. Combined concentrations of PFOS and PFOA in groundwater

30

exceeded 980 ppt in one sample, and ranged from 79 ppt to 980 ppt. *Id*. at pp. 17-24, 28. Combined concentrations of PFOS and PFOA in the surface water in the ponds reached 826 ppt and 730 ppt. *Id*. at p. 24. Sediment samples from Pond #3 showed a combined concentration of PFOA and PFOS of over 370 micrograms per kilogram (µg/kg). *Id*. at p. 23. The United States concluded that "[u]se of AFFF at [Peterson AFB] has resulted in impacts to the environment at [these locations.]. *Id*. at p. 24. The United States also concluded that "[g]roundwater flows to the southwest … toward downgradient wells" and PFC-contaminated groundwater "may be flowing off base." *Id*. at p. 28.

154.    At Site 8, PFCs were detected in the surface soil, subsurface soil, and groundwater. *Id*. at pp. 9-11, 28.

155.    At Fire Station #1, PFCs were detected in surface soil, subsurface soil, and groundwater. Combined concentrations of PFOA and PFOS in groundwater at Fire Station #1 ranged from 77 ppt to 178 ppt. *Id*. at pp. 11 – 14. The United States concluded that "spray testing at Fire Station #1 has resulted in releases of [PFCs] to the environment." *Id*. at p. 14. The United States also concluded that "[g]roundwater flows to the southwest at Fire Station #1 and impacted groundwater may be flowing off base." *Id*. at p. 35.

156.    At Fire Station #2, PFCs were detected in surface soil, subsurface soil, and groundwater. A soil sample contained PFOS at 2,400 µg/kg. *Id*. at pp. 14-17, 29. The United States concluded that this PFOS detection in the soil "indicates the potential for possible impacts to groundwater," *Id*. at pp. 27-28, and "surface soil could impact groundwater at concentrations above the EPA [Health Advisory] creating a potential human exposure pathway," *Id*. at p. 31.

31

157.    The United States has not yet analyzed the extent of PFC contamination at numerous other locations where AFFF was used and escaped into the environment, including, but not limited to, Hangar 119, Hangar 121, Hangar 133, Hangar 140, Hangar 210, and Hangar 214, and other areas along the surface and groundwater pathways from Peterson AFB to the Widefield and Windmill Gulch Aquifers. The United States is conducting additional aquifer investigation work. Plaintiffs reserve the right to incorporate additional information regarding PFC contamination in soil and water as it is discovered.

**Specific and Mandatory Directives Prohibited the United States' Actions**

158.    The United States' discharges of PFCs violated mandatory laws, regulations, policies, and instructions, including a mandatory Executive Order and mandatory USAF Instructions.

159.    Air Force Instruction 32-1067, February 4, 2015, Civil Engineering: Water and Fuel Systems ("AFI 32-1067") contains mandatory instructions on how to handle wastewater and PFCs. (This Instruction superseded Air Force Instructions 32-1067 (Water Systems, April 3, 2013), 32-1066 (Plumbing Systems, October 17, 2007), 32-7041 (Water Quality Compliance, December 10, 2003), and 32-1069 (Gas Supply and Distribution, March 31, 1994)). Upon information and belief, AFI 32-1067 became effective on February 4, 2015 and currently remains in effect.

160.    AFI 32-1067 includes the following requirements:

a)   "Collect and manage industrial wastewater (e.g., wastewater discharge from aircraft hangar accidental release of fire fighting foam solution) as a hazardous waste per AFI 32-7042, *Waste Management*, if regulations or permit limits prohibit discharging such wastewater into domestic or other non-industrial sewer systems. . . .

32

Unless permitted, do not discharge substances to sanitary or storm systems that contain perfluorinated compounds (PFCs) like perfluorooctane sulfonic acid (PFOS), perfluorooctanoic acid (PFOA), perfluorononanoic acid (PFNA), perflourohexane sulfonic acid (PFHxS), perfluoroheptanoic acid (PFHpA), or perflurobutanesulfonic acid (PFBS). PFC-containing firefighting foams will not be discharged to a POTW [Publicly Owned Treatment Works] or FOTW. Release of firefighting solutions that contain PFCs from fire systems test activation and fire vehicle chemical discharges will be captured, contained, and disposed of to meet applicable regulatory requirements or applicable policy directives." ¶¶ 4.3.2 and 4.3.2.1.

b) "Firefighting solutions that do not contain PFCs may be discharged to the sanitary sewer after receiving approval from the receiving POTW or FOTW." ¶ 4.3.2.2.

c) "NPDES Permits. For installations located in the U.S., discharges of domestic wastewater require an NPDES permit from Federal or delegated state regulatory authorities. . . . Discharges to POTW Treatment Facilities. Installations that discharge to POTW are considered as indirect dischargers and are regulated by the POTW authority. Installations must comply with applicable POTW regulations, permits, and contractual agreements." ¶¶ 4.3.8. and 4.3.8.4.

d) "Accidental Releases of Fire Fighting Foam Solutions. Unless permitted, do not discharge substances that contain pentadecafluorooctanoic acid, perfluorooctanoic acid, perfluorocaprylic acid or perfluorooctanoate (PFOA) or perfluorooctanyl sulfonate, perfluoronoanoic acid (PFOS) [sic]. Release of firefighting solutions from fire systems test activation and fire vehicle chemical discharges will be captured, contained and

33

disposed to meet applicable regulatory requirements. Prior to discharge to the sanitary sewer; obtain approval of the receiving POTW or FOTW. If metered firefighting foam release to the sanitary sewer is not approved, then containerize and dispose following regulatory standards. Firefighting foam of all types will not be released to storm water conveyance structures." ¶ 5.6.

161.    Upon information and belief, from February 4, 2015 into at least 2018, the United States failed to capture or contain or treat firefighting foam containing PFCs, including PFOA and PFOS.

162.    Pursuant to the Federal Resource Conservation and Recovery Act, hazardous waste is subject to strict requirements for containment, storage, treatment and disposal.  42 U.S.C. § 6921, et seq.; 40 C.F.R. § 260, et seq.; C.R.S. § 25-15-308; 6 CCR 1007-3, Parts 260-279.

163.    As described above, PFCs were not captured, contained and disposed of as hazardous waste, but intentionally were released, discharged, and disposed of at numerous unpermitted locations at Peterson AFB, including Fire Stations #1 and #2, Hangar 119, Hangar 121, Hangar 133, Hangar 140, Hangar 210, Hangar 214, Fire Stations #1 and #2, Pond # 3, the Overflow Pond, and the golf course.

164.    Air Force Instruction 32-7041, Civil Engineering: Water Quality Compliance, December 10, 2003 (effective through February 4, 2015) ("AFI 32-7041") contains mandatory instructions on wastewater discharges, including the following:

a)    "Discharges to Publicly Owned Treatment Works (POTWs) . . . . Installations that discharge to permitted POTWs are considered as secondary dischargers and are regulated

by the POTW authority. They must comply with applicable POTW regulations, permits, and contractual agreements." ¶ 2.2.3.2.

b)   "Strictly control the discharge of industrial wastewater and other prohibited waste from entering into domestic wastewater or other non-industrial sewer systems and storm sewer systems. . . . Unauthorized discharges of certain types of industrial wastewaters through drains to domestic wastewater collection systems are prohibited. For discharges to POTWs, contact the facility manager for clarification. . . . Pretreat regulated industrial wastewater to acceptable levels before discharge to a domestic wastewater or other non-industrial sewer systems. Pretreat other industrial wastewater, such as toxic, flammable, and corrosive wastes to remove these characteristics before discharge into a domestic wastewater system. . . . Collect and manage industrial wastewater as a hazardous waste per AFI 32-7042, *Solid and Hazardous Waste Compliance*, if regulations prohibit discharging such wastewater into domestic wastewater or other non-industrial sewer systems and pretreatment is not practical." ¶¶ 2.9., 2.9.1., 2.9.3., and 2.9.4.

c)   Industrial wastewater is defined as "wastewater from industrial activities." Page 20. This Instruction acknowledges that "The Environmental Protection Agency defines 11 categories of industrial activities, some of which may apply to Air Force installations, including: (1) Air and ground transportation facilities. . . ." Page 22.

165.   Upon information and belief, from December 10, 2003 through February 4, 2015, the United States failed to comply with the mandatory obligations of AFI 32-7041. AFFF waste should have been treated as industrial wastewater because it was waste from Peterson AFB, an air and ground transportation facility.

35

166. The United States did not collect and manage PFCs as hazardous wastes. Instead, PFCs were discharged and disposed of into the environment, including into soil, surface water and groundwater.

167. Air Force Instruction 32-7041, Civil Engineering: Water Quality Compliance, May 13, 1994 (effective through December 10, 2003) ("AFI 32-7041") contains the following mandatory instructions:

a) "Industrial Wastewater. . . . Pretreat other industrial wastewater, such as toxic and corrosive wastes, before discharging it into a domestic wastewater system. . . . Strictly control the discharge of industrial wastewater by: . . . Keeping prohibited waste from entering domestic wastewater and other nonindustrial sewer systems; Pretreating regulated industrial wastewater to acceptable levels before discharge to a domestic wastewater or other nonindustrial sewer systems. . . . Collect and manage industrial wastewater as a hazardous waste per AFI 32-7042, *Solid and Hazardous Waste Compliance*, if: Regulations forbid discharging such wastewater into domestic wastewater or other nonindustrial sewer systems; Pretreatment is impossible." ¶¶ 2.8 – 2.8.3.

b) "Fire Training Facilities. Operate new fire training facilities as zero-discharge facilities. New facilities must: Protect groundwater; Include a groundwater monitoring system and double-lined basins with leak-detection systems." ¶¶ 2.9 – 2.9.1.

168. Upon information and belief, from May 13, 1994, through December 10, 2003, the United States failed to comply with AFI 32-7041. AFFF waste should have been treated as industrial wastewater. As industrial wastewater, USAF should have pretreated PFC-containing

AFFF before discharge into the CS-U sewer system, or should have collected and managed the AFFF as a hazardous waste.

169.     The United States discharged and disposed of AFFF containing PFC into the environment, including into soil, surface water and groundwater. PFC-contaminated water also was reused for golf course irrigation on Peterson AFB, without treatment.  Thus, the Air Force failed to either pretreat and deliver AFFF waste to a POTW pursuant to authorization or to manage the AFFF as hazardous waste.

170.     In addition, upon information and belief, the United States failed to operate new fire training facilities as zero-discharge facilities with groundwater monitoring systems and double-lined basins having leak-detection systems.

171.     Air Force Instruction 32-1067, Civil Engineering: Water Systems, March 25, 1994 (effective through April 3, 2013) ("AFI 32-1067") contains the following mandatory instructions:

a)     "Pollution Control: Operate and maintain water pollution control facilities according to AFM 91-32 and plant-specific O&M manuals which are required for each major facility. . . . Activities that require special attention include . . . fire training." ¶ 7.3.1.

b)     "A base standard wastewater treatment procedure is required to govern the discharge of industrial and nondomestic waste to the sanitary system by generating activities. Base Civil Engineering outlines procedures for discharging industrial wastes to the sanitary system and generators must follow these instructions. Instructions should describe pretreatment requirements, discharge procedures, and limitations for industrial waste. . . . Generators must use pollution control techniques in AFI 32-7080, *Pollution Prevention*

*Programs* (formerly AFR 19-15), to minimize pollutant discharges. Hazardous waste

may not be discharged to the collection system." ¶ 7.3.2.

172.    Upon information and belief, from March 25, 1994, through April 3, 2013, the United

States failed to comply with AFI 32-1067 by failing to have a base standard wastewater

treatment procedure for PFC-containing AFFF and by failing to handle PFCs as hazardous waste.

173.    Air Force Instruction 32-7042, Civil Engineering: Waste Management, November 7,

2014, revised February 8, 2017 ("AFI 32-7042"), contains the following mandatory instruction:

a)    "Inherent in the mission of the AF are the associated environmental responsibilities of

protecting human health and the environment and ably managing the natural resources

whose care has been entrusted to the AF. . . . Where environmentally damaging materials

are used, their use is minimized. If the use of such materials cannot be avoided, the spent

material or waste is reused or recycled whenever feasible. As a last resort, spent material

or waste that cannot be reused or recycled is disposed of in an environmentally safe

manner, consistent with the requirements of all applicable laws . . . ." ¶ 1.1.

174.    Executive Order 11507, Prevention, Control, and Abatement of Air and Water Pollution

at Federal Facilities, February 4, 1970 (effective through December 17, 1973) ("EO 11507")

required federal agencies to:

> ensure that all facilities under their jurisdiction are designed,
> operated, and maintained so as to meet the following requirements:
> . . . . No waste shall be disposed of or discharged in such a manner
> as could result in the pollution of ground water which would
> endanger the health or welfare of the public.

§ 4.a.5. Upon information and belief, from 1970 to 1973 and from 2014 to 2018, the United

States discharged and disposed of PFC waste on Peterson AFB in violation of AFI 32-7042 (Rev.

2017) and EO 11507, by discharging AFFF containing PFCs to soil, surface water, and groundwater which resulted in groundwater pollution that endangers the health and welfare of the public.

175.    Despite a FOIA Request, Air Force Instruction 32-1067, Civil Engineering: Water Systems, April 3, 2013, has not been made available to Security. Upon information and belief, this April 3, 2013 Instruction contains mandatory rules and directives that became effective on April 3, 2013, that remained in effect through February 4, 2015, and that are substantially similar to the May 13, 1994 and February 4, 2015 versions of AFI 32-1067. Pending discovery, Plaintiffs allege the same facts and allegations as they did for the May 13, 1994 and February 4, 2015 versions of AFI 32-1067.

176.    Despite a FOIA Request, the following instructions also have not been made available to Security: AFR 91-9, December 1, 1989 and AFR 91-10, January 2, 1990. Upon information and belief, these instructions are predecessors of AFI 32-1067 and contain similar instructions. Pending discovery, Plaintiffs allege the same facts and allegations as they did for the May 13, 1994 and February 4, 2015 versions of AFI 32-1067.

177.    Despite a FOIA Request, no instructions, manuals, or other mandatory directives that are specific to Peterson AFB have been made available to Security.

178.    As additional information becomes available regarding the United States' handling, release and disposal of PFCs at Peterson AFB, additional instructions, rules, manuals, and directives may be implicated that are not specifically identified or cited in this Complaint. Plaintiffs reserve the right to incorporate additional rules, manuals, instructions, directives, or the like, as additional information is discovered.

## The United States' Actions Were Not Grounded in Policy

179.     The United States' release and disposal of PFCs was not based on considerations of public policy, including social, economic, or political policy.

180.     The foregoing directives forbid discharges of PFCs to the environment and establish requirements for handling these wastes. They granted no authority to balance social, economic, or political concerns and none exist. Moreover, the prohibitions on discharges to the environment are absolute and require no balancing of factors. Thus, none of the United States' actions were protected policy determinations.

181.     There was and is no policy benefit from handling and disposing of AFFF containing PFCs in violation of mandatory directives, for contaminating groundwater with PFCs, or contaminating Plaintiffs' water supply, which provided drinking water to approximately 19,000 people.

182.     There is no policy benefit from trespassing on Plaintiffs' land and water rights, acting negligently, and creating a nuisance through releases of PFCs into Plaintiffs' water supply.

183.     Properly handling, disposing of, and/or treating PFCs posed and poses no threat to national security or Peterson AFB; and, in fact, was and is expressly required by the directives, discussed above.

## Release, Discharge, and Disposal of PFCs Is Contaminating the Widefield Aquifer

184.     The Widefield and Windmill Gulch Aquifers and the Fountain Creek Watershed are contaminated with numerous types of PFCs. The Colorado Department of Public Health and Environment (CDPHE), the agency tasked with regulation of water quality in Colorado, reports that these include PFOS, PFOA, PFBS, PFHpA, PFHxS, and PFNA.

40

185.    Plaintiffs have discovered PFOS, PFOA, and other PFCs in samples of groundwater collected from all of their wells.

186.    For example, levels of PFOA, PFOS, and PFHxS have been detected in water withdrawn from Plaintiffs' wells at the concentrations shown in Table 1, below.

**Table 1**

| Well | Date | PFHxS (ppt) | PFOA (ppt) | PFOS (ppt) |
|------|------|-------------|------------|------------|
| CS13 | 1/25/2016 | 440 | 90 | 150 |
| FV4 | 2014 average | 180 | 50 | 60 |
| R1 | 2014 average | 315 | 40 | 45 |
| R2 | 2014 average | 335 | 60 | 55 |
| S2 | 2014 average | 210 | 50 | 40 |
| S4 | 2014 average | 125 | 30 | 95 |
| S7 | 2014 average | 135 | 30 | 90 |
| S8 | 2014 average | 90 | 20 | 40 |
| S9 | 2014 average | 195 | 45 | 75 |
| S10 | 2014 average | 135 | 40 | 90 |
| S11 | 2014 average | 95 | 30 | 95 |
| S12 | 1/25/2016 | 140 | 30 | 100 |
| S13 | 1/25/2016 | 400 | 90 | 160 |
| S14 | 1/25/2016 | 640 | 60 | 510 |
| S15 | 2014 average | 260 | 65 | 20 |

| Well | Date | PFHxS (ppt) | PFOA (ppt) | PFOS (ppt) |
|------|------|-------------|------------|------------|
| S16 | 2014 average | 360 | 65 | 55 |
| Tank for Wells V4, V5, V7, V8 | 2014 average | 370 | 70 | 60 |
| Yucatan Tank Pump Station Blend | 2014 average | 75 | 7.5 | 40 |
| W8 | 2014 average | 330 | 80 | 580 |
| W9 | 2014 average | 325 | 75 | 975 |
| W12 | 2014 average | 240 | 45 | 595 |
| Water Treatment Plant TP042 | 2014 average | 515 | 85 | 175 |

187.    In May 2016, the EPA issued health advisory exposure limits of 70 ppt for PFOA and PFOS, either alone or combined. Most of the samples listed in Table 1 exceeded 70 ppt for PFOA, PFOS, or a combination of both.

188.    Upon information and belief, soil, plants, and animals in the Fountain Creek Watershed and in Security's service area also contain PFCs due to the contaminated groundwater.

**PFCs, including PFOA and PFOS, Threaten Human Health**

189.    Humans may absorb PFCs from drinking water, and PFCs accumulate primarily in the blood stream, kidneys and liver.

190.    PFCs are extremely persistent and bioaccumulate, or build up, in the human body. Even a short-term exposure results in a body burden that persists for years and can increase with additional exposures later.

191.    The EPA projects that PFOS has a half-life of 5.4 years, PFOA has a half-life of 2.3 – 3.8

years, and PFHxS has a half-life of 8.5 years, in humans. (A half-life is the amount of time it

takes for fifty percent of the contaminant to leave the body.) Because of these long half-lives, the

EPA expects that "it can reasonably be anticipated that continued exposure could increase body

burdens to levels that would result in adverse outcomes." EPA, Long-Chain Perfluorinated

Chemicals (PFCs) Action Plan, pp. 1, 8-9, December 30, 2009.

192.    The EPA Health Advisories have identified a number of health risks associated with

exposure to PFCs. Studies show associations between increased PFOA and PFOS levels in blood

and an increased risk of several health effects, including high cholesterol levels, changes in

thyroid hormone, ulcerative colitis (autoimmune disease), pre-eclampsia (a complication of

pregnancy that includes high blood pressure), and kidney and testicular cancer.

193.    The EPA also classified PFOA and PFOS as having suggestive evidence of carcinogenic

potential in humans. EPA, Health Effects Support Document for Perfluorooctanoic Acid

(PFOA), p. 3-159, May 2016; EPA, Health Effects Support Document for Perfluorooctane

Sulfonate (PFOS), p. 3-114, May 2016.

194.    The EPA cited reports from the Organization for Economic Co-operation and

Development ("OECD") in the May 2016 Health Advisories. The OECD is an international

intergovernmental organization that meets, discusses issues of concern, and works to respond to

international problems.

195.    According to a published OECD Report, for mammalian species, PFOA and its salts have

been found to cause cancer in rats and adverse effects on the immune system in mice. In

addition, PFOA and its salts can display reproductive or developmental toxicity in rodents at

43

moderate levels of exposure, and moderate to high systemic toxicity in rodents and monkeys following long-term exposure by the oral route. OECD, Report of an OECD Workshop on Perfluorocarboxylic Acids (PFCAs) and Precursors, p. 21, June 18, 2007. The OECD also concluded in a Hazard Assessment that PFOS is persistent, bioaccumulative and toxic to mammalian species. OECD, Hazard Assessment of Perfluorooctane Sulfonate (PFOS) and Its Salts, p. 5, November 21, 2002.

196.    The EPA also cited findings from a C8 Science Panel and Health Project in the May 2016 Health Advisory for PFOA. The C8 Science Panel was formed out of a class action settlement related to PFOA contamination of groundwater from a manufacturing facility in West Virginia. The C8 Health Project is the largest study evaluating human exposure and health endpoints for PFOA; the study included more than 65,000 people in Mid-Ohio Valley communities who were exposed to PFOA for longer than 1 year. The C8 Science Panel consisted of three epidemiologists and its goal was to assess the links between PFOA and a number of diseases. The C8 Science Panel carried out a series of exposure and health studies between 2005 and 2013; information was gathered through questionnaires and blood samples from the individuals who had drinking water that was contaminated with PFOA and previously published studies were also reviewed as part of the project.

197.    The C8 Science Panel released reports and found probable links between exposure to PFOA and six diseases: high cholesterol, ulcerative colitis, thyroid disease, testicular cancer, kidney cancer, and pregnancy-induced hypertension.

198.    The U.S. Agency for Toxic Substances and Disease Registry ("ATSDR") states in its 2018 draft Toxicological Profile that studies suggest associations between PFOA and PFOS

exposure and liver damage, pregnancy-induced hypertension, increased cholesterol, increased risk of thyroid disease, increased risk of asthma, increased risk of decreased fertility, low birth weight and increases in testicular and kidney cancers.

199.   In addition, CDPHE advises on its website that "[r]ecent information has strengthened the link between exposure to PFOA and PFOS and developmental effects including low birth weight and accelerated puberty. Low birth weight can contribute to many long-term health and behavioral risks, including diabetes and obesity. Some human studies show that increased exposure to PFOA and PFOS might increase the risk for certain health problems such as changes in blood cholesterol, liver enzymes, and uric acid levels, which may be linked with an elevated risk of heart disease, liver disease or high blood pressure." CDPHE, PFCs – Health Recommendations.

200.   CDPHE believes that PFHpA has the potential to have similar effects to PFOA and PFOS. CDPHE, EPA Health Advisory, https://www.colorado.gov/pacific/cdphe/PFCs/health.

201.   If PFOA and PFOS levels exceed the Health Advisory levels, CDPHE states that "actions [should be initiated] to protect humans from coming in contact with the substance." CDPHE, PFCs – Health Recommendations, https://www.colorado.gov/pacific/cdphe/PFCs/health.

202.   The Colorado Solid and Hazardous Waste Commission ("Commission") added PFOA and PFOS and their anions to Colorado's list of hazardous constituents in 6 CCR 1007-3, Part 261, Appendix VIII. The Colorado Hazardous Waste Regulations allow substances to be added to the list of hazardous constituents if they have been shown in scientific studies to have toxic, carcinogenic, mutagenic or teratogenic effects on humans or other life forms. The Commission

45

found that PFOS and PFOA have been shown in scientific studies to be toxic and potentially

carcinogenic to humans, satisfying the regulatory criteria for listing.

203. Upon information and belief, the PFCs with carbon chains longer than that of PFOA and

PFOS (i.e., longer than eight) are even more dangerous to human health. OECD, Report of an

OECD Workshop on Perfluorocarboxylic Acids (PFCAs) and Precursors, p. 21, June 18, 2007.

PFNA, which contains a carbon chain longer than PFOA and PFOS has been found in some

sampling of the Widefield and Windmill Gulch Aquifers.

204. To date, no known studies and assessments of risks associated with PFCs have taken into

account any additive and synergistic toxic effects of mixtures of these compounds. To date,

mixtures of at least PFOA, PFOS, PFNA, PFBS, PFHxS, and PFHpA have been found in

sampling of the Widefield and Windmill Gulch Aquifers.

205. Notwithstanding the foregoing actions and determinations by EPA and CDPHE, neither

PFAS nor PFOA, nor other PFCs, have been listed as, or otherwise determined to be, hazardous

waste regulated by the Resource Conservation and Recovery Act. Thus, the mandatory directives

requiring Air Force to treat AFFF containing PFC as hazardous waste are internal requirements,

not RCRA compliance obligations.

206. Upon information and belief, Defendants knew or should reasonably have known about

the health effects from PFCs, discussed above, at the time they developed, manufactured,

marketed, sold, distributed, or used PFC-based AFFF.

**PFCs, including PFOA and PFOS, Threaten the Environment**

207. PFCs are extremely persistent in the environment because they are chemically and

biologically stable and are resistant to environmental degradation. The EPA projects that PFOS

has a half-life in water of over 41 years, and PFOA has a half-life in water of over 92 years. And, "PFOA and PFOS are considered to be resistant to degradation in soil." EPA, Long-Chain Perfluorinated Chemicals (PFCs) Action Plan, p. 1, December 30, 2009.

208.    PFCs also are particularly mobile in soil and water, readily absorbed into groundwater, and can migrate across long distances.

209.    Additionally, non-human receptors exposed to the contaminated environment are at significant risk of harm. PFOA is persistent and can cause adverse effects in laboratory animals, including cancer and developmental and systemic toxicity. PFOS is persistent, bioaccumulative and toxic to mammalian species. PFOS is linked to developmental, reproductive, and systemic toxicity. PFOA and PFOS are also linked to:

(a) immune system impacts on certain animal species (which are often used as indicators of the overall health of an ecosystem);

(b) elevated mortality in unexposed progeny of freshwater macro-invertebrates with exposure in the parental generation;

(c) disruption of the endocrine system in wildlife; and

(d) liver toxicity in animals.

210.    PFOA also is readily taken up by plants, including wild plants as well as crops grown on contaminated soil, and bioaccumulates in the food chain.

211.    These impacts impair use of Plaintiffs' Widefield and Windmill Gulch Aquifer water rights for irrigation of food crops or other uses that could expose humans and animals to PFCs.

212.    Further, since PFOA and PFOS are not the only PFCs in the environment, mixtures of PFCs raise the likelihood of additive and synergistic impacts on non-human receptors. It is likely

that one or more other PFCs possess similar characteristics and pose similar threats of adverse health effects as set forth above for PFOA and PFOS.

213.    Upon information and belief, Defendants knew or should reasonably have known about the environmental effects from PFCs, discussed above, at the time they developed, manufactured, marketed, sold, distributed, or used PFC-based AFFF.

## The Threats from PFCs are Ongoing

214.    The PFC contamination caused by Defendants is not contained and continues to spread into Plaintiffs' property and groundwater supplies.

215.    If the Widefield and Windmill Gulch Aquifers and the contaminated soil are not remediated, PFC contamination will continue to impact Plaintiffs' property and water rights far into the future because PFCs resist degradation and are persistent and mobile in water and soil.

## Plaintiffs' Have Been Damaged by Defendants Actions

216.    The PFC contamination prevents Plaintiffs from fully utilizing their property, including their water rights and wells in the Widefield and Windmill Gulch Aquifers.

217.    Due to the PFC contamination, Security stopped using its wells in 2016 and cannot currently utilize its groundwater and other property rights. Security has the right to use in excess of 840 million gallons of water per year (approximately 2,583 acre-feet per year) from the Widefield and Windmill Gulch Aquifers. This groundwater historically provided about half of Security's total water supply requirements.

218.    Due to PFC contamination of its groundwater, Security spent in excess of $6 million from 2016 to the present to purchase and transport alternate and supplemental sources of water through the FVA conduit, SDS pipeline, and CS-U connection, to shut down its wells in the

48

Widefield and Windmill Gulch Aquifers, to construct the CS-U connection, to construct alternate internal water delivery configurations so that water from the surface water supplies from the three pipelines could be distributed to Security's customers, to monitor and sample for PFCs, to repair reputational damage, and to otherwise respond to the PFCs contamination.

219.    PFCs are damaging, and will continue to damage, Security's water and property because they will persist for decades in water and soil and are bioaccumulating in plants and organisms.

220.    The PFC contamination prevents the Foundation from fully utilizing its property, including its water rights and wells in the Widefield Aquifer. As a result of contamination of this water and farm land by Defendants, the Foundation has suffered and will suffer damages.

221.    Due to the PFC contamination, the Foundation cannot currently utilize its water and property rights for growing produce and vegetables, for domestic purposes or for leasing water to municipalities. The Foundation has the right to use in excess of 162 million gallons of water per year (500 acre-feet per year) from the Widefield Aquifer for crop irrigation, and to lease in excess of 366 million gallons of water per year to municipalities, including Security. Under the current lease, the Foundation leases 1,350 acre-feet of water per year to Security and Widefield in perpetuity, who sublease a portion of the water rights to the City of Fountain. Those leased water rights have not been able to be used for municipal purposes due to the PFC contamination caused by Defendants. Moreover, Security and Widefield might not remain liable for the lease payments even if the contaminated water is filtered to remove PFCs.

222.    The Foundation's water and property rights have been impaired and devalued by the PFC contamination. Due to PFC contamination of its groundwater, the Foundation has lost, and

reasonably anticipates losing, in excess of $7,000,000, including lost rents and crops, repair of reputational damage, and costs to mitigate and treat the PFC contamination.

223.    PFCs are damaging and will continue to damage the Foundation's water and property because they will persist for decades in water and soil, and are bioaccumulating in plants and organisms.

## FTCA CLAIMS

### FTCA Statutory Background

224.    Under the FTCA, the government is liable "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, "in accordance with the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b)(1). Courts resolve questions of liability under the FTCA in accordance with the law of the state where the tortious activity took place. *Hoery v. United States*, 324 F.3d 1220, 1222 (10th Cir. 2003).

## FIRST CLAIM FOR RELIEF

### TRESPASS

### (United States)

225.    Plaintiffs incorporate all averments in this Complaint as if restated fully herein.

226.    The United States has trespassed, and continues to trespass, on Plaintiffs' property, including Plaintiffs' water rights, by contaminating Plaintiffs' property with persistent, toxic, and bioaccumulative PFCs.

227.    In Colorado, a defendant is liable for trespass when the defendant permits "a physical intrusion upon the property of another without the proper permission from the person legally entitled to possession of that property." *Hoery v. United States*, 64 P.3d 214, 217 (Colo. 2003).

"The intrusion can occur when an actor . . . causes something else to enter" the property, including land and groundwater. *Id.*; *Antolovich v. Brown Grp. Retail, Inc.*, 183 P.3d 582, 602 (Colo. App. 2007) (plaintiffs alleged that defendant caused pollutant to enter plaintiffs' soil and groundwater); *see also* CJI-Civ 4th, Civil 18:1 and 18:2. Trespass may be a permanent or continuing tort. For continuing trespass, the claim continues to accrue as long as tortious conduct continues. *Hoery*, 324 F.3d at 1222.

228.     The United States intentionally sprayed, dumped, discharged, or disposed of AFFF containing PFCs on open ground, soil, and water at Peterson AFB; "irrigate[d] the wildlife" and the Peterson AFB golf course with water containing PFCs; spilled PFCs; stored PFC-contaminated water in ponds, containers, and vehicles on Peterson AFB where it leaked and leached into the environment; and otherwise discharged PFCs into the environment.

229.     PFCs from Peterson AFB migrated from Peterson AFB through groundwater to the Widefield and Windmill Gulch Aquifers and property owned by Plaintiffs, including the property on which their wells are, or could be, located and into the groundwater for which they possess decreed water rights.

230.     The United States' intentional release and disposal of PFC waste has caused a trespass on Plaintiffs' property and water rights.

231.     The continued migration to, and existence of, PFCs beneath Plaintiffs' property and in Plaintiffs' water rights in the Widefield and Windmill Gulch Aquifers, constitute a continuing trespass.

232.     The United States holds no right to possess Plaintiffs' property and water rights.

51

233.    The United States did not have Plaintiffs' permission to place PFCs upon, in, or beneath Plaintiffs' property, including the lands where Plaintiffs' wells are, or could be, located and the water rights owned by Plaintiffs.

234.    Upon information and belief, the United States knew, or should have known and knows that PFCs migrated or would migrate downgradient into the Widefield and Windmill Gulch Aquifers, and into Plaintiffs' real property and water rights.

235.    The United States intentionally and unreasonably failed to remediate or stop the PFC contamination from spreading to the Plaintiffs' property and water supplies.

236.    The intrusion into Plaintiffs' property and water rights of PFCs caused Security to suffer in excess of $6 million in damages, including the costs of obtaining, providing, and delivering alternate water supplies and delivery systems; costs of sampling and monitoring; and other response or remediation costs. Security expects to incur in excess of an additional $8.5 million in future liabilities and restoration costs in order to remove PFCs from its groundwater.

237.    The intrusion of PFCs into the Foundation's property and water rights caused, and is reasonably anticipated to cause, the Foundation to suffer in excess of $7 million in damages, including loss of rents and revenue; loss of crops; loss of an ability to carry on an economic enterprise on and with its property; cost of treating its water in order to beneficially use it; and other response or remediation costs.

238.    As a direct and proximate result of the trespass by the United States, the Plaintiffs' water rights and property are being damaged and destroyed, causing economic loss.

## SECOND CLAIM FOR RELIEF

## NUISANCE

### (United States)

239.     Plaintiffs incorporate all averments in this Complaint as if restated fully herein.

240.     The United States created and continues to cause a nuisance to Plaintiffs by unreasonably and substantially interfering with Plaintiffs' use and enjoyment of their property and water rights by contaminating them with PFCs.

241.     In Colorado, a defendant is liable for nuisance when it creates a substantial invasion of a plaintiff's interest in the use and enjoyment of its property. *Hoery,* 64 P.3d at 218. The invasion may be intentional and unreasonable. To be unreasonable, an interference must be significant enough that a normal person in the community would find it offensive, annoying, or inconvenient. *Pub. Serv. Co. of Colorado v. Van Wyk*, 27 P.3d 377, 391 (Colo. 2001). The invasion also may be unintentional and negligent or reckless. *Id.* Conduct constituting a nuisance can include indirect or physical conditions created by the defendant that cause harm. *Hoery,* 64 P.3d at 218. Nuisance may be a permanent or continuing tort. For continuing nuisance, the claim continues to accrue as long as tortious conduct continues. *Id*.

242.     The United States substantially invaded Plaintiffs' interests in the use and enjoyment of their property and water rights, because the United States directly and proximately caused and is causing the contamination of Plaintiffs' property and water rights, with extremely persistent, toxic, and bioaccumulative PFCs.

243.     The United States permitted and is permitting PFCs to spread beyond Peterson AFB, travel through the Fountain Creek Watershed, and invade Plaintiffs' property and water rights.

244.    The PFC contamination from the United States' actions have contaminated Plaintiffs'

water supplies, which they rely on for municipal, including drinking water, and agricultural

irrigation uses. Due to the contamination, Plaintiffs no longer can use the water.

245.    The United States' interference is intentional and unreasonable. The United States

intentionally and unreasonably discharged PFC-contaminated wastewater by spraying and

dumping PFCs on open ground, soil, and water at Peterson AFB, irrigating its golf course and

wildlife with PFC-contaminated water, storing PFC-contaminated water in unlined ponds where

it leaked into soil and groundwater, failing to contain and handle PFC-contaminated wastewater

as hazardous waste, and discharging PFC-contaminated wastewater.

246.    The United States' intentional discharges were made knowing that the discharges would

contaminate groundwater and result in PFCs migrating to Plaintiffs' properties and water rights,

and continued after the United States knew the discharges had interfered with the use of

Plaintiffs' properties.

247.    In the alternative, the United States' interferences are negligent because United States

should have reasonably foreseen that its discharges of AFFF would contaminate groundwater,

and Plaintiffs' properties and water rights, with PFCs.

248.    The continued migration to, and existence of, PFCs beneath Plaintiffs' property and in its

decreed groundwater supplies as a result of the United States' actions and omissions, have

compelled Plaintiffs to forego use of their valuable groundwater rights, which is offensive,

annoying, and inconvenient, and constitutes a continuing nuisance.

249.    The intrusion of PFCs into Security's property and water rights caused Security to suffer

in excess of $6 million in damages in the costs of securing and delivering alternate water

supplies; costs of sampling and monitoring; and other response or remediation costs. Security expects to incur in excess of an additional $8.5 million in future costs to remove PFCs from its groundwater.

250.    The intrusion into the Foundation's property and water rights of PFCs caused, and is reasonably anticipated to cause, the Foundation to suffer in excess of $7 million in damages, including loss of rents and revenue; loss of crops; loss of an ability to carry on an economic enterprise on and with its property; cost of treating its water in order to beneficially use it; and other response or remediation costs.

251.    As a direct and proximate result of the conduct and other tortious acts and omissions of the United States, Plaintiffs' water and property are being damaged and destroyed, causing economic loss.

### THIRD CLAIM FOR RELIEF

### NEGLIGENCE

### (United States)

252.    Plaintiffs incorporate all averments in this Complaint as if restated fully herein.

253.    The United States negligently discharged and disposed of PFCs and is failing to remediate PFC contamination.

254.    In Colorado, a defendant is negligent when the defendant owes a duty to the plaintiff, the defendant breaches that duty, and the defendant's breach causes injury to the plaintiff. *Casebolt v. Cowan,* 829 P.2d 352, 356 (Colo. 1992).

255.    The United States owed, and still owes, a duty to Plaintiffs' to maintain its operations and property in a safe manner and to prevent a dangerous condition on the United States' property

55

from escaping its land and causing damage to Plaintiffs' neighboring land. *See Moore v. Standard Paint & Glass Co. of Pueblo*, 358 P.2d 33, 36 (Colo. 1960); *Haas v. Lavin*, 625 F.2d 1384, 1387 (10th Cir. 1980).

256.    The United States' standard of care is defined, at least in part, by the numerous directives that required special handling and disposal of AFFF containing PFCs.

257.    The United States breached its duty to manage its operations and property as a reasonably careful person by mishandling and discharging to the environment AFFF containing PFCs.

258.    The United States also breached its duty by failing to follow the standards and requirements of numerous directives that required special handling and disposal of AFFF containing PFCs.

259.    The negligently discharged AFFF has contaminated the Widefield and Windmill Gulch Aquifers and Plaintiffs' property and water rights.

260.    The United States' negligence has caused Security to suffer in excess of $6 million in damages in costs of securing and delivering alternate water supplies; costs of sampling and monitoring; and other response or remediation costs. Security expects to incur in excess of an additional $8.5 million in future costs to remove PFCs from its groundwater.

261.    The United States' negligence has caused the Foundation to suffer in excess of $7 million in past and reasonably anticipated future damages, including loss of rents and revenue; loss of crops; loss of an ability to carry on an economic enterprise on and with its property; cost of treating its water in order to beneficially use it; and other response or remediation costs.

262.    As a direct and proximate result of the conduct and other negligent acts and omissions of the United States, Plaintiffs' water and property are being damaged and destroyed, causing economic loss.

## FOURTH CLAIM FOR RELIEF

## NEGLIGENCE

### (Manufacturers)

263.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

264.    Manufacturers had a duty to manufacture and/or market, distribute and sell their AFFF in a manner that avoided contamination of the environment, including municipal and agricultural water supplies, and avoided harm to those who foreseeably would come into contact with its chemical components.

265.    Manufacturers knew or should have known that the manufacture of AFFF containing PFCs was hazardous to human health and the environment.

266.    Manufacturers further knew or should have known that it was unsafe and/or unreasonably dangerous to manufacture AFFF using PFCs because it was highly probable that the chemicals would migrate into the environment, including the environment at Air Force bases such as Peterson AFB, and contaminate groundwater used as public and agricultural water supply.

267.    Knowing of the dangerous and hazardous properties of the AFFF, Manufacturers had the duty to warn of the hazards of consuming water containing PFCs.

268.    Plaintiffs were foreseeable victims of the harm caused by the chemical components of Manufacturer's AFFF.

269.    Manufacturers negligently designed, engineered, developed, fabricated and tested AFFF and PFCs, negligently manufactured and/or distributed and sold AFFF, and negligently created the associated warnings and instructions, and thereby failed to exercise reasonable care to prevent the AFFF and its components from presenting an unreasonable risk of harm to the health of persons who would come in contact with them and to prevent contamination of public and agricultural water supplies, including Plaintiffs' water supplies.

270.    Manufacturers' negligent design, engineering, development, fabrication, testing, warnings and instructions constitute a pattern of continuous and ongoing tortious conduct.

271.    Upon information and belief, Manufacturers have and continue to engage in discrete acts of negligent design, engineering, development, fabrication, testing, warnings and instructions to the date of this Amended Complaint.

272.    Upon information and belief, Manufacturers have not recalled their AFFF product to the date of this Amended Complaint.

273.    As a result of Manufacturers' breaches of their legal duties, the groundwater beneath and around Peterson AFB, including groundwater in the Widefield and Windmill Gulch aquifers that constitute Plaintiffs' water rights, has been, and continues to be, contaminated with PFCs.

274.    Manufacturers' negligent manufacture and/or distribution and sale of AFFF, and their negligent misrepresentation and failure to warn, caused, is causing, and will cause damage to Plaintiffs' property interests due to the presence of PFCs in their water supply.

275.    As a result of Manufacturers' negligent, reckless and/or intentional acts and omissions alleged herein, groundwater in the Widefield and Windmill Gulch aquifers has been contaminated with PFCs.

276.    Manufacturers' acts were willful, wanton or reckless and conducted with a reckless indifference to the rights and property of Plaintiffs.

277.    As a result of Manufacturer's conduct and the resulting contamination of the Widefield and Windmill Gulch aquifers by the chemical components of the Manufacturers' AFFF, the Plaintiffs have or will incur costs to secure and deliver alternate water supplies, including costs of installing pipelines and other infrastructure and of assuring water quality through the delivery system; costs of sampling and analyzing groundwater and other media; costs of responding to public inquiries and managing public relations regarding the contamination; costs of treatment of groundwater, including treatment systems, operations and maintenance, and treatment media management and disposal; loss of rents and revenue; loss of crops; loss of an ability to carry on an economic enterprise; and other response costs.    In addition, the Plaintiffs have lost the value and marketability of their property and property rights, including appropriated water rights.  As a result of the contamination, Plaintiffs have lost use and enjoyment of their properties, including appropriated water rights, and have suffered annoyance, discomfort, and inconvenience.

### FIFTH CLAIM FOR RELIEF

### DEFECTIVE PRODUCT – FAILURE TO WARN

### (Manufacturers)

278.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were fully set forth herein.

279.    At all times relevant, Manufacturers were in the business of, among other things, manufacturing and/or selling and distributing AFFF.

280.    As manufacturers and/or sellers and distributors of a commercial product, the Manufacturers had a duty to provide adequate, full instructions and warnings about the risks of injury posed by their products.

281.    Manufacturers knew or should have known that the foreseeable storage, use, release and disposal of the AFFF that they manufactured and/or sold and distributed to the Air Force, including at Peterson AFB, had the likelihood of entering the groundwater and household water supplies, to persist there for decades, and to cause risk to human health and the environment and harm to property.

282.    At the time of the design, manufacture and/or distribution and sale of the AFFF, Manufacturers knew or should have known of the dangerous properties of their AFFF which contained PFCs.

283.    Upon information and belief, the Manufacturers at significant times failed to provide sufficient instructions and warnings to the users of AFFF, including the Air Force, that use and release of Manufacturers' AFFF to the environment would result in the contamination of groundwater, including drinking water and agricultural water supplies, and risks to those exposed to the water supplies.

284.    Upon information and belief, the Manufacturers at significant times failed to provide adequate instructions and warnings to the users of the dangers to human health and the environment if their AFFF was permitted to contaminate the groundwater and soil.

285.    Manufacturers' failure to provide adequate instructions and warnings constitute a pattern of continuous and ongoing tortious conduct.

60

286.    Upon information and belief, Manufacturers have and continue to fail to provide adequate instructions and warnings to the date of this Amended Complaint.

287.    Upon information and belief, Manufacturers have not recalled their AFFF product to the date of this Amended Complaint.

288.    Adequate instructions and warnings would have reduced or avoided the foreseeable risks of harm posed by the use and release the AFFF.

289.    Had Manufacturers provided adequate warnings, the Air Force would not have used AFFF containing PFCs or would have taken measures to store, use, discharge, and dispose of AFFF so as to reduce or eliminate groundwater and soil contamination by the components of AFFF.

290.    As a result of Manufacturers' failure to warn against the likelihood of contamination from their AFFF, the groundwater in the Widefield and Windmill Gulch aquifers has been contaminated with the chemical components of AFFF including PFCs.

291.    As a direct and proximate result of Manufacturers' failure to warn of the environmental and health impacts caused by the chemical components of their AFFF and the release thereof, the groundwater in the Widefield and Windmill Gulch aquifers became contaminated with PFCs, causing loss of Plaintiffs' use and benefit of their appropriated water rights and the incurrence, or reasonably certain incurrence, of costs to treat the groundwater and soil on their lands.

292.    Manufacturers' failure to provide adequate warnings or instructions renders Manufacturers' AFFF a defective product.

293.    As a result of Manufacturers' manufacture and/or distribution and sale of a defective product, Manufacturers are strictly liable for damages to the Plaintiffs.

61

294.    Manufacturers' acts were willful, wanton or reckless and conducted with a reckless indifference to the rights of Plaintiffs.

295.    As a result of Manufacturer's conduct and the resulting contamination of the Widefield and Windmill Gulch aquifers by the chemical components of the Manufacturers' AFFF, the Plaintiffs have or will incur costs to secure and deliver alternate water supplies, including costs of installing pipelines and other infrastructure and of assuring water quality through the delivery system; costs of sampling and analyzing groundwater and other media; costs of responding to public inquiries and managing public relations regarding the contamination; costs of treatment of groundwater, including treatment systems, operations and maintenance, and treatment media management and disposal; loss of rents and revenue; loss of crops; loss of an ability to carry on an economic enterprise; and other response costs.  In addition, the Plaintiffs have lost the value and marketability of their property and property rights, including appropriated water rights.  As a result of the contamination, Plaintiffs have lost use and enjoyment of their properties, including appropriated water rights, and have suffered annoyance, discomfort, and inconvenience.

## SIXTH CLAIM FOR RELIEF

## DEFECTIVE PRODUCT - DESIGN DEFECT

### (Manufacturers)

296.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

297.    At all times relevant, Manufacturers were in the business of, among other things, manufacturing, selling and/or distributing AFFF.

298.    It was foreseeable that toxic chemicals from the AFFF that Manufacturers manufactured and/or sold and distributed would enter the water supplies of the Plaintiffs and cause damage to their property interests, including appropriated water rights.

299.    Alternative designs and formulations of AFFF were available, technologically feasible and practical, and would have reduced or prevented the reasonably foreseeable risks of harm to Plaintiffs.

300.    Further, design, formulation, manufacture and/or distribution and sale of a product containing toxic chemicals that were so toxic and so mobile and persistent in the environment was unreasonably dangerous.

301.    The AFFF manufactured and/or distributed and sold by Manufacturers was defective in design because the foreseeable risk of harm posed by the AFFF could have been reduced or eliminated by the adoption of a reasonable alternative design, and because it was unreasonably dangerous.

302.    Manufacturers' products were defective at the time of manufacture and/or distribution and sale, and thus at the time they left Manufacturers' control.

303.    Manufacturers' sale and distribution of AFFF, constitutes a pattern of continuous and ongoing tortious conduct.

304.    Upon information and belief, Manufacturers have and continue to sell and distribute AFFF in a tortious manner to the date of this Amended Complaint.

305.    Upon information and belief, Manufacturers have not recalled their AFFF product to the date of this Amended Complaint.

306.     As a result of Manufacturers' manufacture and/or distribution and sale of a defectively designed product, the Widefield and Windmill Gulch aquifers became contaminated with toxic PFCs and damaged the Plaintiffs.

307.     As a result of Manufacturers' design, formulation, manufacture and/or distribution and sale of a defective product, Manufacturers are strictly liable in damages to the Plaintiffs.

308.     Manufacturers' acts were willful, wanton or reckless and conducted with a reckless indifference to the rights of Plaintiffs.

309.     As a result of Manufacturer's conduct and the resulting contamination of the Widefield and Windmill Gulch aquifers by the chemical components of the Manufacturers' AFFF, the Plaintiffs have or will incur costs to secure and deliver alternate water supplies, including costs of installing pipelines and other infrastructure and of assuring water quality through the delivery system; costs of sampling and analyzing groundwater and other media; costs of responding to public inquiries and managing public relations regarding the contamination; costs of treatment of groundwater, including treatment systems, operations and maintenance, and treatment media management and disposal; loss of rents and revenue; loss of crops; loss of an ability to carry on an economic enterprise; and other response costs.   In addition, the Plaintiffs have lost the value and marketability of their property and property rights, including appropriated water rights.  As a result of the contamination, Plaintiffs have lost use and enjoyment of their properties, including appropriated water rights, and have suffered annoyance, discomfort, and inconvenience.

## SEVENTH CLAIM FOR RELIEF

## NUISANCE

### (Manufacturers)

310.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

311.    Manufacturers manufacture and/or sale and distribution of AFFF foam containing PFCs constituted intentional, negligent and/or unreasonably dangerous activity causing the unreasonable and substantial interference with the use and enjoyment of the property interests of Plaintiffs.

312.    Manufacturers knew and/or should have reasonably foreseen that the invasion of the Plaintiffs' property interests, including their water supplies, was substantially certain to result from the use of the AFFF as Manufacturers intended, including at Peterson AFB, given, among other reasons, the chemical properties of the components of the AFFF.  Manufacturers participated to a substantial extent in the carrying on of the nuisance by their actions described above.

313.    The unreasonable and substantial interference with the use and enjoyment of the property interests of Plaintiffs includes but is not limited to the contamination of groundwater and soil on Plaintiffs' property, including the source of Plaintiffs' appropriated water rights, the need to obtain alternative sources of water and expense thereof, and the exposure to known toxic chemicals manufactured and/or sold and distributed by Manufacturers.

314.    Manufacturers' sale and distribution of AFFF, constitutes a pattern of continuous and ongoing tortious conduct.

315.    Upon information and belief, Manufacturers have and continue to sell and distribute AFFF in a tortious manner to the date of this Amended Complaint.

316.    PFCs continue to contaminate Plaintiffs' properties and continue to migrate to Plaintiffs' properties.

317.    As a result of Manufacturers' creation of a nuisance, the groundwater supplies relied upon by Plaintiffs pursuant to their appropriated water rights has been, and continue to be, contaminated with PFCs.

318.    As a result of Manufacturers' creation of a nuisance, the soil of the land on which the Foundation grew crops has been, and continues to be, contaminated with PFCs.

319.    Manufacturers' creation of a nuisance caused and is causing Plaintiffs substantial and unreasonable interference with their property rights.

320.    Manufacturers' acts were willful, wanton or reckless and conducted with a reckless indifference to the rights and property of Plaintiffs.

321.    As a result of Manufacturer's conduct and the resulting contamination of the Widefield and Windmill Gulch aquifers by the chemical components of the Manufacturers' AFFF, the Plaintiffs have or will incur costs to secure and deliver alternate water supplies, including costs of installing pipelines and other infrastructure and of assuring water quality through the delivery system; costs of sampling and analyzing groundwater and other media; costs of responding to public inquiries and managing public relations regarding the contamination; costs of treatment of groundwater, including treatment systems, operations and maintenance, and treatment media management and disposal; loss of rents and revenue; loss of crops; loss of an ability to carry on an economic enterprise; and other response costs.    In addition, the Plaintiffs have lost the value and marketability of their property and property rights, including appropriated water rights.  As a result

66

of the contamination, Plaintiffs have lost use and enjoyment of their properties, including appropriated water rights, and have suffered annoyance, discomfort, and inconvenience.

## EIGHTH CLAIM FOR RELIEF

## UNJUST ENRICHMENT

### (Manufacturers)

322.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

323.    Manufacturers profited from the manufacture and/or distribution and sale of AFFF containing PFCs, and continued to do so long after they were aware of the health and environmental risks of their products.  Further, Manufacturers have failed to recall their products to prevent the further release of their AFFF into groundwater and onto Plaintiffs' properties. Through Manufacturers' actions and inaction at the expense of Plaintiffs, Manufacturers have been unjustly enriched.

324.    The Court should award as a remedy the expenditures saved and the profits obtained by Manufacturers at the expense of Plaintiffs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Security Water District and Pikes Peak Community Foundation respectfully request that this Court grant the following relief:

a)    Award Plaintiffs all damages suffered, or that will be suffered, as a result of Defendants' actions, including, without limitation, the costs of obtaining alternative water supplies, including the costs of installation of pipelines and other infrastructure, the costs of managing water quality, and the costs of acquiring and

67

delivering water; the costs of collecting and analyzing samples of groundwater and other media; the costs of managing public relations and public inquiries relating to the PFC contamination; the costs of treating groundwater contaminated with PFC, including treatment system costs, operation and maintenance costs, and costs of managing and disposing of treatment system media; lost rents or, alternatively, costs of rent on contaminated water rights; lost crops and revenues from crops; the decrease in the value and marketability of their property and property rights; and the loss of use and enjoyment of their properties, and the annoyance, discomfort, and inconvenience caused by the contamination of and interference with their water supplies and properties by Manufacturers PFCs and the United States' actions;

b) An order for disgorgement of the profits and savings which were obtained by the unjust enrichment of Manufacturers through their manufacture and/or distribution and sale of AFFF containing PFCs and through the use and at the expense and marketability of the properties of Plaintiffs;

c) Award Plaintiffs prejudgment and postjudgment interest, as provided by law;

b) Award Plaintiffs their costs incurred in this action; and

c) Award Plaintiffs such other and further relief as the Court deems just.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all claims so triable.

68

Respectfully submitted this 21st day of October, 2019.

THE HANNON LAW FIRM, LLC


By: /s/ Kevin S. Hannon
Kevin S. Hannon
Justin D. Blum
1641 Downing Street

Denver, CO  80218
(303) 861-8800 - Telephone
(303) 861-8855 - Facsimile
khannon@hannonlaw.com
jblum@hannonlaw.com


BURNS, FIGA & WILL, P.C.


By: /s/ Scott A. Clark
Scott A. Clark (#24509)
BURNS, FIGA & WILL, P.C.
6400 S. Fiddlers' Green Circle, Suite 1000
Greenwood Village, CO 80111
Phone Number:    303-796-2626
Fax Number:       303-796-2777
E-mail:              sclark@bfwlaw.com

**Attorneys for Plaintiffs Security Water District and Pikes Peak Community Foundation**