## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION )<br>)<br>)<br>)<br>) | MDL No. 2:18-mn-2873-RMG<br><br>**This Document Relates to No. <u>2:19-cv-02187-RMG</u>** |

| | |
|---|---|
| SECURITY WATER DISTRICT and )<br>PIKES PEAK COMMUNITY FOUNDATION )<br>)<br>      Plaintiffs,                                        )<br>)<br>            v.                                              )<br>)<br>AGC CHEMICALS AMERICAS INC.;      )<br>AMEREX CORPORATION;                       )<br>ARCHROMA MANAGEMENT LLC;         )<br>ARKEMA INC.;                                         )<br>BASF CORPORATION;                             )<br>BUCKEYE FIRE EQUIPMENT COMPANY;  )<br>CARRIER GLOBAL CORPORATION,       )<br>(individually and as successor in interest to Kidde-  )<br>Fenwal, Inc.);                                           )<br>CHEMDESIGN PRODUCTS, INC.;           )<br>CHEMGUARD, INC;                               )<br>CHEMICALS, INC.;                                )<br>CLARIANT CORPORATION;                   )<br>CORTEVA, INC.;                                     )<br>DEEPWATER CHEMICALS, INC.;          )<br>DUPONT DE NEMOURS INC., (f/k/a/       )<br>DOWDUPONT, INC.);                            )<br>DYNAX CORPORATION;                        )<br>E.I. DUPONT DE NEMOURS AND COMPANY,  )<br>(individually and as successor in interest to DuPont  )<br>Chemical Solutions Enterprise);              )<br>ENTERRA CORPORATION;                    )<br>KIDDE-FENWAL, INC., (individually and as  )<br>successor in interest to NATIONAL FOAM, INC.);  )<br>KIDDE FIRE FIGHTING, INC., (f/k/a CHUBB  )<br>NATIONAL FOAM, INC., f/k/a NATIONAL  )<br>FOAM, INC.,individually and as successor in  )<br>interest to NATIONAL FOAM, INC.);        )<br>) | **THIRD AMENDED COMPLAINT** |

| KIDDE PLC, INC., (f/k/a WILLIAMS US INC., | ) |
| f/k/a WILLIAMS HOLDINGS, INC., individually | ) |
| and as successor in interest to NATIONAL FOAM, | ) |
| INC.); | ) |
| NATIONAL FOAM, INC.; | ) |
| NATION FORD CHEMICAL COMPANY; | ) |
| THE 3M COMPANY (f/k/a Minnesota Mining and | ) |
| Manufacturing Co.); | ) |
| THE CHEMOURS COMPANY, (individually and | ) |
| as successor in interest to DuPont Chemical | ) |
| Solutions Enterprise); | ) |
| THE CHEMOURS COMPANY FC, LLC, | ) |
| (individually and as successor in interest to DuPont | ) |
| Chemical Solutions Enterprise); | ) |
| TYCO FIRE PRODUCTS, L.P., (successor-in- | ) |
| interest to The Ansul Company); | ) |
| UNITED STATES OF AMERICA; | ) |
| UTC FIRE & SECURITY AMERICAS | ) |
| CORPORATION, INC., (f/k/a GE INTERLOGIX, | ) |
| INC., individually and as successor in interest to | ) |
| NATIONAL FOAM, INC.) | ) |
| | ) |
| Defendants. | ) |
| | ) |

## SUMMARY OF CLAIM

1.      Plaintiffs SECURITY WATER DISTRICT ("Security") and PIKES PEAK

COMMUNITY FOUNDATION ("Foundation"), by and through their undersigned counsel, file

this action against the UNITED STATES OF AMERICA pursuant to the Federal Tort Claims Act

("FTCA"), 28 U.S.C. §§ 2671-2680, and the Comprehensive Environmental Response and

Compensation Act ("CERCLA"), 42 U.S.C. § 9601, *et seq*., and against THE 3M COMPANY

(f/k/a Minnesota Mining and Manufacturing Co.)("3M")[1];  TYCO FIRE PRODUCTS, L.P.,

---

[1] Security's claims against The 3M Company; E.I. DuPont De Nemours and Company;  The Chemours Company; The Chemours Company FC, LLC, Corteva, Inc; DuPont De Nemours Inc. (collectively "3M and DuPont") are subject to the Settlement Agreement Between Public Water Systems and 3M Company and the Class Action Settlement Agreement between Public Water Systems and The Chemours Company, The Chemours Company FC,

2

successor-in-interest to THE ANSUL COMPANY ("TYCO"); CHEMGUARD, INC.; NATIONAL FOAM, INC.; KIDDE FIRE FIGHTING, INC., f/k/a CHUBB NATIONAL FOA, INC.; KIDDE PLC, INC., f/k/a WILLIAMS US INC., f/k/a WILLIAMS HOLDINGS, INC., individually and as a successor in interest to NATIONAL FOAM, INC.; KIDDE-FENWAL, INC., individually and as a successor in interest to NATIONAL FOAM, INC.; UTC FIRE & SECURITY AMERICAS CORPORATION, INC., f/k/a GE INTERLOGIX, INC.; BUCKEYE FIRE EQUIPMENT COMPANY; E.I. DUPONT DE NEMOURS AND COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise; THE CHEMOURS COMPANY, individually and as successor in interest to DuPont Chemical Solutions Enterprise; THE CHEMOURS COMPANY FC, LLC, individually and as successor in interest to DuPont Chemical Solutions Enterprise; CORTEVA, INC.; DUPONT DE NEMOURS INC., f/k/a/ DOWDUPONT, INC.; ARKEMA INC.; AGC CHEMICALS AMERICAS INC.; DYNAX CORPORATION; CLARIANT CORPORATION; BASF CORPORATION; CHEMDESIGN PRODUCTS, INC.; ENTERRA CORPORATION; AMEREX CORPORATION; ARCHROMA MANAGEMENT LLC; CARRIER GLOBAL CORPORATION, individually and as successor in interest to Kidde-Fenwal, Inc.; DEEPWATER CHEMICALS, INC.; NATION FORD CHEMICAL COMPANY; and CHEMICALS, INC. (collectively referred to herein as the "Manufacturers") (the United States and the Manufacturers collectively are referred to herein as the "Defendants").

---

LLC, DuPont de Nemours, Inc., Corteva, Inc., and E.I. DuPont de Nemours and Company n/k/a EIDP, Inc., respectively, and the final Court orders approving those settlements. Pursuant to those settlement agreements, and each Final Order and Judgment Approving Settlement entered by the Court with respect to the 3M and the DuPont settlements, Security's claims against 3M and DuPont have been dismissed. In this Third Amended Complaint, only the Foundation asserts claims against 3M and DuPont.

2.      Plaintiffs seek to be made whole for the property damages they have suffered and costs they have incurred as a result of Defendants' contamination of groundwater relied upon by Plaintiffs.

3.      Manufacturers manufactured, and/or distributed, and/or sold a fire suppressant known as Aqueous Film Forming Foam ("AFFF"), or the toxic components used in AFFF. Manufacturers sold AFFF, including the toxic components therein, to the United States Air Force, which used the AFFF as intended at locations including Peterson Air Force Base in El Paso County, Colorado ("Peterson AFB"). Manufacturers manufactured and/or distributed and/or sold these chemicals with knowledge of, and with inadequate warning of, the toxic effects these chemicals would cause if they contaminated the environment, and did so without regard to property interests of Plaintiffs, which would foreseeably be damaged once these chemicals infiltrated the environment, including the groundwater.

4.      The AFFF sold to the Air Force contained perfluorinated compounds ("PFCs"), such as perfluorooctane sulfonate ("PFOS") and perfluorooctanoic acid ("PFOA") and/or certain other PFCs, including those that can degrade into other PFCs. PFCs are a group of toxic, extremely persistent, and bioaccumulative synthetic chemicals. When consumed, PFCs can cause numerous and serious health impacts. PFOS and PFOA have been listed as CERCLA "hazardous substances" by the federal Environmental Protection Agency ("EPA"). 40 C.F.R. § 302.4.

5.      As the manufacturers and/or distributers and sellers of AFFF or of the toxic PFC components used in AFFF foam sold, Manufacturers knew or should have known that the inclusion of PFCs in AFFF presented an unreasonable risk to human health and the environment. Manufacturers also knew or should have known that PFCs are highly soluble in water, highly

mobile and highly persistent in the environment, and highly likely to contaminate water supplies if released to the environment.

6. Manufacturers marketed and/or distributed and sold their AFFF or the toxic components used in AFFF foam with knowledge that large quantities of toxic AFFF would be used in training exercises, in fire control, in fire sprinkler systems, in emergency situations, and in other ways at Air Force bases in such a manner that PFCs and other contaminants would be released into the environment.

7. The United States, through the United States Air Force, used PFC-containing AFFF on Peterson AFB for many decades. The United States discharged and disposed of AFFF on land and water at Peterson AFB until at least 2018. The PFC component of the AFFF, including PFOA and PFOS, has entered the groundwater and migrated, and continues to migrate, from Peterson AFB downgradient to groundwater wells owned by the Plaintiffs and historically used by Plaintiffs to serve approximately 19,000 municipal water customers for household and commercial use and to irrigate vegetable crops.

8. Because of the negligent development, manufacturing, distribution, marketing and sale of AFFF or the toxic PFC components used in AFFF foam, and the United States' release and disposal of PFCs, including PFOA and PFOS, in violation of mandatory Air Force requirements, groundwater relied upon by the Plaintiffs has been contaminated with PFCs, including PFOA and PFOS, and Plaintiffs have incurred, and will continue to incur, significant costs, expenses and losses associated with shutting down their wells, securing alternative water supplies, ceasing agricultural operations, and otherwise responding to and mitigating the impacts of the contamination.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction to hear Plaintiffs' claims against the United States pursuant to 28 U.S.C. § 1346(b)(1), 42 U.S.C. § 9613(b), 28 U.S.C. § 1331, and 28 U.S.C. § 2201.

10.    This Court has jurisdiction to hear Plaintiffs' claims against Manufacturers pursuant to 28 U.S.C. § 1332(a) because the Plaintiffs are citizens of states different from home states of the Manufacturers, and the aggregate amount in controversy exceeds $75,000.00, exclusive of interest and costs.

11.    Peterson AFB, Security and the Foundation, and the contaminated groundwater, all are located in Colorado and the actions complained of took place in Colorado. Therefore, the United States District Court for the District of Colorado is the proper venue for this action. 28 U.S.C. §§ 1391(b)(2) and 1402(b).

12.    Plaintiffs discovered the United States' responsibility for the PFC contamination in August 2016 when the Air Force released its Final Preliminary Assessment Report for Perfluorinated Compounds at Peterson Air Force Base, El Paso County, Colorado.

13.    On or about April 18, 2018, Security and the Foundation each submitted an administrative claim to the United States Air Force for damages pursuant to 28 U.S.C. § 2675(a); 28 C.F.R. § 14.2; and 32 C.F.R. §§ 842.4 – 842.7. On September 6, 2018, less than six months prior to filing the Complaint in this action, the United States Air Force issued a denial of both claims. Therefore, the Plaintiffs have exhausted their administrative remedies and timely filed this action. 28 U.S.C. §§ 2401(b) and 2675.

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a) because complete diversity exists between plaintiffs and defendants and the amount in controversy exceeds $75,000.00.

15.     This action originally was filed in the United States District Court for the District of Colorado and was transferred to this Court by order of the Judicial Panel on Multidistrict Litigation.  Plaintiff designates the United States District Court for the District of Colorado as the "home venue" where plaintiff filed suit pursuant to 28 U.S.C. § 1391, and otherwise would have filed this Third Amended Complaint.  Plaintiff respectfully requests that, at the time of the transfer of this action back to trial court for further proceedings, this case be transferred to the United States District Court for the District of Colorado.

16.     The United States District Court for the District of Colorado has personal jurisdiction over the Manufacturers because at all times relevant to this lawsuit, the Manufacturers manufactured, designed, marketed, distributed, released, promoted and/or otherwise sold (directly or indirectly) PFC-containing AFFF products or the toxic PFC components used in AFFF foam to various locations, such that each Manufacturer knew or should have known that said products would be delivered to areas in the state of Colorado for active use by the United States Air Force during the course of training and firefighting activities.  Therefore, the exercise of jurisdiction over the Manufacturers by the United States District Court for the District of Colorado does not offend traditional notions of fair play and substantial justice.

## PLAINTIFFS' CLAIMS SATISFY FTCA REQUIREMENTS

17.     Claims submitted pursuant to the FTCA must meet the requirements set forth in 28 U.S.C. § 1346(b)(1) by being "civil actions on claims against the United States, for money

7

damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

18.     Additionally, under the so-called discretionary function exception, no liability shall lie for any claim "based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

19.     This "discretionary function" exception is inapplicable if a government employee violated a mandatory directive or used an impermissible exercise of judgment. *Berkovitz v. United States*, 486 U.S. 531, 535-37 (1988).

20.     The Plaintiffs hereby assert civil claims against the United States for money damages, which accrued after 1945, for property damages and losses, which can be shown were proximately caused by violations of mandatory directives and impermissible exercises of judgment by employees and officers of the Air Force under circumstances where the United States, if a private person, would be liable for trespass, nuisance, and negligence under Colorado law.

## PARTIES AND GENERAL ALLEGATIONS

21.     Plaintiff Security is a water district, which was formed as a special district pursuant to the Colorado Special District Act, C.R.S. § 32-1-102. In Colorado, special districts are quasi-

municipal corporations and political subdivisions. C.R.S. § 32-1-103(20). The purpose of special districts is to "serve a public use and . . . promote the health, safety, prosperity, security, and general welfare of the inhabitants of such districts." C.R.S. § 32-1-102(1). Water districts have the additional purposes of "supply[ing] water for domestic and other public and private purposes by any available means and provid[ing] all necessary or proper reservoirs, treatment works and facilities, equipment, and appurtenances incident thereto." C.R.S. § 32-1-103(25). To fulfill their purposes, water districts are empowered to "sue," C.R.S. § 32-1-1001(1)(c), and "exercise all rights and powers necessary or incidental to or implied from the specific powers granted to special districts." C.R.S. § 32-1-1001(1)(n).

22.     Security's principal place of business is located at 231 Security Blvd., Colorado Springs, El Paso County, Colorado 80911. Security's service area encompasses approximately five square miles in El Paso County, Colorado, and approximately 19,000 customers. Approximately eighty-five percent (85%) of Security's customers are residential and use water for drinking and domestic purposes.

23.     Until September 2016, one of Security's primary water sources was groundwater from the Widefield and Windmill Gulch Aquifers. The Widefield and Windmill Gulch Aquifers historically have supplied about half of Security's water requirements.

24.     Security owns Colorado water rights in the Widefield and Windmill Gulch Aquifers that the District Court for Water Division 2, State of Colorado, confirmed and awarded in decrees in Case Nos. W-103 to W-111, Case No. W-112, Case No. 116, Case No. 116, Case No. W-347, Case No. W-400, Case No. W-578, Case No. W-664, Case No. W-1551, Case No. W-3174, Case No. 4212, Case No. W-4766, Case No. 1984CW130, Case No. 1990CW28, Case No. 2001CW149,

Case No. 2006CW119, Case No. 2006CW126, Case No. 2006CW117, Case No. 2007CW51, Case No. 2009CW67, Case No. 2009CW92, Case No. 2012CW99. These decrees confirm a priority of appropriation for withdrawal and use of water from the Widefield and Windmill Gulch Aquifers, and set forth plans for augmentation using Security's senior decreed water rights that allow and replace well depletions to Fountain Creek, the main drainage to which the Widefield and Windmill Gulch Aquifers are tributary.

25.     Security owns and operates a water supply system that consists of twenty-four (24) active wells, associated distribution systems, and the land on which those wells and other facilities are located. Pursuant to Security's decreed water rights, this system withdraws, treats and delivers water from the Widefield and Windmill Gulch Aquifers to customers for domestic, commercial, industrial, and other uses. Security's decreed Colorado water rights also include rights to construct additional wells.

26.     The Foundation is a nonprofit Colorado corporation that invests and administers charitable funds for programs dedicated to improving the quality of life in the Colorado Springs area.

27.     The Foundation's principal place of business is located at 102 S. Tejon Street, Suite 530, Colorado Springs, El Paso County, Colorado 80903. The Foundation owns real property in El Paso County, Colorado, with an address of 5210 US-85, Colorado Springs, Colorado 80911, which is known as the Venetucci Farm.

28.     The Foundation owns Colorado water rights in the Widefield Aquifer that the District Court for Water Division 2, State of Colorado, confirmed and awarded by decree in Case Nos. W-103, W-104, W-105, W-106, W-107, W-108, W-109, W-110, and W-111, and W-568.

These decrees confirmed a priority of appropriation for withdrawal and use of water from the Widefield Aquifer.

29. The Foundation owns and operates groundwater wells located on the Venetucci Farm. Until July 2016, the Foundation, pursuant to its decreed water rights, withdrew water from those wells to irrigate produce and vegetables at the Venetucci Farm, which were sold to the public, and for household use. The Foundation also leases a portion of its groundwater to Security Water District and Widefield Water and Sanitation District ("Widefield"), and those entities sublease a portion of the Foundation's groundwater rights to the City of Fountain, all for use in their municipal water supply systems.

30. Decreed Colorado water rights are property rights that are afforded legal protection. *Empire Lodge Homeowners' Ass'n v. Moyer*, 39 P.3d 1139, 1146-48 (Colo. 2001); *Santa Fe Trail Ranches Prop. Owners Ass'n v. Simpson*, 990 P.2d 46, 53 (Colo. 1999). Colorado water rights are considered real property. *Dallas Creek Water Company v. Huey*, 933 P.2d 27, 39 (Colo. 1997); see also C.R.S. § 38-30-102(2) (conveyance of water rights subject to same formalities as conveyance of real estate). Air Force also treats water rights as real property rights. See Air Force Instruction 32-1067, February 4, 2015, Civil Engineering: Water and Fuel Systems, ¶ 3.3.1. (allocating responsibility for water rights asset management to "real property section").

31. Defendant 3M is a corporation organized and existing under the laws of the State of Delaware, having its principal place of business at 3M Center, St. Paul, Minnesota 55133. Beginning before 1970 and until at least 2002, 3M manufactured and distributed and sold AFFF. Defendant 3M sold military specification AFFF foam that contained PFCs to the Air Force, which was then distributed and used at Air Force locations, including Peterson AFB.

32.     Defendant Tyco is a limited partnership organized and existing under the laws of the State of Delaware, having a principal place of business at One Stanton Street, Marinette, Wisconsin 54143.  Tyco manufactures the Ansul brand of products and is the successor-in-interest to the corporation formerly known as The Ansul Company (hereinafter "Ansul" and included in any reference to Tyco).

33.     At all times relevant, Tyco manufactured and/or distributed and sold fire suppression products, including AFFF that contained fluorocarbon surfactants containing PFCs. Defendant Tyco distributed and/or sold military specification AFFF foam to the Air Force, which was then distributed and used at Air Force locations, including Peterson AFB.

34.     Defendant Chemguard, Inc. is a Texas corporation having its principal place of business at One Stanton Street, Marinette, Wisconsin 54143.

35.     At all times relevant to the present litigation, Chemguard designed, manufactured and sold AFFF containing PFC that was used in training operations and to fight fires at numerous military bases and other locations throughout the country, including at Peterson AFB.

36.     Defendant National Foam, Inc. (a/k/a Chubb National Foam) is a Delaware corporation, having a principal place of business at 144 Junny Road, Angier, North Carolina 27501.

37.     At all times relevant to the present litigation, National Foam Inc. designed, manufactured and sold AFFF containing PFCs that was used for training and to fight fires at numerous military bases and other locations throughout the country, including Peterson AFB.

38.     Defendant Kidde Fire Fighting, Inc., f/k/a Chubb National Foam, Inc., f/k/a National Foam Inc., is a Pennsylvania corporation having a principal place of business at One

12

Carrie Place, Farmington, Connecticut. At all times relevant to the present litigation, Kidde Fire Fighting, Inc. designed, manufactured and sold AFFF containing PFCs that was used in training operations and for emergency fire-fighting situations, including at Peterson AFB.

39. Kidde Fire Fighting, Inc., is sued individually, and as successor in interest to National Foam, Inc.

40. Kidde Plc, Inc., f/k/a Williams US Inc., f/k/a Williams Holdings, Inc., is a Massachusetts corporation having a principal place of business at One Carrier Place, Farmington, Connecticut 06302. At all times relevant to the present litigation, Kidde Plc, Inc. designed, manufactured, and sold AFFF containing PFCs that was used in training operations and for emergency fire-fighting situations, including at Peterson AFB.

41. Kidde Plc, Inc., is sued individually, as a successor in interest to National Foam, Inc.

42. Kidde-Fenwal, Inc. is a Massachusetts corporation with its principal place of business at 400 Main Street, Ashland, Massachusetts 01721. At all times relevant to this litigation, Kidde- Fenwal, Inc. designed, manufactured, and sold AFFF used in training operations and for emergency fire-fighting situations, including at Peterson AFB.

43. Upon information and belief, Fenwal, Inc. was incorporated on June 21, 1988, and later changed its name to Kidde-Fenwal, Inc.

44. Upon information and belief, the Canadian Intellectual Property Office has registered the National Foam trademark to Kidde-Fenwal, Inc., formerly registered to Kidde Fire Fighting, Inc.

45. Kidde-Fenwal, Inc., is sued individually, and as successor in interest to National Foam, Inc.

46. UTC Fire & Security Americas Corporation, Inc., f/k/a GE Interlogix, Inc., is a North Carolina corporation with its principal place of business at 3211 Progress Drive, Lincolnton, North Carolina 28092. At all times relevant to this litigation, UTC Fire & Security Americas Corporation, Inc. designed, manufactured and sold AFFF used for training operations and fighting fires, including at Peterson AFB.

47. Upon information and belief, Kidde-Fenwal, Inc. is part of the UTC Climate Control & Security unit of United Technologies Corporation.

48. UTC Fire & Security Americas Corporation, Inc., is sued individually, and as successor in interest to National Foam, Inc.

49. Defendant Enterra Corporation is a Massachusetts corporation. At all times relevant, Enterra Corporation designed, manufactured, and sold AFFF used in training operations and for emergency fire-fighting situations at numerous military bases, including at Peterson AFB.

50. Upon information and belief, Enterra Corporation is the current holder of the National Foam trademark.

51. Enterra Corporation is sued individually, and as successor in interest to National Foam, Inc.

52. Defendant Carrier Global Corporation ("Carrier") is a corporation organized under the laws of the State of Delaware, with its principal place of business at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418.

53.     On information and belief, Carrier was formed in March 2020 when United Technologies Corporation spun off its fire and security business prior to merging with Raytheon Company a month later. On information and belief, Carrier became successor in interest to Kidde-Fenwal as part of the spin off and is legally responsible for the liabilities arising from Kidde-Fenwal's design, manufacture, marketing, distribution, and sale of AFFF.

54.     National Foam, Inc.; Kidde Fire Fighting, Inc., f/k/a Chubb National Foam, Inc., f/k/a National Foam Inc., individually and as successor in interest to National Foam, Inc.; Kidde Plc, Inc., f/k/a Williams US Inc., f/k/a Williams Holdings, Inc., individually and as successor in interest to National Foam, Inc.; Kidde-Fenwal, Inc., individually and as successor in interest to National Foam, Inc.; UTC Fire & Security Americas Corporation, Inc., f/k/a GE Interlogix, Inc.; Enterra Corporation;  and Carrier Global Corporation, individually and as successor in interest to National Foam, Inc. shall collectively be referred to herein as "National Foam."

55.     At all times relevant to the present litigation, National Foam designed, manufactured, and sold AFFF used in training operations and for emergency fire-fighting situations, including at Peterson AFB.

56.     Defendant Buckeye Fire Equipment Company ("Buckeye Fire") is a corporation organized and existing under the laws of the state of Ohio, with its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086. Buckeye does business throughout the United States, including conducting business in Colorado.

57.     At all times relevant to the present litigation, Buckeye designed, distributed, manufactured and/or sold AFFF containing PFCs used in training operations and for emergency fire-fighting situations including at Peterson AFB.

58. DuPont Chemical Solutions Enterprise ("DuPont Chemical") was a Delaware Corporation, with a principal place of business located at 1007 Market Street Wilmington, Delaware 19898.

59. DuPont Chemical was a member of the Telomer Research Program ("TRP"). As a member, it was required to provide a list and volume of products it was selling in the United States on a yearly basis.

60. In a letter addressed to the Office of Pollution Prevention and Toxics ("OPPT") Document Control Office, dated May 14, 2003 and signed by Stephen H. Korzeniowski, DuPont provided its list of telomer-based sales products in the United States for the year 2002.

61. The letter, which was redacted and sent to the USEPA under its PFOA Stewardship Program, included AFFF sales volume, on an active ingredient pound basis, as well as its Chemical Abstracts Service (CAS) number and chemical name, and is included in the PFOA Stewardship Program Docket.[2]

62. Upon information and belief, at all times relevant to the present litigation, DuPont Chemical designed, manufactured and sold AFFF used for training and to fight fires at numerous military bases and other locations throughout the country, including Peterson AFB.

63. Defendant, E.I. Du Pont de Nemours and Company ("E.I. DuPont"), successor in interest to DuPont Chemical, is a Delaware Corporation and does business throughout the United States, including conducting business in Colorado. Its principal place of business is 974 Centre Road, Wilmington, Delaware 19805.

---

[2] https://www.regulations.gov/docket?D=EPA-HQ-OPPT-2006-0621, last accessed 9.22.20.

64.     Upon information and belief, at all times relevant to the present litigation, E.I. DuPont designed, manufactured and sold AFFF used for training and to fight fires at numerous military bases and other locations throughout the country, including Peterson AFB.

65.     Defendant The Chemours Company ("Chemours"), successor in interest to DuPont Chemical, is a Delaware Corporation and conducts business throughout the United States, including conducting business in Colorado. Its principal place of business is 1007 Market Street, Wilmington, Delaware, 19889.

66.     Chemours was incorporated as a subsidiary of E.I. Du Pont as of April 30, 2015. From that time until July, 2015, Chemours was a wholly-owned subsidiary of E.I. Du Pont. In July, 2015, E.I. Du Pont spun off Chemours and transferred to Chemours its "performance chemicals" business line, which included the fluoroproducts business, distributing shares of Chemours stock to E.I. Du Pont stockholders, and Chemours has since been an independent, publicly traded company.

67.     Upon information and belief, at all times relevant to the present litigation, Chemours designed, manufactured and sold AFFF used for training and to fight fires at numerous military bases and other locations throughout the county, including Peterson AFB.

68.     E.I. Du Pont merged with The Dow Chemical Company in August 2017 to create DowDuPont Inc. (DowDuPont). E.I. Du Pont and The Dow Chemical Company each merged with wholly-owned subsidiaries of DowDuPont and, as a result, became subsidiaries of DowDuPont. Since that time, DowDuPont has affected a series of separation transactions to separate its businesses into three independent, publicly-traded companies for each of its agriculture, materials science, and specialty products businesses, discussed below.

69.     Defendant The Chemours Company FC L.L.C. (" Chemours Company"), successor in interest to DuPont Chemical, is a Delaware Corporation and conducts business throughout the United States, including conducting business in Colorado. Its principal place of business is 1007 Market Street Wilmington, Delaware, 19899.

70.     Upon information and belief, at all times relevant to the present litigation, Chemours Company designed, manufactured and sold AFFF used for training and to fight fires at numerous military bases and other locations throughout the country, including Peterson AFB.

71.     Defendant DuPont de Nemours Inc., formerly known as DowDuPont, Inc., is a Delaware Corporation that conducts business throughout the United States, including business in Colorado. Its principal place of business is 1999 Bryan Street, Suite 900, Dallas, Texas 75201.

72.     Upon information and belief, at all times relevant to the present litigation, DuPont de Nemours manufactured, designed and sold AFFF and/or PFC constituents in AFFF that was used at Peterson AFB.

73.     Defendant Corteva, Inc. ("Corteva") is a Delaware Corporation that conducts business throughout the United States, including business in Colorado. Its principal place of business is 974 Centre Rd., Wilmington, Delaware 19805.

74.     On June 1, 2019, DowDuPont separated its agriculture business through the spin-off of Corteva, Inc.

75.     Corteva, Inc. was initially formed in February 2018. From that time until June 1, 2019, Corteva was a wholly-owned subsidiary of DowDuPont.

76.     On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva, Inc. common stock by way of a pro rata dividend. Following that distribution, Corteva, Inc. is the direct parent of Du Pont and holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

77.     Upon information and belief, at all times relevant to the present litigation, Corteva designed, manufactured and sold AFFF and/or PFC constituents in AFFF that was used at Peterson AFB.

78.     On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva, Inc. and of another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to be known as DuPont (New DuPont). New DuPont retained assets in the specialty products business lines following the above described spin-offs, as well as the balance of the financial assets and liabilities of E.I. DuPont not assumed by Corteva, Inc.

79.     Defendants E. I. du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; DuPont de Nemours, Inc. are collectively referred to as "DuPont" throughout this Complaint.

80.     Defendant Dynax Corporation is a Delaware Corporation that conducts business throughout the United States, including business in Colorado.  Its principal place of business is 103 Fairview Park Drive, Elmsford, New York, 10523-1544.

81.     In 1991, Dynax Corporation (f/k/a Daikin-TLIM Co., Ltd.) entered the AFFF business, quickly becoming a leading global producer of fluorosurfactants and fluorochemical foam stabilizers used in firefighting foam agents.

82. Upon information and belief, at all times relevant to the present litigation, Dynax designed, manufactured and sold AFFF and/or PFC constituents in AFFF that was used at Peterson AFB.

83. Defendant BASF Corporation, ("BASF"), is a corporation organized and existing under the laws of Delaware, having a principal place of business at 100 Park Avenue, Florham Park, New Jersey 07932.

84. On information and belief, BASF is the largest affiliate of BASF SE and the second largest producer and marketer of chemicals and related products in North America.

85. On information and belief, BASF Corporation is the successor in interest to Ciba-Geigy, Inc., Ciba Specialty Chemicals Company, and Ciba, Inc., Swiss specialty chemicals companies.

86. Ciba-Geigy, Inc., Ciba Specialty Chemicals Company, and Ciba, Inc. manufactured and sold PFCs or PFC constituents for use in AFFF that was used at Peterson AFB.

87. Defendant ChemDesign Products, Inc. is a corporation organized and existing under the laws of Texas and having a principal place of business at 2 Stanton Street, Marinette, Wisconsin 54143.

88. ChemDesign Products manufactured PFCs or PFC constituents for Tyco and Chemguard to use in AFFF, including AFFF that was used at Peterson AFB.

89. Defendant Arkema Inc. ("Arkema") is a corporation organized and existing under the laws of Pennsylvania, having a principal place of business at 900 First Avenue, King of Prussia, PA 19406.

90. Arkema develops specialty chemicals and fluoropolymers.

91.     Arkema is a successor in interest to Elf Atochem North America and Atofina Chemicals Inc.

92.     Arkema, Elf Atochem and/or Atofina Chemicals manufactured and sold PFCs or PFC constituents for use in AFFF that was used at Peterson AFB.

93.     Defendant AGC Chemicals Americas Inc. ("AGC Americas") is a corporation organized and existing under the laws of Delaware, having a principal place of business in 5 East Uwchlan Avenue, Suite 201, Exton, PA 19341. AGC Americas operates throughout the United States, manufacturing glass, electronic displays and chemical products, including resins, water and oil repellants, greenhouse films, silica additives, and various fluorointermediates.

94.     AGC Americas manufactured and sold PFCs or PFC constituents for use in AFFF that was used at Peterson AFB.

95.     Defendant Clariant Corporation ("Clariant") is a corporation organized and existing under the laws of New York, having a principal place of business at 4000 Monroe Road, Charlotte, North Carolina 28205.

96.     On information and belief, Clariant was formerly known as Sandoz Chemicals Corporation and as Sodyeco, Inc.

97.     Clariant, Sandoz Chemicals and/or Sodyeco manufactured and sold PFCs or PFC constituents for use in AFFF that was used at Peterson AFB.

98.     Defendant Amerex Corporation ("Amerex") is a corporation organized and existing under the laws of the State of Alabama, with its principal place of business located at 7595 Gadsden Highway, Trussville, AL 35173.

99. Defendant Amerex is a manufacturer of firefighting products. Beginning in 1971, it was a manufacturer of hand portable and wheeled extinguishers for commercial and industrial applications.

100. In 2011, Amerex acquired Solberg Scandinavian AS, one of the largest manufacturers of AFFF products in Europe.

101. On information and belief, beginning in 2011, Amerex designed, manufactured, marketed distributed, and sold AFFF containing PFCs, including but not limited to PFOA and PFOS, that was used at Peterson AFB.

102. Defendant Deepwater Chemicals, Inc. ("Deepwater") is a corporation organized under the laws of Delaware, with its principal place of business located at 196122 E County Road 40, Woodward, OK, 73801.

103. On information and belief, Deepwater Chemicals designed, manufactured, marketed, distributed, and sold fluorosurfactants containing PFOS, PFOA, and/or their chemical precursors for use in AFFF products that were used at Peterson AFB.

104. Defendant Archroma Management LLC ("Archroma") is a foreign corporation organized and existing under the laws of Switzerland, with its a principal place of business at Neuhofstrasse 11, 4153 Reinach, Basel-Land, Switzerland.

105. On information and belief, Archroma was formed in 2013 when Clariant Corporation divested its textile chemicals, paper specialties, and emulsions business to SK Capital Partners.

106. On information and belief, Archroma designed, manufactured, marketed, distributed, and sold PFCs containing PFOS, PFOA, and/or their chemical precursors for use in

manufacturing the fluorosurfactants used in AFFF products that were used at Peterson AFB.

107.    Defendant Chemicals, Inc. ("Chemicals, Inc.") is a corporation organized and existing under the laws of Texas, with its principal place of business located at 12321 Hatcherville, Baytown, TX 77520.

108.    On information and belief, Chemicals, Inc. supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products that were used at Peterson AFB.

109.    Defendant Nation Ford Chemical Co. ("Nation Ford") is a corporation organized and existing under the laws of South Carolina, with its principal place of business located at 2300 Banks Street, Fort Mill, SC 29715.

110.    On information and belief, Nation Ford supplied PFCs containing PFOS, PFOA, and/or their chemical precursors for use in manufacturing the fluorosurfactants used in AFFF products that were used a Peterson AFB.

111.    Defendant the United States was at all times relevant herein, and still is, the federal government, duly organized, and empowered to form federal agencies, such as the United States Air Force.

112.    Upon information and belief, the United States acting through its agency, the Air Force, and the employees and personnel of that agency, owns, operates and uses Peterson AFB, and is now and has been responsible for activities and operations on Peterson AFB.  The actions and omissions of the United States asserted herein were made by employees and personnel of the Air Force.

113.    Peterson AFB is located in the State of Colorado.

114. The United States stores and stored toxic PFC-based firefighting foam and PFC-contaminated water at Peterson AFB.

115. The United States uses and used PFC-based firefighting foam on Peterson AFB and surrounding facilities.

116. The United States discharged and disposed, and continues to discharge and dispose, of toxic PFCs, including PFOA and PFOS, into the environment, including by spraying, storing, and placing PFC-containing firefighting foam on land and water at Peterson AFB, including irrigating a golf course on the base with PFC-contaminated water, all in violation of mandatory directives.

117. Security, the Venetucci Farm, Peterson AFB, and the Widefield and Windmill Gulch Aquifers are located in the Fountain Creek Watershed area of Colorado, along Fountain Creek. Security, the Venetucci Farm, and the Widefield and Windmill Gulch Aquifers are located downgradient of Peterson AFB.

118. Groundwater from Peterson AFB flows downgradient to the Windmill Gulch and Widefield Aquifers. See "Final Site Inspection Report of Aqueous Film Forming Foam Areas at Peterson Air Force Base, El Paso County, Colorado," July 2017, p. 27 [hereinafter "Final SI"], pp. 9, 12, 15, 18, 25, 27-28; Final Expanded SI Field Sampling Plan, Figure 1.

119. PFCs, including PFOA and PFOS, from Peterson AFB migrated, and are migrating, from areas of release on Peterson AFB to the Widefield and Windmill Gulch Aquifers and have entered and contaminated Plaintiffs' real property, water rights, wells, and systems.

120. In May 2016, the United States Environmental Protection Agency, pursuant to the Safe Drinking Water Act, issued separate Drinking Water Health Advisories for two PFC

chemicals – perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonate ("PFOS"). The Health Advisories contained recommended human exposure limits of 70 parts per trillion (ppt) for PFOA and PFOS, both individually and in combination.

121.    Because PFOA and PFOS, either individually or combined, in the groundwater at Plaintiffs' wells exceeded the Health Advisory limits, Plaintiffs shut down their wells in 2016.

122.    Security then pursued alternative surface water supplies, installed new pipelines and other infrastructure, and modified existing infrastructure in order to receive and then deliver to customers the alternative water supplies free of contamination from PFOA and PFOS.  Those costs would not have been incurred but for the PFC contamination.

123.    Security took, and continues to take, delivery of a substitute supply of water through the Southern Delivery System ("SDS") pipeline, which runs approximately forty-five (45) miles from Pueblo Reservoir near Pueblo, Colorado, on the Arkansas River, and connects to Security's water supply system. Security has used the SDS pipeline to take delivery of Security's water reserves that Security stores in Pueblo Reservoir. Security pays for water, storage, and delivery of water received through the SDS, and has paid additional fees and costs to take delivery of water through SDS in partial replacement of its contaminated groundwater.

124.    Security also began taking additional water through the Fountain Valley Authority ("FVA") Conduit.  Water delivered through the FVA Conduit is delivered to Security from Pueblo Reservoir and consists of either Security's stored water reserves or water purchased from other entities when available. Security pays for water, storage, and delivery of water received through the FVA Conduit, and has incurred additional fees and costs to take delivery of water through FVA in partial replacement of its contaminated groundwater.

125.     Security also has obtained, and continues to obtain, substitute supplies of water delivered through a pipeline connection to the Colorado Springs Utilities ("CS-U") water system. Water delivered through the CS-U connection is either water from Security's stored water reserves or is CS-U's water that Security purchases. Security pays for water, storage, and delivery of water received through CS-U, and has incurred additional fees and costs to take delivery of water from CS-U in partial replacement of its contaminated groundwater.

126.     In May 2024, EPA designated PFOS and PFOA as "hazardous substances" under CERCLA.  EPA, Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, 89 FR 39124; 40 CFR § 302.4.

127.     Security cannot rely on the SDS, FVA, or CS-U sources to replace its lost groundwater indefinitely. Use of its own stored reserves reduces Security's ability to weather a drought. In addition, delivery of additional water to Security through each pipeline depends, to some extent, on other pipeline participants making a share of their capacity available to Security. Additional deliveries also depend on the availability of water to purchase from other water rights owners. At times, that capacity and water might not be available.

128.     Because of the groundwater contamination, Security also constructed additional pipelines and system facilities in order to take delivery of the alternative sources and to distribute that water throughout its system.

129.     Similarly, in July 2016, the Foundation ceased irrigating its crops and otherwise using groundwater due to PFC contamination of its groundwater and has not grown crops since then.

130.    Lease deliveries to Security, Widefield and Fountain also ceased because those entities terminated use of the contaminated water.

131.    Thus, the Manufacturers, through their development, manufacturing, distribution, marketing, and sale of AFFF or the toxic PFC components used in AFFF foam; and the United States, acting through the Air Force, and their employees and personnel, by its trespass, nuisance, and negligence; proximately caused Plaintiffs' injuries and damages by contaminating the groundwater.

132.    The United States currently owns and operates, and at all times when PFCs, including PFOA and PFOS, were released to the environment owned and operated, Peterson Air Force Base.

## BASIS OF CLAIM

### PFCs Are Used in Firefighting Foam

133.    PFCs are synthetic carbon chain compounds that contain large amounts of the element fluorine. As used in this Complaint, the term "PFCs" includes all PFCs and their precursors, derivatives and/or salts that have been or may be detected in or that are threatening Plaintiffs' water supplies and property, including inter alia, PFOA, PFOS, PFBA, PFBS, PFHxA, PFHxS, PFPeA, PFHpA, PFNA, PFDA, PFDS, PFUnA, PFDoA, and PFTrA.

134.    PFCs are used in the firefighting foam known as "aqueous film forming foam" ("AFFF").

135.    AFFF is water-based and used to extinguish fires that involve petroleum or other flammable liquid because PFCs resist heat, oil, grease, and water.

136. PFCs are not naturally occurring. Thus, the PFCs found in the environment or humans are attributable to human activity.

137. AFFF that contained PFCs was developed in the 1960s as an alternative to firefighting foams that existed at the time.

138. 3M AFFF, which is produced through a 3M process called electrochemical fluorination, or ECF, contained PFCs including PFOS. Other formulations of the foam purchased by the Department of Defense manufactured by Defendant Tyco and other Manufacturers are synthesized through telomerization and contain PFCs including PFOA. Both processes include formulations containing chemicals that can break down into other PFCs.

139. Manufacturers each manufactured and/or distributed and sold AFFF containing PFCs or the toxic PFC components used in AFFF foam, among other chemicals, for sale to the Department of Defense, and Manufacturers sold and distributed AFFF or toxic PFC components used in AFFF foam that was used at Peterson AFB.

140. In 1969, the United States Department of Defense issued Military Specification MIL-F-24385 for AFFF.

141. In order for an AFFF manufacturer to sell its AFFF to the Air Force, it was required to meet MIL-F-24385.

142. MIL-F-24385 covered "the requirements for aqueous film-forming foam (AFFF) liquid concentrate fire extinguishing agents consisting of fluorocarbon surfactants and other compounds as required to conform to the requirements specified hereafter."

143.    If the Department of Defense found that a manufacturer's product satisfied MTL-F-24385 performance expectations, the Department placed the product on the Department of Defense Qualified Product Listing.

144.    In MIL-F-24385, the United States required that "The material shall have no adverse effect on the health of personnel when used for its intended purpose."  This provision remained a part of the specification throughout the time Manufacturers sold and/or distributed AFFF products or the toxic components used in AFFF foam sold to the United States.

145.    Manufacturers chose to include and/or distribute PFCs including PFOS and PFOA and other PFCs as ingredients in the AFFF they sold and delivered to the United States pursuant to MIL-F-24385.

146.    The inclusion of PFCs including PFOA and PFOS in AFFF sold to the Air Force violated the MIL-F-24385 specification that "The material shall have no adverse effect on the health of personnel when used for its intended purpose."

147.    Manufacturers sold and delivered AFFF or the toxic components used in AFFF to the Air Force for use on its bases, including at Peterson AFB.

148.    Manufacturers knew or should have known that the AFFF or the toxic PFC components used in AFFF foam sold and delivered to the United States or to manufacturers of AFFF would adversely affect the health of personnel when used for its intended purpose and did not meet the specifications of MIL-F-24385.

149.    Manufacturers knew or should have known that their harmful and defective products, AFFF containing toxic PFCs, would be used for various purposes on Air Force bases, including, but not limited to, training for firefighting, testing firefighting equipment, actual

firefighting, and use in hangar sprinkler fire suppressant systems, which would cause the AFFF to drain into the ground and eventually pollute or contaminate the groundwater beneath the bases and eventually migrate into the drinking water and agricultural water supplies of the Plaintiffs.

**Manufacturers Failed to Provide Notice of AFFF Toxicity**

150. Upon information and belief, instructions, labels and material safety data sheets were provided with the AFFF and the toxic PFC components used in AFFF sold by Manufacturers, which, at least at significant times, did not fully describe the health and environmental hazards of AFFF which Manufacturers knew or should have known.

151. Upon information and belief, Manufacturers had known of these health and environmental hazards for years and, at least at significant times, failed to disclose this information to, and actively hid it from, their customers, including the Air Force.

152. 3M knew as early as the mid-1950s that PFCs bio-accumulate in humans and animals.

153. A 1956 study at Stanford University concluded that the PFCs manufactured by 3M bind to proteins in blood.

154. By the early 1960s, 3M understood that PFCs are stable, persist in the environment, and do not degrade.

155. In 1970, the authors of a scientific journal article observed after conducting tests on a 3M product containing PFCs that the product was "highly derogatory to marine life and the entire test program had to be abandoned to avoid severe local stream pollution."

156. Studies undertaken by 3M in the 1970s demonstrated that PFCs were even "more toxic than was previously believed."

157.    A 1978 study by 3M on PFCs and PFOA confirmed that "these chemicals are likely to persist in the environment for extended periods unaltered by microbial catabolism."

158.    In 1979, a 3M scientist recognized that PFCs posed a cancer risk because they are "known to persist for a long time in the body and thereby give long-term chronic exposure."

159.    In the 1970s, 3M began a major program to review personnel handling of fluorochemicals.  3M's monitoring confirmed that fluorochemicals could bioaccumulate.

160.    The potential loss of tremendous profits from PFAS drove 3M to engage in a deliberate campaign to influence the science relating to PFAS and, according to internal company documents, to conduct scientific "research" that it could use to mount "[d]efensive [b]arriers to [l]itigation."

161.    A key priority of an internal 3M committee was to "[c]ommand the science" concerning the "exposure, analytical, fate, effects, human health and ecological" risks posed by PFAS and for 3M to provide "[s]elective funding of outside research through 3M 'grant' money."

162.    In exchange for providing grant money to friendly researchers, 3M obtained the right to review and edit the drafts of papers on PFAS and sought control over when and whether these papers were published at all.

163.    Under pressure from the U.S. EPA, on May 16, 2000, 3M announced it would phase out production of two synthetic chemicals, PFOS and PFOA, that it had developed more than fifty years earlier.  3M press release, "3M Phasing Out Some of Its Specialty Materials", May 16, 2000

3M, who was the predominant manufacturer of AFFF, ceased production of PFOS based AFFF in 2002.[3]

164.     A U.S. EPA internal memo on the day of 3M's phase-out announcement stated: "3M data supplied to EPA indicated that these chemicals are very persistent in the environment, have a strong tendency to accumulate in human and animal tissues and could potentially pose a risk to human health and the environment over the long term.  [PFOS] appears to combine Persistence, Bioaccumulation, and Toxicity properties to an extraordinary degree."  EPA internal memo, "Phaseout of PFOS", May 16, 2000.[4]

165.     In contrast, 3M's news release insisted that "our products are safe" while extolling their "principles of responsible environmental management" as driving the cessation of production. 3M press release, "3M Phasing Out Some Of Its Specialty Materials", May 16, 2000.[5]

166.     In the 1970s, Manufacturers began making AFFF with PFCs and toxic PFC components used in AFFF other than PFOS and PFOA, including shorter carbon chain PFCs. Upon information and belief, those other PFCs also are highly soluble, persistent, bioaccumulative, and toxic to humans.

167.     By at least the end of the 1990s, additional research and testing performed by Defendants manufacturing and/or using PFAS materials, including at least 3M, DuPont and Dynax

---

[3] http://www.chemicalindustryarchives.org/dirtysecrets/scotchgard/pdfs/226-0641.pdf#page=1 last accessed 9.22.20.

[4] http://www.chemicalindustryarchives.org/dirtysecrets/scotchgard/pdfs/226-0629.pdf#page=2n, last accessed 9.22.20.

[5] http://www.chemicalindustryarchives.org/dirtysecrets/scotchgard/pdfs/226-0641.pdf#page=1, last accessed 9.22.20.

Corporation, indicated that at least one such PFAS material, PFOA, had caused a triad of tumors (Leydig cell (testicular), liver and pancreatic) in a second chronic cancer.

168.     Upon information and belief, those other PFCs were sold and delivered to the Air Force by Manufacturers, were stored, used, released, discharged, and disposed of at Peterson AFB by Air Force, and have contaminated Plaintiffs' soil and groundwater.   For instance, perfluorohexanesulfonic acid (PfHXS) has been detected in groundwater samples collected from the Plaintiffs' drinking water supply wells.

169.     Upon information and belief, the Manufacturers continued to manufacture, sell and distribute AFFF containing PFCs or the toxic PFC components of AFFF sold to the Air Force for use on bases, including Peterson AFB.

170.     The concentrations of PFCs found in the Widefield and Windmill Gulch aquifers have been caused by releases of Manufacturers' AFFF to the environment.   As was reasonably foreseeable by Manufacturers, the training, fire response and other use of AFFF occurred on, and/or resulted in discharges to, open ground and stormwater systems.   As was reasonably foreseeable by Manufacturers, the chemical components of AFFF, including PFCs, migrated into and through the soil and groundwater and from there migrated to and contaminated soil and groundwater on or beneath property owned and operated by the Plaintiffs and contaminated the supply for Plaintiffs' appropriated groundwater rights.   The PFC contamination is therefore directly caused by Manufacturers' manufacture and/or distribution and sale of AFFF and the toxic PFC components used in AFFF foam.

171. It was and is reasonably foreseeable to Manufacturers that the property interests of Plaintiffs would be damaged by contamination resulting from releases of AFFF, and its chemical components, at Peterson AFB.

172. Manufacturers knowingly manufactured and/or distributed and sold a dangerous and defective product, failed to provide sufficient warnings to protect bystanders, such as the Plaintiffs, and failed to recall their products when they took them off the market and/or knew them to present a hazard to human health.

173. Upon information and belief, non-PFC based products were available for fire training that would not have led to contamination of Plaintiffs' property, including their drinking water and agricultural water supplies.

174. Upon information and belief, Manufacturers control a substantial share of the market in the United States for AFFF containing PFCs and the toxic components thereof and are jointly responsible for the contamination of the groundwater in the Widefield and Windmill Gulch aquifers and for causing the damages and injuries the Plaintiffs have and will suffer.

175. As a direct and proximate result of the contaminated groundwater near Peterson AFB, Plaintiffs have suffered, and will suffer, damages.

**DuPont's Knowledge of the Dangers of PFAS**

176. DuPont company scientists issued internal warnings about the toxicity associated with their PFOA products as early as 1961.

177. DuPont's Toxicology Section Chief opined that such products should be "handled with extreme care," and that contact with the skin should be "strictly avoided."

178.    In 1978, based on information it received from 3M about elevated and persistent fluorine levels in workers exposed to PFOA, DuPont initiated a plan to review and monitor the health conditions of potentially exposed workers in order to assess whether any negative health effects could be attributed to PFOA exposure.

179.    This monitoring plan involved obtaining blood samples from the workers and analyzing them for the presence of fluorine.

180.    By 1979, DuPont had data indicating that its workers exposed to PFOA had a significantly higher incidence of health issues than did unexposed workers.

181.    DuPont did not report this data or the results of its worker health analysis to any government agency or community.

182.    The following year, DuPont internally confirmed that PFOA "is toxic," that humans accumulate PFOA in their tissue, and that "continued exposure is not tolerable."

183.    Not only did DuPont know that PFOA accumulates in humans, but it was also aware that PFOA could cross the placenta from an exposed mother to her gestational child.

184.    In fact, DuPont had reported to EPA in March 1982 that results from a rat study showed PFOA crossing the placenta is present in maternal blood, but DuPont concealed the results of internal studies of its own plant workers.

185.    While DuPont knew about this toxicity danger as early as the 1960s, DuPont also was aware that PFAS was capable of contaminating the surrounding environment.

186.    Further, no later than 1984, DuPont was aware that PFOA is biopersistent.

187.    DuPont was long aware that the PFAS it was releasing from its facilities was leaching into groundwater used for public drinking water.

188.    After obtaining data on these releases and the consequent contamination near DuPont's plant in West Virginia, DuPont, in 1984, held a meeting at its corporate headquarters in Wilmington, Delaware, to discuss health and environmental issues related to PFOA (the "1984 Meeting").

189.    DuPont employees who attended the 1984 Meeting discussed available technologies that were capable of controlling and reducing PFOA releases from its manufacturing facilities, as well as potential replacement materials.

190.    DuPont chose not to use either available technologies or replacement materials, despite knowing of PFOA's toxicity.

191.    During the 1984 Meeting, DuPont employees in attendance spoke of the PFOA issue as "one of corporate image, and corporate liability."

192.    They also stated that the "legal and medical [departments within DuPont] will likely take the position of total elimination" of PFOA use in DuPont's business, and that these departments had "no incentive to take any other position."

193.    DuPont's own Epidemiology Review Board ("ERB") repeatedly raised concerns about DuPont's statements to the public that there were no adverse health effects associated with human exposure to PFOA.

194.    For example, in February 2006, the ERB "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential

basis of [DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health.

195.    DuPont knew or should have known that in their intended and/or common use, products containing PFAS would very likely injure and/or threaten public health and the environment.

196.    The Firefighting Foam Coalition ("FFFC"), an AFFF trade group, was formed in 2001 to advocate for AFFF's continued viability.

197.    DuPont, which as is described above had extensive knowledge about the toxicity associated with PFAS, was a member of the FFFC.

198.    Many of the Manufacturers were members of the FFFC ("FFFC Defendants").

199.    Through their involvement in the FFFC, as well as a variety of other trade associations and groups, FFFC Defendants shared knowledge and information regarding PFOA.

200.    The FFFC Defendants worked together to protect AFFF from scrutiny.

201.    Their close cooperation included messaging on PFOA's toxicological profile.

202.    The FFFC's efforts were designed to shield its members and the AFFF industry from the detrimental impact of the public and regulators learning about the harms of PFOA to human health and the environment.

203.    FFFC Defendants regularly published newsletters and attended conferences bolstering their AFFF products.

204.    These coordinated efforts by the FFFC Defendants were meant to dispel concerns about the impact AFFF had on the environment and human health. They worked in concert to conceal known risks of their AFFF from the government and public.

205. FFFC Defendants repeated the same message for years: Only one PFC chemical, PFOS, had been taken off the market. Since the FFFC Defendants' products did not contain PFOS, they claimed their products were safe.

206. FFFC Defendants knew the use of their AFFF products presented a similar threat to human health and the environment.

207. While this was known to FFFC Defendants, it was not fully understood by the users of AFFF, the public and Plaintiffs.

208. Plaintiffs' water supply has been, and continues to be, contaminated in varying amounts over time, as a result of AFFF, and toxic PFCs contained in the AFFF, manufactured, distributed, and sold by Manufacturers, causing Plaintiffs significant injury and damage.

### DuPont's Spinoff of Chemours

209. In February 2014, E.I. DuPont formed The Chemours Company as a wholly-owned subsidiary.

210. In July 2015, E.I. DuPont used Chemours to spin off its "performance chemicals" business line.

211. At the time of the spinoff, the performance chemicals division consisted of E.I. DuPont's Titanium Technologies, Chemical Solutions and Fluorochemicals segments (the "Performance Chemicals Business").

212. Until the spinoff was complete, Chemours was a wholly-owned subsidiary of E.I. DuPont. Although Chemours had a separate board, the board was controlled by E.I. DuPont employees.

213. Prior to the spinoff of Chemours, in 2005, E.I. DuPont agreed to pay $10.25 million to resolve eight counts brought by the United States Environmental Protection Agency ("EPA") alleging violations of the Toxic Substances Control Act ("TSCA") and the Resource Conservation and Recovery Act ("RCRA") concerning the toxicity of PFAS compounds. At the time, it was the largest such penalty in history.

214. E.I. DuPont also promised to phase out production and use of PFOA by 2015.

215. Also, in 2005, E.I. DuPont settled a class action lawsuit filed on behalf of 70,000 residents of Ohio and West Virginia for $141 million.

216. Under the terms of the 2005 class action settlement, E.I. DuPont agreed to fund a panel of scientists to determine if any diseases were linked to PFOA exposure, to filter local water for as long as C-8 concentrations exceeded regulatory thresholds, and to set aside $235 million for ongoing medical monitoring of the affected community.

217. After 8 years, the C-8 Science Panel found several significant diseases, including cancer, linked to PFOA.

218. Once the spinoff was complete, seven new members of the Chemours board were appointed, for an eight-member board of directors of the new public company.

219. The new independent board appointed upon the completion of the spinoff did not take part in the negotiations of the terms of the separation.

220. In addition to the transfer of assets, Chemours accepted broad assumption of liabilities for E.I. DuPont's historical use, manufacture, and discharge of PFCs, although the specific details regarding the liabilities that Chemours assumed are set forth in the non-public schedules.

221.    Within the publicly available information about the transfer is the fact that Chemours agreed to indemnify E.I. DuPont against, and assumed for itself, all "Chemours Liabilities," which is defined broadly to include, among other things, "any and all liabilities relating," "primarily to, arising primarily out of or resulting primarily from, the operation of or conduct of the [Performance Chemicals] Business at any time."

222.    Chemours agreed to indemnify E.I. DuPont against and assume for itself the Performance Chemical Business's liabilities regardless of:  (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the spinoff; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud or misrepresentation by any member of the DuPont group or the Chemours group; and (v) which entity is named in any action associated with any liability.

223.    Chemours agreed to indemnify E.I. DuPont from, and assume all, environmental liabilities that arose prior to the spinoff if they were "primarily associated" with the Performance Chemicals Business.

224.    Such liabilities were deemed "primarily associated" if E.I. DuPont reasonably determined that 50.1% of the liabilities were attributable to the Performance Chemicals Business.

225.    Chemours also agreed to use its best efforts to be fully substituted for E.I. DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities."

226.     In addition to the assumption of such liabilities, Chemours also provided broad indemnification to E.I. DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

227.     The effect of creation of Chemours was to segregate a large portion of E.I. DuPont's environmental liabilities, including liabilities related to its PFC chemicals and products.

228.     The consolidation of E.I. DuPont's performance chemical liabilities has potentially limited the availability of funds arising out of E.I. DuPont's liability.

229.     As Chemours explained in its November 2016 SEC filing: "[s]ignificant unfavorable outcomes in a number of cases in the [Ohio] MDL could have a material adverse effect on Chemours consolidated financial position, results of operations or liquidity."

230.     At the time of the transfer of its Performance Chemicals Business to Chemours, E.I. DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding E.I. DuPont's liability for damages and injuries from the manufacture of PFC compounds and products that contain PFC compounds.

**The United States' Use, Storage, Release, Discharge and Disposal of PFCs from Firefighting Foam at Peterson AFB has Contaminated Plaintiffs' Water Supply**

231.     The United States began using PFC-based AFFF at military installations, including Peterson AFB, in about 1970 to extinguish fuel-based fires. Final SI, p. 1.

232.     It is estimated that 75% of the military AFFF inventory is PFC-based product. During most of the past 30 years, 3M was the primary supplier of AFFF to the Department of Defense ("DoD") stock system. Fire Fighting Foam Coalition, "Estimated Quantities of Aqueous Film Forming Foam in the United States", August, 2004.

233.   The military Qualified Products Database listed 3M AFFF products as early as 1970, and Tyco products as early as 1976.  The other Manufacturers provided AFFF to the DoD, or supplied PFCs for AFFF delivered to the DoD, at various times from about 1973 to the present.[6]

234.   According to a 2011 Department of Defense risk alert document, "through 2001, the DoD purchased AFFF from 3M and/or Ansul, Inc.  3M supplied PFOS-based AFFF under the product name, 3M Light Water AFFF." DoD Risk Alert #03-11, "Aqueous Film Forming Foam".[7]

235.   Thousands of gallons of AFFF manufactured by Manufacturers, containing PFOS and PFOA, among other PFCs, was used and/or stored by the United States at Peterson AFB from approximately 1970 through at least 2018. See Final SI, pp. 3-4.

236.   The AFFF manufactured by Manufacturers was expected to reach Peterson AFB without substantial change in the condition in which it was distributed and sold to the Air Force, and it did.

237.   Air Force personnel conducted training exercises and other activities at Peterson AFB, including firefighting and explosion training, using AFFF.

238.   The United States discharged and disposed of spent AFFF containing PFCs on Peterson AFB. The United States' discharge and disposal of spent AFFF, and its PFC component, has included, but is not limited to, releases and discharges into soil and water pathways that connect the Peterson AFB to Plaintiffs' property, wells, water rights and systems. U.S. Army Corps of Engineers and Aerostar SES LLC, "Final Expanded Site Inspection Field Sampling Plan,

---

[6] http://dcppe.org/Systems/AFFF/MIL-F-24385%20QPL%20History%20for%20Type%206%20AFFF.pdf, last accessed 9.22.20.
[7] http://www.denix.osd.mil/cmrmp/ecmr/ecprogrambasics/resources/chemical-material-emerging-risk-alert-for-afff/, last accessed 9.22.20.

Attachment 1 to Final Uniform Federal Policy (UFP) Quality Assurance Project Plan (QAPP) for Site Inspections of Aqueous Film Forming Foam Areas, Multiple Sites, United Air Force Installations Addendum 8, Field Sampling Plan for Peterson Air Force Base, El Paso County, Colorado," November 2017, p. 2 (hereinafter "Final Expanded SI Field Sampling Plan").

239.     For instance, training, exercises, and fire response activities occurred on open ground at Peterson AFB, causing PFC waste to drain into soil, groundwater, surface waters, wetlands, ponds, and ditches.

240.     PFC-contaminated runoff from AFFF activities has been captured and stored in golf course ponds and re-used to irrigate the Peterson AFB golf course. Final Expanded SI Field Sampling Plan, p. 3; Final SI, pp. 5-6.

241.     The United States discharged and disposed of 10,000 – 20,000 gallons of PFC-contaminated AFFF wastewater into CS-U's sewer system as often as three times a year or more. See Final SI, p. 6. Upon information and belief, PFCs cannot be removed by the CS-U sewage treatment plant and were discharged into Fountain Creek.

242.     PFCs, including PFOA and PFOS, discharged to soil, surface waters, wetlands, ponds, and the golf course have migrated into groundwater and contaminated the Widefield and Windmill Gulch Aquifers where Plaintiffs' wells are located, contaminating Plaintiffs' water supply.

**Specific Release, Discharge, Disposal and Storage Locations on Peterson AFB**

243.     The U.S. Army Corps of Engineers identified numerous specific locations on Peterson AFB where the Air Force used, stored, discharged, and/or disposed of PFCs. These locations include, but are not limited to, a current Fire Training Area, former fire training areas

43

including "Site 5" and "Site 8," Hangar 119, Hangar 121, Hangar 133, Hangar 140, Hangar 210, Hangar 214, an underground storage tank, Fire Stations #1 and #2, Pond #3 and its Overflow Pond, a golf course, a former leach field, a former pond and burn pit, Building 104, and off-Base landfills where The United States discharged and disposed of contaminated soil. U.S. Army Corps of Engineers and Aerostar SES LLC, "Revised Final Preliminary Assessment Report for Perfluorinated Compounds at Peterson Air Force Base El Paso County, Colorado", November 2016b pp. 9, 46-48, [hereinafter "Revised Final PA"].

244.    Surface water in the northwest corner of Peterson AFB drains into East Fork Sand Creek, which crosses the Base and then flows into Fountain Creek above Security and the Widefield Aquifer, which is recharged in part from Fountain Creek. Final SI, pp. 28-29, D-1. The current Fire Training Area, Hangar 140, and Hangar 133 are located in the northwest corner of the Base.

245.    Drainage from the rest of the Base flows either through surface ditches into the golf course ponds (Ponds #1, #2, and #3), or through the storm water management system into Pond #3 and/or the Overflow Pond in the southern part of the Base. Id. at p. 5. Water in these ponds is used for irrigation. Id. at pp. 5-6; Final Expanded SI Field Sampling Plan, p. 3.

246.    Water from inside the Hangars is routed through floor drains to an underground storage tank (UST) near Hangar 210, where it is or was discharged into the CS-U public sewer system. Final Revised PA, pp. 19-24. Peterson AFB connected to the CS-U sewer system in or about 1978. Final SI, p. 5. Prior to this connection, any wastewater was discharged into a leach field at Peterson AFB. Id.

247.    Water that escapes outside the Hangars drains through the storm water management system into Pond #3 and the Overflow Pond or percolates into the soil. See Revised Final PA, pp. 19-24.

248.    PFC-based AFFF was used in training exercises in the current Fire Training Area from as early as 1989 through as recently as October 2016. Spent PFCs from the Fire Training Area were then stored in a holding tank, which was drained into the CS-U sewer system. Final SI, p. 6.

249.    Upon information and belief, CS-U was unaware of, and did not authorize, The United States's discharge and disposal of PFCs into the sewer. See Tom Roeder, Air Force: Toxic wastewater sent into Fountain Creek up to three times a year until 2015, The Gazette, http://gazette.com/air-force-toxic-wastewater-sent-into-fountain-creek-up-to-three-times-a-year-until-2015/article/1588901.

250.    Upon information and belief, PFC-based AFFF was sprayed beyond the perimeter of the Fire Training Area pit in an area where no system of containment existed and where it entered the environment, including soil and groundwater. See Final SI, p. 7.

251.    PFC-based AFFF was used in training exercises on Site 5, a former fire training area, from as early as 1970 through as recently as 1977. The burn pit at Site 5 that was used for training exercises did not have a liner to prevent seepage. Upon information and belief, wastewater from training exercises drained into the golf course ponds and has been reused for irrigation or percolated into the surrounding soil and groundwater. See Revised Final PA, pp. 11-13.

252.    PFC-based AFFF was used in training exercises on Site 8, a former fire training area, from as early as 1977 through as recently as 1992. Upon information and belief, the burn pit

45

at Site 8 that was used for training exercises was not lined. Upon information and belief, wastewater from training exercises drained into the golf course ponds and was reused for irrigation or percolated into the surrounding soil and groundwater. Final SI, p.4.

253. PFC-based AFFF was used and/or stored at Hangar 119, an aircraft maintenance hangar, for an unknown number of years. Hangar 119 has a floor drain that drains into the UST near Hangar 210, which drains into the CS-U sewer system. Revised Final PA, p. 19. AFFF was released during testing of the fire suppression system at least twice since 2009. Id. at D-3.

254. PFC-based AFFF was used and/or stored at Hangar 121, an aircraft maintenance hangar, at least after 1994, and for an unknown number of years before then. Hangar 121 has a floor drain that drains into the UST near Hangar 210, which drains into the CS-U sewer system. Id. at p. 20. AFFF was released during testing of the fire suppression system at least twice since 2009. Id. at D-3.

255. PFC-based AFFF was used and/or stored at Hangar 133 at least after 1992, and for an unknown number of years before then. In 2011 or 2012, AFFF was accidentally released into the mechanical room. Hangar 133 has a floor drain that drains into the UST near Hangar 210, which drains into the CS-U sewer system. Id. at p. 21. AFFF was released during testing of the fire suppression system at least twice since 2009. Id. at D-3.

256. PFC-based AFFF was used and/or stored at Hangar 140 at least after 2005, and for an unknown number of years before then. Hangar 140 has a floor drain that drains into the UST near Hangar 210, which drains into the CS-U sewer system. Id. at p. 22.

257. PFC-based AFFF was used and/or stored at Hangar 210 at least after 1985. There have been four reported accidental releases of AFFF in Hangar 210, the latest incident occurring

in 2014. Hangar 210 has a floor drain that drains into the UST near Hangar 210, which drains into the CS-U sewer system. Id. at p. 23. AFFF was released during testing of the fire suppression system at least twice since 2009. Id. at D-3.

258.    PFC-based AFFF was used and/or stored at Hangar 214 at least after 1987. There was one reported accidental release in an unknown year, which may have escaped into a storm sewer, the environment, or a pond. There was another accidental release on October 6, 2015, where AFFF may have escaped into a storm sewer, the environment, or a pond. Hangar 214 has a floor drain that drains into the UST near Hangar 210, which drains into the CS-U sewer system. Id. at p. 24. AFFF was released during testing of the fire suppression system at least twice since 2009. Id. at D-3.

259.    Upon information and belief, a portion of AFFF released in the hangars entered the storm water system, including ponds on the Base.

260.    Fire Station #1 is an active fire station. AFFF has been stored in drums and equipment at Fire Station #1. Spray testing using AFFF was conducted at Fire Station #1 for an unknown number of years, including over concrete and a sand-covered volleyball court. Upon information and belief, there was no liner or other containment beneath the testing areas. Runoff from testing went into the storm water system and then into Pond #3, the Overflow Pond, the other golf course ponds, the CS-U sewer system, East Fork Sand Creek, and/or the environment. Id. at pp. 25-26; Final SI, pp. 4-5.

261.    Fire Station #2 is an active fire station that opened in 1996. AFFF is stored in drums and equipment at Fire Station #2. Spray testing using AFFF was conducted at Fire Station #2 for an unknown number of years. Runoff from testing drained into surface drainages, Pond #3 and the

Overflow Pond, the golf course ponds, and/or the environment. Final Revised PA, pp. 27-28, 42; Final SI, p. 5.

262.     Ponds #1, #2, and #3 are detention ponds that have received storm water runoff since at least 1979. Water from Pond #3 is pumped into Ponds #1 and #2. Water in the ponds is reused to irrigate the golf course, and it is not treated prior to reuse. Prior to 2002, Pond #3 did not have a liner to prevent seepage. It is unclear at this time whether Ponds #1 and #2 have liners. Revised Final PA, pp. 28-31; Final SI, pp. 5-6; Final Expanded SI Field Sampling Plan, p. 3.

263.     The Overflow Pond is adjacent to Pond #3. It does not have a pond liner to prevent seepage. If Pond #3 is too full, water overflows through "Outfall #4" into the Overflow Pond. Water from all of the Hangars also may flow into the Overflow Pond. There is visible "overflow scarring" at the Overflow Pond, indicating that water has overflowed into it and out from it through "Outfall #5". See Final Revised PA, pp. 29, B-19, D-4; Final SI, p. 6.

264.     PFC-contaminated wastewater was discharged to a leach field (at the location of the current golf course) at least from 1970 through 1978. The leach field was designed to be an industrial waste drainage system and consisted of a settling tank, an oil water separator, and a gravel envelope leach field. PFC-contaminated effluent from the leach field would have entered the subsurface and groundwater. Revised Final PA, pp. 30-31; Final SI, p. 5.

265.     In addition, a pond formerly was located near the current location of Pond #3. An unknown amount of AFFF was discharged into that pond. See Revised Final PA, pp. 29, 41-42.

266.     At Building 104, which is near Pond #3, an unknown amount of AFFF was sprayed into the environment to "irrigate the wildlife." Id. at p. 31, D-5, Figure 3-10.

267. The United States excavated Site #5 and dumped contaminated soil into Landfill 3. Landfill 3 was excavated and placed into another landfill. The landfills are located between Peterson AFB and Plaintiffs' well fields. Id. at p. 43.

268. Several drums that contained AFFF were washed at an unknown location on Peterson AFB. Id. at pp. 10, 43.

269. Until at least 2018, the United States continued to store at least 150,000 gallons of PFC-contaminated water on Peterson AFB, including in a tank, vehicles, and ponds.

270. As additional information becomes available regarding the United States' handling, release, discharge, and disposal of PFCs at Peterson AFB, additional locations where AFFF was used, stored, discharged, and/or disposed of may be discovered. A Freedom of Information Act Request for additional information and documents was submitted on February 24, 2017, which has not yet been fully processed. Plaintiffs reserve the right to incorporate additional or revised information as it is discovered.

**Release, Discharge and Disposal of PFCs Is Contaminating the Widefield and Windmill Gulch Aquifers**

271. The United States preliminarily identified groundwater, surface water, and soil pathways where PFCs from AFFF used on Peterson AFB is or could be migrating to the Widefield and Windmill Gulch Aquifers. The United States analyzed groundwater, surface water, and soil samples from several locations: the current Fire Training Area, former fire training areas "Site 5" and "Site 8," Fire Stations #1 and #2, Pond #3 and its Overflow Pond, the golf course/former leach field, Building 104, and the off-Base landfills where the United States discharged and disposed of contaminated soil. Final SI, pp. 3-4. The United States also expanded the investigation and

analyzed Pond #1 and areas identified as possible "paleochannels" where PFCs migrate off Peterson AFB. Final Expanded SI Field Sampling Plan, pp. 1-3.

272.    At the current Fire Training Area, PFCs were detected in the subsurface soil and groundwater. PFOA and PFOS in groundwater in one sample had a combined concentration of over 88,000 parts per trillion ("ppt"). Final SI, pp. 25-26, 29, 32, 36, A-20. EPA's 2016 health advisories set forth a maximum combined PFOA and PFOS exposure limit of 70 ppt.  In 2022, EPA issued new health advisories that set maximum PFOA and PFOS lifetime exposure limits of 4 ng/L each.  In April 2024, EPA set Safe Drinking Water Act Maximum Contaminant Levels for PFOS and PFOA of 4 ng/L each.  40 C.F.R. § 141.61(c)(2).

273.    The United States concluded that "[u]se of AFFF at the current [Fire Training Area] has resulted in releases of [PFCs] to the environment," "apparently the result of overspray. . . ." Id. at pp. 7, 36. The United States also concluded that "migration of [PFC]-impacted groundwater offsite is possible and downgradient drinking water wells could be impacted." *Id*. at p. 32.

274.    At Site 5, Pond #3 and its Overflow Pond, the golf course/former leach field, and Building 104, PFCs were detected in the surface soil, subsurface soil, groundwater, sediment from the ponds, and surface water. Combined concentrations of PFOS and PFOA in groundwater exceeded 980 ppt in one sample, and ranged from 79 ppt to 980 ppt. Id. at pp. 17-24, 28. Combined concentrations of PFOS and PFOA in the surface water in the ponds reached 826 ppt and 730 ppt. *Id*. at p. 24. Sediment samples from Pond #3 showed a combined concentration of PFOA and PFOS of over 370 micrograms per kilogram (µg/kg). Id. at p. 23. The United States concluded that "[u]se of AFFF at [Peterson AFB] has resulted in impacts to the environment at [these locations.]. Id. at

p. 24. The United States also concluded that "[g]roundwater flows to the southwest … toward downgradient wells" and PFC-contaminated groundwater "may be flowing off base." *Id*. at p. 28.

275.    At Site 8, PFCs were detected in the surface soil, subsurface soil, and groundwater. *Id*. at pp. 9-11, 28.

276.    At Fire Station #1, PFCs were detected in surface soil, subsurface soil, and groundwater. Combined concentrations of PFOA and PFOS in groundwater at Fire Station #1 ranged from 77 ppt to 178 ppt. Id. at pp. 11 – 14. The United States concluded that "spray testing at Fire Station #1 has resulted in releases of [PFCs] to the environment." Id. at p. 14. The United States also concluded that "[g]roundwater flows to the southwest at Fire Station #1 and impacted groundwater may be flowing off base." *Id*. at p. 35.

277.    At Fire Station #2, PFCs were detected in surface soil, subsurface soil, and groundwater. A soil sample contained PFOS at 2,400 µg/kg. Id. at pp. 14-17, 29. The United States concluded that this PFOS detection in the soil "indicates the potential for possible impacts to groundwater," Id. at pp. 27-28, and "surface soil could impact groundwater at concentrations above the EPA [Health Advisory] creating a potential human exposure pathway," *Id*. at p. 31.

278.    The United States has not yet analyzed, or has not yet reported, the extent of PFC contamination at numerous other locations where AFFF was used and escaped into the environment, including, but not limited to, Hangar 119, Hangar 121, Hangar 133, Hangar 140, Hangar 210, and Hangar 214, and other areas along the surface and groundwater pathways from Peterson AFB to the Widefield and Windmill Gulch Aquifers. The United States is conducting additional aquifer investigation work. Plaintiffs reserve the right to incorporate additional information regarding PFC contamination in soil and water as it is discovered.

**Specific and Mandatory Directives Prohibited the United States' Actions**

279.    The United States' discharges of PFCs violated mandatory laws, regulations, policies, and instructions, including a mandatory Executive Order and mandatory USAF Instructions.

280.    Air Force Instruction 32-1067, February 4, 2015, Civil Engineering: Water and Fuel Systems ("AFI 32-1067") contains mandatory instructions on how to handle wastewater and PFCs. (This Instruction superseded Air Force Instructions 32-1067 (Water Systems, April 3, 2013), 32-1066 (Plumbing Systems, October 17, 2007), 32-7041 (Water Quality Compliance, December 10, 2003), and 32-1069 (Gas Supply and Distribution, March 31, 1994)). Upon information and belief, AFI 32-1067 became effective on February 4, 2015 and currently remains in effect.

281.    AFI 32-1067 includes the following requirements:

a)    "Collect and manage industrial wastewater (e.g., wastewater discharge from aircraft hangar accidental release of fire fighting foam solution) as a hazardous waste per AFI 32-7042, *Waste Management*, if regulations or permit limits prohibit discharging such wastewater into domestic or other non-industrial sewer systems. . . .

Unless permitted, do not discharge substances to sanitary or storm systems that contain perfluorinated compounds (PFCs) like perfluorooctane sulfonic acid (PFOS), perfluorooctanoic acid (PFOA), perfluorononanoic acid (PFNA), perflourohexane sulfonic acid (PFHxS), perfluoroheptanoic acid (PFHpA), or perflurobutanesulfonic acid (PFBS). PFC-containing firefighting foams will not be discharged to a POTW [Publicly Owned Treatment Works] or FOTW. Release of firefighting solutions that contain PFCs from fire

systems test activation and fire vehicle chemical discharges will be captured, contained, and disposed of to meet applicable regulatory requirements or applicable policy directives." ¶¶ 4.3.2 and 4.3.2.1.

b) "Firefighting solutions that do not contain PFCs may be discharged to the sanitary sewer after receiving approval from the receiving POTW or FOTW." ¶ 4.3.2.2.

c) "NPDES Permits. For installations located in the U.S., discharges of domestic wastewater require an NPDES permit from Federal or delegated state regulatory authorities. . . . Discharges to POTW Treatment Facilities. Installations that discharge to POTW are considered as indirect dischargers and are regulated by the POTW authority. Installations must comply with applicable POTW regulations, permits, and contractual agreements." ¶¶ 4.3.8. and 4.3.8.4.

d) "Accidental Releases of Fire Fighting Foam Solutions. Unless permitted, do not discharge substances that contain pentadecafluorooctanoic acid, perfluorooctanoic acid, perfluorocaprylic acid or perfluorooctanoate (PFOA) or perfluorooctanyl sulfonate, perfluoronoanoic acid (PFOS) [sic]. Release of firefighting solutions from fire systems test activation and fire vehicle chemical discharges will be captured, contained and disposed to meet applicable regulatory requirements. Prior to discharge to the sanitary sewer; obtain approval of the receiving POTW or FOTW. If metered firefighting foam release to the sanitary sewer is not approved, then containerize and dispose following regulatory standards. Firefighting foam of all types will not be released to storm water conveyance structures." ¶ 5.6.

282.     Upon information and belief, from February 4, 2015 into at least 2018, the United States failed to capture or contain or treat firefighting foam containing PFCs, including PFOA and PFOS.

283.     Pursuant to the Federal Resource Conservation and Recovery Act, hazardous waste is subject to strict requirements for containment, storage, treatment and disposal.  42 U.S.C. § 6921, et seq.; 40 C.F.R. § 260, et seq.; C.R.S. § 25-15-308; 6 CCR 1007-3, Parts 260-279.

284.     As described above, PFCs were not captured, contained and disposed of as hazardous waste, but intentionally were released, discharged, and disposed of at numerous unpermitted locations at Peterson AFB, including Fire Stations #1 and #2, Hangar 119, Hangar 121, Hangar 133, Hangar 140, Hangar 210, Hangar 214, Fire Stations #1 and #2, Pond # 3, the Overflow Pond, and the golf course.

285.     Air Force Instruction 32-7041, Civil Engineering: Water Quality Compliance, December 10, 2003 (effective through February 4, 2015) ("AFI 32-7041") contains mandatory instructions on wastewater discharges, including the following:

a)  "Discharges to Publicly Owned Treatment Works (POTWs) . . . . Installations that discharge to permitted POTWs are considered as secondary dischargers and are regulated by the POTW authority. They must comply with applicable POTW regulations, permits, and contractual agreements." ¶ 2.2.3.2.

b)  "Strictly control the discharge of industrial wastewater and other prohibited waste from entering into domestic wastewater or other non-industrial sewer systems and storm sewer systems. . . . Unauthorized discharges of certain types of industrial wastewaters through drains to domestic wastewater collection systems are prohibited. For discharges to POTWs,

contact the facility manager for clarification. . . . Pretreat regulated industrial wastewater to acceptable levels before discharge to a domestic wastewater or other non-industrial sewer systems. Pretreat other industrial wastewater, such as toxic, flammable, and corrosive wastes to remove these characteristics before discharge into a domestic wastewater system. . . . Collect and manage industrial wastewater as a hazardous waste per AFI 32-7042, *Solid and Hazardous Waste Compliance*, if regulations prohibit discharging such wastewater into domestic wastewater or other non-industrial sewer systems and pretreatment is not practical." ¶¶ 2.9., 2.9.1., 2.9.3., and 2.9.4.

c) Industrial wastewater is defined as "wastewater from industrial activities." Page 20. This Instruction acknowledges that "The Environmental Protection Agency defines 11 categories of industrial activities, some of which may apply to Air Force installations, including: (1) Air and ground transportation facilities. . . ." Page 22.

286.    Upon information and belief, from December 10, 2003 through February 4, 2015, the United States failed to comply with the mandatory obligations of AFI 32-7041. AFFF waste should have been treated as industrial wastewater because it was waste from Peterson AFB, an air and ground transportation facility.

287.    The United States did not collect and manage PFCs as hazardous wastes. Instead, PFCs were discharged and disposed of into the environment, including into soil, surface water and groundwater.

288.    Air Force Instruction 32-7041, Civil Engineering: Water Quality Compliance, May 13, 1994 (effective through December 10, 2003) ("AFI 32-7041") contains the following mandatory instructions:

a) "Industrial Wastewater. . . . Pretreat other industrial wastewater, such as toxic and corrosive wastes, before discharging it into a domestic wastewater system. . . . Strictly control the discharge of industrial wastewater by: . . . Keeping prohibited waste from entering domestic wastewater and other nonindustrial sewer systems; Pretreating regulated industrial wastewater to acceptable levels before discharge to a domestic wastewater or other nonindustrial sewer systems. . . . Collect and manage industrial wastewater as a hazardous waste per AFI 32-7042, *Solid and Hazardous Waste Compliance*, if: Regulations forbid discharging such wastewater into domestic wastewater or other nonindustrial sewer systems; Pretreatment is impossible." ¶¶ 2.8 – 2.8.3.

b) "Fire Training Facilities. Operate new fire training facilities as zero-discharge facilities. New facilities must: Protect groundwater; Include a groundwater monitoring system and double-lined basins with leak-detection systems." ¶¶ 2.9 – 2.9.1.

289. Upon information and belief, from May 13, 1994, through December 10, 2003, the United States failed to comply with AFI 32-7041. AFFF waste should have been treated as industrial wastewater. As industrial wastewater, USAF should have pretreated PFC-containing AFFF before discharge into the CS-U sewer system or should have collected and managed the AFFF as a hazardous waste.

290. The United States discharged and disposed of AFFF containing PFC into the environment, including into soil, surface water and groundwater. PFC-contaminated water also was reused for golf course irrigation on Peterson AFB, without treatment. Thus, the Air Force failed to either pretreat and deliver AFFF waste to a POTW pursuant to authorization or to manage the AFFF as hazardous waste.

291. In addition, upon information and belief, the United States failed to operate new fire training facilities as zero-discharge facilities with groundwater monitoring systems and double-lined basins having leak-detection systems.

292. Air Force Instruction 32-1067, Civil Engineering: Water Systems, March 25, 1994 (effective through April 3, 2013) ("AFI 32-1067") contains the following mandatory instructions:

293. "Pollution Control: Operate and maintain water pollution control facilities according to AFM 91-32 and plant-specific O&M manuals which are required for each major facility. . . . Activities that require special attention include . . . fire training." ¶ 7.3.1.

294. "A base standard wastewater treatment procedure is required to govern the discharge of industrial and nondomestic waste to the sanitary system by generating activities. Base Civil Engineering outlines procedures for discharging industrial wastes to the sanitary system and generators must follow these instructions. Instructions should describe pretreatment requirements, discharge procedures, and limitations for industrial waste. . . . Generators must use pollution control techniques in AFI 32-7080, Pollution Prevention Programs (formerly AFR 19-15), to minimize pollutant discharges. Hazardous waste may not be discharged to the collection system." ¶ 7.3.2.

295. Upon information and belief, from March 25, 1994, through April 3, 2013, the United States failed to comply with AFI 32-1067 by failing to have a base standard wastewater treatment procedure for PFC-containing AFFF and by failing to handle PFCs as hazardous waste.

296. Air Force Instruction 32-7042, Civil Engineering: Waste Management, November 7, 2014, revised February 8, 2017 ("AFI 32-7042"), contains the following mandatory instruction:

a) "Inherent in the mission of the AF are the associated environmental responsibilities of protecting human health and the environment and ably managing the natural resources whose care has been entrusted to the AF. . . . Where environmentally damaging materials are used, their use is minimized. If the use of such materials cannot be avoided, the spent material or waste is reused or recycled whenever feasible. As a last resort, spent material or waste that cannot be reused or recycled is disposed of in an environmentally safe manner, consistent with the requirements of all applicable laws . . . ." ¶ 1.1.

297. Executive Order 11507, Prevention, Control, and Abatement of Air and Water Pollution at Federal Facilities, February 4, 1970 (effective through December 17, 1973) ("EO 11507") required federal agencies to:

> ensure that all facilities under their jurisdiction are designed, operated, and maintained so as to meet the following requirements: . . . . No waste shall be disposed of or discharged in such a manner as could result in the pollution of ground water which would endanger the health or welfare of the public.

§ 4.a.5. Upon information and belief, from 1970 to 1973 and from 2014 to 2018, the United States discharged and disposed of PFC waste on Peterson AFB in violation of AFI 32-7042 (Rev. 2017) and EO 11507, by discharging AFFF containing PFCs to soil, surface water, and groundwater which resulted in groundwater pollution that endangers the health and welfare of the public.

298. Based on information and belief, additional directives compelled or prohibited specific conduct relating to AFFF, which the United States violated, including instructions, rules, manuals, and directives specific to Peterson Air Force Base. As additional information becomes available through discovery regarding the United States' handling, release and disposal of PFCs at Peterson AFB, additional instructions, rules, manuals, and directives may be implicated that are

not specifically identified or cited in this Complaint. Plaintiffs reserve the right to incorporate additional rules, manuals, instructions, directives, or the like, as additional information is discovered.

### The United States' Actions Were Not Grounded in Policy

299.    The United States' release and disposal of PFCs was not based on considerations of public policy, including social, economic, or political policy.

300.    The foregoing directives forbid discharges of PFCs to the environment and establish requirements for handling these wastes. They granted no authority to balance social, economic, or political concerns and none exist. Moreover, the prohibitions on discharges to the environment are absolute and require no balancing of factors. Thus, none of the United States' actions were protected policy determinations.

301.    There was and is no policy benefit from handling and disposing of AFFF containing PFCs in violation of mandatory directives, for contaminating groundwater with PFCs, or contaminating Plaintiffs' water supply, which provided drinking water to approximately 19,000 people.

302.    There is no policy benefit from trespassing on Plaintiffs' land and water rights, acting negligently, and creating a nuisance through releases of PFCs into Plaintiffs' water supply.

303.    Properly handling, disposing of, and/or treating PFCs posed and poses no threat to national security or Peterson AFB; and, in fact, was and is expressly required by the directives, discussed above.

**Release, Discharge, and Disposal of PFCs Is Contaminating the Widefield Aquifer**

304.    The Widefield and Windmill Gulch Aquifers and the Fountain Creek Watershed are contaminated with numerous types of PFCs. The Colorado Department of Public Health and Environment (CDPHE), the agency tasked with regulation of water quality in Colorado, reports that these include PFOS, PFOA, PFBS, PFHpA, PFHxS, and PFNA.

305.    Plaintiffs have discovered PFOS, PFOA, and other PFCs in samples of groundwater collected from all of their wells.

306.    For example, levels of PFOA, PFOS, and PFHxS have been detected in water withdrawn from Plaintiffs' wells at the concentrations shown in Table 1, below.

**Table 1**

| Well | Date | PFHxS (ppt) | PFOA (ppt) | PFOS (ppt) |
|------|------|-------------|------------|------------|
| CS13 | 1/25/2016 | 440 | 90 | 150 |
| FV4 | 2014 average | 180 | 50 | 60 |
| R1 | 2014 average | 315 | 40 | 45 |
| R2 | 2014 average | 335 | 60 | 55 |
| S2 | 2014 average | 210 | 50 | 40 |
| S4 | 2014 average | 125 | 30 | 95 |
| S7 | 2014 average | 135 | 30 | 90 |
| S8 | 2014 average | 90 | 20 | 40 |
| S9 | 2014 average | 195 | 45 | 75 |
| S10 | 2014 average | 135 | 40 | 90 |

| Well | Date | PFHxS (ppt) | PFOA (ppt) | PFOS (ppt) |
|---|---|---|---|---|
| S11 | 2014 average | 95 | 30 | 95 |
| S12 | 1/25/2016 | 140 | 30 | 100 |
| S13 | 1/25/2016 | 400 | 90 | 160 |
| S14 | 1/25/2016 | 640 | 60 | 510 |
| S15 | 2014 average | 260 | 65 | 20 |
| S16 | 2014 average | 360 | 65 | 55 |
| Tank for Wells V4, V5, V7, V8 | 2014 average | 370 | 70 | 60 |
| Yucatan Tank Pump Station Blend | 2014 average | 75 | 7.5 | 40 |
| W8 | 2014 average | 330 | 80 | 580 |
| W9 | 2014 average | 325 | 75 | 975 |
| W12 | 2014 average | 240 | 45 | 595 |
| Water Treatment Plant TP042 | 2014 average | 515 | 85 | 175 |

307.    In May 2016, the EPA issued health advisory exposure limits of 70 ppt for PFOA and PFOS, either alone or combined. Most of the samples listed in Table 1 exceeded 70 ppt for PFOA, PFOS, or a combination of both.

308.    Upon information and belief, soil, plants, and animals in the Fountain Creek Watershed and in Security's service area also contain PFCs due to the contaminated groundwater.

**PFCs, including PFOA and PFOS, Threaten Human Health**

309.    Humans may absorb PFCs from drinking water, and PFCs accumulate primarily in the blood stream, kidneys and liver.

310.    PFCs are extremely persistent and bioaccumulate, or build up, in the human body. Even a short-term exposure results in a body burden that persists for years and can increase with additional exposures later.

311.    The EPA projects that PFOS has a half-life of 5.4 years, PFOA has a half-life of 2.3 – 3.8 years, and PFHxS has a half-life of 8.5 years, in humans. (A half-life is the amount of time it takes for fifty percent of the contaminant to leave the body.) Because of these long half-lives, the EPA expects that "it can reasonably be anticipated that continued exposure could increase body burdens to levels that would result in adverse outcomes." EPA, Long-Chain Perfluorinated Chemicals (PFCs) Action Plan, pp. 1, 8-9, December 30, 2009.

312.    The EPA Health Advisories have identified a number of health risks associated with exposure to PFCs. Studies show associations between increased PFOA and PFOS levels in blood and an increased risk of several health effects, including high cholesterol levels, changes in thyroid hormone, ulcerative colitis (autoimmune disease), pre-eclampsia (a complication of pregnancy that includes high blood pressure), and kidney and testicular cancer.

313.    The EPA also classified PFOA and PFOS as having suggestive evidence of carcinogenic potential in humans. EPA, Health Effects Support Document for Perfluorooctanoic Acid (PFOA), p. 3-159, May 2016; EPA, Health Effects Support Document for Perfluorooctane Sulfonate (PFOS), p. 3-114, May 2016.

314.     The EPA cited reports from the Organization for Economic Co-operation and Development ("OECD") in the May 2016 Health Advisories. The OECD is an international intergovernmental organization that meets, discusses issues of concern, and works to respond to international problems.

315.     According to a published OECD Report, for mammalian species, PFOA and its salts have been found to cause cancer in rats and adverse effects on the immune system in mice. In addition, PFOA and its salts can display reproductive or developmental toxicity in rodents at moderate levels of exposure, and moderate to high systemic toxicity in rodents and monkeys following long-term exposure by the oral route. OECD, Report of an OECD Workshop on Perfluorocarboxylic Acids (PFCAs) and Precursors, p. 21, June 18, 2007. The OECD also concluded in a Hazard Assessment that PFOS is persistent, bioaccumulative and toxic to mammalian species. OECD, Hazard Assessment of Perfluorooctane Sulfonate (PFOS) and Its Salts, p. 5, November 21, 2002.

316.     The EPA also cited findings from a C8 Science Panel and Health Project in the May 2016 Health Advisory for PFOA. The C8 Science Panel was formed out of a class action settlement related to PFOA contamination of groundwater from a manufacturing facility in West Virginia. The C8 Health Project is the largest study evaluating human exposure and health endpoints for PFOA; the study included more than 65,000 people in Mid-Ohio Valley communities who were exposed to PFOA for longer than 1 year. The C8 Science Panel consisted of three epidemiologists and its goal was to assess the links between PFOA and a number of diseases. The C8 Science Panel carried out a series of exposure and health studies between 2005 and 2013; information was gathered through questionnaires and blood samples from the individuals who had drinking water

that was contaminated with PFOA and previously published studies were also reviewed as part of the project.

317.     The C8 Science Panel released reports and found probable links between exposure to PFOA and six diseases: high cholesterol, ulcerative colitis, thyroid disease, testicular cancer, kidney cancer, and pregnancy-induced hypertension.

318.     The U.S. Agency for Toxic Substances and Disease Registry ("ATSDR") states in its 2018 draft Toxicological Profile that studies suggest associations between PFOA and PFOS exposure and liver damage, pregnancy-induced hypertension, increased cholesterol, increased risk of thyroid disease, increased risk of asthma, increased risk of decreased fertility, low birth weight and increases in testicular and kidney cancers.

319.     In addition, CDPHE advises on its website that "[r]ecent information has strengthened the link between exposure to PFOA and PFOS and developmental effects including low birth weight and accelerated puberty. Low birth weight can contribute to many long-term health and behavioral risks, including diabetes and obesity. Some human studies show that increased exposure to PFOA and PFOS might increase the risk for certain health problems such as changes in blood cholesterol, liver enzymes, and uric acid levels, which may be linked with an elevated risk of heart disease, liver disease or high blood pressure." CDPHE, PFCs – Health Recommendations.

320.     CDPHE believes that PFHpA has the potential to have similar effects to PFOA and PFOS. CDPHE, EPA Health Advisory.[8]

---

[8]https://www.colorado.gov/pacific/cdphe/PFCs/health, last accessed 09.22.20.

321.    If PFOA and PFOS levels exceed the Health Advisory levels, CDPHE states that "actions [should be initiated] to protect humans from coming in contact with the substance." CDPHE, PFCs – Health Recommendations.[9]

322.    The Colorado Solid and Hazardous Waste Commission ("Commission") added PFOA and PFOS and their anions to Colorado's list of hazardous constituents in 6 CCR 1007-3, Part 261, Appendix VIII. The Colorado Hazardous Waste Regulations allow substances to be added to the list of hazardous constituents if they have been shown in scientific studies to have toxic, carcinogenic, mutagenic or teratogenic effects on humans or other life forms. The Commission found that PFOS and PFOA have been shown in scientific studies to be toxic and potentially carcinogenic to humans, satisfying the regulatory criteria for listing.

323.    Upon information and belief, the PFCs with carbon chains longer than that of PFOA and PFOS (i.e., longer than eight) are even more dangerous to human health. OECD, Report of an OECD Workshop on Perfluorocarboxylic Acids (PFCAs) and Precursors, p. 21, June 18, 2007. PFNA, which contains a carbon chain longer than PFOA and PFOS has been found in some sampling of the Widefield and Windmill Gulch Aquifers.

324.    To date, no known studies and assessments of risks associated with PFCs have taken into account any additive and synergistic toxic effects of mixtures of these compounds. To date, mixtures of at least PFOA, PFOS, PFNA, PFBS, PFHxS, and PFHpA have been found in sampling of the Widefield and Windmill Gulch Aquifers.

325.    Notwithstanding the foregoing actions and determinations by EPA and CDPHE, neither PFOS nor PFOA, nor other PFCs, have been listed as, or otherwise determined to be,

---

[9] https://www.colorado.gov/pacific/cdphe/PFCs/health, last accessed 09.22.20.

hazardous waste regulated by the Resource Conservation and Recovery Act. Thus, the mandatory directives requiring Air Force to treat AFFF containing PFC as hazardous waste are internal requirements, not RCRA compliance obligations.

326. Upon information and belief, Defendants knew or should reasonably have known about the health effects from PFCs, discussed above, at the time they developed, manufactured, marketed, sold, distributed, or used PFC-based AFFF.

### PFCs, including PFOA and PFOS, Threaten the Environment

327. PFCs are extremely persistent in the environment because they are chemically and biologically stable and are resistant to environmental degradation. The EPA projects that PFOS has a half-life in water of over 41 years, and PFOA has a half-life in water of over 92 years. And, "PFOA and PFOS are considered to be resistant to degradation in soil." EPA, Long-Chain Perfluorinated Chemicals (PFCs) Action Plan, p. 1, December 30, 2009.

328. PFCs also are particularly mobile in soil and water, readily absorbed into groundwater, and can migrate across long distances.

329. Additionally, non-human receptors exposed to the contaminated environment are at significant risk of harm. PFOA is persistent and can cause adverse effects in laboratory animals, including cancer and developmental and systemic toxicity. PFOS is persistent, bioaccumulative and toxic to mammalian species. PFOS is linked to developmental, reproductive, and systemic toxicity. PFOA and PFOS are also linked to:

(a) immune system impacts on certain animal species (which are often used as indicators of the overall health of an ecosystem);

(b) elevated mortality in unexposed progeny of freshwater macro-invertebrates with exposure in the parental generation;

(c) disruption of the endocrine system in wildlife; and

(d) liver toxicity in animals.

330.    PFOA also is readily taken up by plants, including wild plants as well as crops grown on contaminated soil, and bioaccumulates in the food chain.

331.    These impacts impair use of Plaintiffs' Widefield and Windmill Gulch Aquifer water rights for irrigation of food crops or other uses that could expose humans and animals to PFCs.

332.    Further, since PFOA and PFOS are not the only PFCs in the environment, mixtures of PFCs raise the likelihood of additive and synergistic impacts on non-human receptors. It is likely that one or more other PFCs possess similar characteristics and pose similar threats of adverse health effects as set forth above for PFOA and PFOS.

333.    Upon information and belief, Defendants knew or should reasonably have known about the environmental effects from PFCs, discussed above, at the time they developed, manufactured, marketed, sold, distributed, or used PFC-based AFFF.

### The Threats from PFCs are Ongoing

334.    The PFC contamination caused by Defendants is not contained and continues to spread into Plaintiffs' property and groundwater supplies.

335.    If the Widefield and Windmill Gulch Aquifers and the contaminated soil are not remediated, PFC contamination will continue to impact Plaintiffs' property and water rights far into the future because PFCs resist degradation and are persistent and mobile in water and soil.

## Plaintiffs' Have Been Damaged by Defendants Actions

336. The PFC contamination prevents Plaintiffs from fully utilizing their property, including their water rights and wells in the Widefield and Windmill Gulch Aquifers.

337. Due to the PFC contamination, Security stopped using its wells in 2016 and cannot currently utilize its groundwater and other property rights. Security has the right to use in excess of 840 million gallons of water per year (approximately 2,583 acre-feet per year) from the Widefield and Windmill Gulch Aquifers. This groundwater historically provided about half of Security's total water supply requirements.

338. Due to PFC contamination of its groundwater, Security spent in excess of $6 million from 2016 to the present to purchase and transport alternate and supplemental sources of water through the FVA conduit, SDS pipeline, and CS-U connection, to shut down its wells in the Widefield and Windmill Gulch Aquifers, to construct the CS-U connection, to construct alternate internal water delivery configurations so that water from the surface water supplies from the three pipelines could be distributed to Security's customers, to monitor and sample for PFCs, to repair reputational damage, and to otherwise respond to the PFCs contamination.

339. PFCs are damaging, and will continue to damage, Security's water and property because they will persist for decades in water and soil and are bioaccumulating in plants and organisms.

340. The PFC contamination prevents the Foundation from fully utilizing its property, including its water rights and wells in the Widefield Aquifer. As a result of contamination of this water and farmland by Defendants, the Foundation has suffered and will suffer damages.

341.    Due to the PFC contamination, the Foundation cannot currently utilize its water and property rights for growing produce and vegetables, for domestic purposes or for leasing water to municipalities. The Foundation has the right to use in excess of 162 million gallons of water per year (500 acre-feet per year) from the Widefield Aquifer for crop irrigation, and to lease in excess of 366 million gallons of water per year to municipalities, including Security. Under the current lease, the Foundation leases 1,350 acre-feet of water per year to Security and Widefield in perpetuity, who sublease a portion of the water rights to the City of Fountain. Those leased water rights have not been able to be used for municipal purposes due to the PFC contamination caused by Defendants. Moreover, Security and Widefield might not remain liable for the lease payments even if the contaminated water is filtered to remove PFCs.

342.    The Foundation's water and property rights have been impaired and devalued by the PFC contamination. Due to PFC contamination of its groundwater, the Foundation has lost, and reasonably anticipates losing, in excess of $7,000,000, including lost rents and crops, repair of reputational damage, and costs to mitigate and treat the PFC contamination.

343.    The Foundation has incurred costs and expenses to secure and utilize an alternative water supply for drinking water and other purposes, and will continue to incur those costs in the future, as a result of contamination of its groundwater supply by PFCs, including PFOA and PFAS, from Peterson Air Force Base.

344.    PFCs are damaging and will continue to damage the Foundation's water and property because they will persist for decades in water and soil and are bioaccumulating in plants and organisms.

69

345. Because precise identification of the specific manufacturer of any given AFFF that was the source of PFOA and PFOS found in Plaintiffs supply wells is difficult, Plaintiffs must pursue all Manufacturers, jointly and severally, for those indivisible injuries which Manufacturers have caused Plaintiffs to suffer.

346. Manufacturers are also jointly and severally liable because they conspired to conceal the true toxic nature of PFCs, including PFOS and PFOA, to profit from the use of AFFF containing PFOA and PFOS, at Plaintiff s expense, to foreseeably contaminate Plaintiff's water supplies, and to attempt to avoid liability for such contamination of the groundwater.

347. Enterprise liability attaches to all Manufacturers and the liability of each should be assigned according to its percentage of liability for AFFF containing PFOA and/or PFOS and/or other PFCs for use in AFFF at issue in this Complaint. Each of these Manufacturers participate in a state-wide and national market for AFFF containing PFOA and/or PFOS and/or other PFCs for use in AFFF during the relevant time.

348. Concert of action liability attaches to all Manufacturers, each of which participated in a common plan to commit the torts alleged herein and each of which acted tortiously in pursuance of the common plan to knowingly manufacture and sell inherently dangerous AFFF containing PFOA and/or PFOS and/or other PFCs for use in AFFF.

349. Enterprise liability attaches to all of the named Manufacturers for placing defective, products into the stream of commerce.

# FTCA CLAIMS

## FTCA Statutory Background

350.     Under the FTCA, the government is liable "in the same manner and to the same extent as a private individual under like circumstances," 28 U.S.C. § 2674, "in accordance with the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b)(1). Courts resolve questions of liability under the FTCA in accordance with the law of the state where the tortious activity took place. *Hoery v. United States*, 324 F.3d 1220, 1222 (10th Cir. 2003).

## FIRST CLAIM FOR RELIEF

## TRESPASS

### (United States)

351.     Plaintiffs incorporate all averments in this Complaint as if restated fully herein.

352.     The United States has trespassed, and continues to trespass, on Plaintiffs' property, including Plaintiffs' water rights, by contaminating Plaintiffs' property with persistent, toxic, and bioaccumulative PFCs.

353.     In Colorado, a defendant is liable for trespass when the defendant permits "a physical intrusion upon the property of another without the proper permission from the person legally entitled to possession of that property." *Hoery v. United States*, 64 P.3d 214, 217 (Colo. 2003). "The intrusion can occur when an actor . . . causes something else to enter" the property, including land and groundwater. *Id.*; *Antolovich v. Brown Grp. Retail, Inc.*, 183 P.3d 582, 602 (Colo. App. 2007) (plaintiffs alleged that defendant caused pollutant to enter plaintiffs' soil and groundwater); *see also* CJI-Civ 4th, Civil 18:1 and 18:2. Trespass may be a permanent or

continuing tort. For continuing trespass, the claim continues to accrue as long as tortious conduct continues. *Hoery*, 324 F.3d at 1222.

354. The United States intentionally sprayed, dumped, discharged, or disposed of AFFF containing PFCs on open ground, soil, and water at Peterson AFB; "irrigate[d] the wildlife" and the Peterson AFB golf course with water containing PFCs; spilled PFCs; stored PFC-contaminated water in ponds, containers, and vehicles on Peterson AFB where it leaked and leached into the environment; and otherwise discharged PFCs into the environment.

355. PFCs from Peterson AFB migrated from Peterson AFB through groundwater to the Widefield and Windmill Gulch Aquifers and property owned by Plaintiffs, including the property on which their wells are, or could be, located and into the groundwater for which they possess decreed water rights.

356. The United States' intentional release and disposal of PFC waste has caused a trespass on Plaintiffs' property and water rights.

357. The continued migration to, and existence of, PFCs beneath Plaintiffs' property and in Plaintiffs' water rights in the Widefield and Windmill Gulch Aquifers, constitute a continuing trespass.

358. The United States holds no right to possess Plaintiffs' property and water rights.

359. The United States did not have Plaintiffs' permission to place PFCs upon, in, or beneath Plaintiffs' property, including the lands where Plaintiffs' wells are, or could be, located and the water rights owned by Plaintiffs.

360.     Upon information and belief, the United States knew, or should have known and knows that PFCs migrated or would migrate downgradient into the Widefield and Windmill Gulch Aquifers, and into Plaintiffs' real property and water rights.

361.     The United States intentionally and unreasonably failed to remediate or stop the PFC contamination from spreading to the Plaintiffs' property and water supplies.

362.     The intrusion into Plaintiffs' property and water rights of PFCs caused Security to suffer in excess of $6 million in damages, including the costs of obtaining, providing, and delivering alternate water supplies and delivery systems; costs of sampling and monitoring; and other response or remediation costs. Security expects to incur in excess of an additional $8.5 million in future liabilities and restoration costs in order to remove PFCs from its groundwater.

363.     The intrusion of PFCs into the Foundation's property and water rights caused, and is reasonably anticipated to cause, the Foundation to suffer in excess of $7 million in damages, including loss of rents and revenue; loss of crops; loss of an ability to carry on an economic enterprise on and with its property; cost of treating its water in order to beneficially use it; and other response or remediation costs.

364.     As a direct and proximate result of the trespass by the United States, the Plaintiffs' water rights and property are being damaged and destroyed, causing economic loss.

## SECOND CLAIM FOR RELIEF

### NUISANCE

### (United States)

365.     Plaintiffs incorporate all averments in this Complaint as if restated fully herein.

366. The United States created and continues to cause a nuisance to Plaintiffs by unreasonably and substantially interfering with Plaintiffs' use and enjoyment of their property and water rights by contaminating them with PFCs.

367. In Colorado, a defendant is liable for nuisance when it creates a substantial invasion of a plaintiff's interest in the use and enjoyment of its property. *Hoery*, 64 P.3d at 218. The invasion may be intentional and unreasonable. To be unreasonable, an interference must be significant enough that a normal person in the community would find it offensive, annoying, or inconvenient. *Pub. Serv. Co. of Colorado v. Van Wyk*, 27 P.3d 377, 391 (Colo. 2001). The invasion also may be unintentional and negligent or reckless. Id. Conduct constituting a nuisance can include indirect or physical conditions created by the defendant that cause harm. *Hoery*, 64 P.3d at 218. Nuisance may be a permanent or continuing tort. For continuing nuisance, the claim continues to accrue as long as tortious conduct continues. Id.

368. The United States substantially invaded Plaintiffs' interests in the use and enjoyment of their property and water rights, because the United States directly and proximately caused and is causing the contamination of Plaintiffs' property and water rights, with extremely persistent, toxic, and bioaccumulative PFCs.

369. The United States permitted and is permitting PFCs to spread beyond Peterson AFB, travel through the Fountain Creek Watershed, and invade Plaintiffs' property and water rights.

370. The PFC contamination from the United States' actions have contaminated Plaintiffs' water supplies, which they rely on for municipal, including drinking water, and agricultural irrigation uses. Due to the contamination, Plaintiffs no longer can use the water.

371.     The United States' interference is intentional and unreasonable. The United States intentionally and unreasonably discharged PFC-contaminated wastewater by spraying and dumping PFCs on open ground, soil, and water at Peterson AFB, irrigating its golf course and wildlife with PFC-contaminated water, storing PFC-contaminated water in unlined ponds where it leaked into soil and groundwater, failing to contain and handle PFC-contaminated wastewater as hazardous waste, and discharging PFC-contaminated wastewater.

372.     The United States' intentional discharges were made knowing that the discharges would contaminate groundwater and result in PFCs migrating to Plaintiffs' properties and water rights and continued after the United States knew the discharges had interfered with the use of Plaintiffs' properties.

373.     In the alternative, the United States' interferences are negligent because United States should have reasonably foreseen that its discharges of AFFF would contaminate groundwater, and Plaintiffs' properties and water rights, with PFCs.

374.     The continued migration to, and existence of, PFCs beneath Plaintiffs' property and in its decreed groundwater supplies as a result of the United States' actions and omissions, have compelled Plaintiffs to forego use of their valuable groundwater rights, which is offensive, annoying, and inconvenient, and constitutes a continuing nuisance.

375.     The intrusion of PFCs into Security's property and water rights caused Security to suffer in excess of $6 million in damages in the costs of securing and delivering alternate water supplies; costs of sampling and monitoring; and other response or remediation costs. Security expects to incur in excess of an additional $8.5 million in future costs to remove PFCs from its groundwater.

376. The intrusion into the Foundation's property and water rights of PFCs caused, and is reasonably anticipated to cause, the Foundation to suffer in excess of $7 million in damages, including loss of rents and revenue; loss of crops; loss of an ability to carry on an economic enterprise on and with its property; cost of treating its water in order to beneficially use it; and other response or remediation costs.

377. As a direct and proximate result of the conduct and other tortious acts and omissions of the United States, Plaintiffs' water and property are being damaged and destroyed, causing economic loss.

**THIRD CLAIM FOR RELIEF**

**NEGLIGENCE**

**(United States)**

378. Plaintiffs incorporate all averments in this Complaint as if restated fully herein.

379. The United States negligently discharged and disposed of PFCs and is failing to remediate PFC contamination.

380. In Colorado, a defendant is negligent when the defendant owes a duty to the plaintiff, the defendant breaches that duty, and the defendant's breach causes injury to the plaintiff. *Casebolt v. Cowan*, 829 P.2d 352, 356 (Colo. 1992).

381. The United States owed, and still owes, a duty to Plaintiffs' to maintain its operations and property in a safe manner and to prevent a dangerous condition on the United States' property from escaping its land and causing damage to Plaintiffs' neighboring land. See *Moore v. Standard Paint & Glass Co. of Pueblo*, 358 P.2d 33, 36 (Colo. 1960); *Haas v. Lavin*, 625 F.2d 1384, 1387 (10th Cir. 1980).

382. The United States' standard of care is defined, at least in part, by the numerous directives that required special handling and disposal of AFFF containing PFCs.

383. The United States breached its duty to manage its operations and property as a reasonably careful person by mishandling and discharging to the environment AFFF containing PFCs.

384. The United States also breached its duty by failing to follow the standards and requirements of numerous directives that required special handling and disposal of AFFF containing PFCs.

385. The negligently discharged AFFF has contaminated the Widefield and Windmill Gulch Aquifers and Plaintiffs' property and water rights.

386. The United States' negligence has caused Security to suffer in excess of $6 million in damages in costs of securing and delivering alternate water supplies; costs of sampling and monitoring; and other response or remediation costs. Security expects to incur in excess of an additional $8.5 million in future costs to remove PFCs from its groundwater.

387. The United States' negligence has caused the Foundation to suffer in excess of $7 million in past and reasonably anticipated future damages, including loss of rents and revenue; loss of crops; loss of an ability to carry on an economic enterprise on and with its property; cost of treating its water in order to beneficially use it; and other response or remediation costs.

388. As a direct and proximate result of the conduct and other negligent acts and omissions of the United States, Plaintiffs' water and property are being damaged and destroyed, causing economic loss.

## FOURTH CLAIM FOR RELIEF

## NEGLIGENCE

### (Manufacturers)

389.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

390.     Manufacturers had a duty to manufacture and/or market, distribute and sell their AFFF or the toxic PFC components thereof in a manner that avoided contamination of the environment, including municipal and agricultural water supplies, and avoided harm to those who foreseeably would come into contact with its chemical components.

391.     Manufacturers knew or should have known that the manufacture and use of AFFF containing PFCs was hazardous to human health and the environment.

392.     Manufacturers further knew or should have known that it was unsafe and/or unreasonably dangerous to manufacture AFFF using PFCs because it was highly probable that the chemicals would migrate into the environment, including the environment at Air Force bases such as Peterson AFB, and contaminate groundwater used as public and agricultural water supply.

393.     Knowing of the dangerous and hazardous properties of the AFFF, Manufacturers had the duty to warn of the hazards of consuming water containing PFCs.

394.     Plaintiffs were foreseeable victims of the harm caused by the AFFF, and its chemical components, manufactured, distributed, and/or sold by Manufacturers.

395.     Manufacturers negligently designed, engineered, developed, fabricated and tested AFFF and its component PFCs, negligently manufactured and/or distributed and sold AFFF and the toxic components thereof, and negligently created the associated warnings and instructions,

and thereby failed to exercise reasonable care to prevent the AFFF and its components from presenting an unreasonable risk of harm to the health of persons who would come in contact with them and to prevent contamination of public and agricultural water supplies, including Plaintiffs' water supplies.

396. Manufacturers' negligent design, engineering, development, fabrication, testing, warnings and instructions constitute a pattern of continuous and ongoing tortious conduct.

397. Upon information and belief, Manufacturers have and continue to engage in discrete acts of negligent design, engineering, development, fabrication, testing, warnings and instructions to the date of this Amended Complaint.

398. Upon information and belief, Manufacturers have not recalled their AFFF product or its component PFCs to the date of this Amended Complaint.

399. As a result of Manufacturers' breaches of their legal duties, the groundwater beneath and around Peterson AFB, including groundwater in the Widefield and Windmill Gulch aquifers that constitute Plaintiffs' water rights, has been, and continues to be, contaminated with PFCs.

400. Manufacturers' negligent manufacture and/or distribution and sale of AFFF or the toxic PFC components thereof, and their negligent misrepresentation and failure to warn, caused, is causing, and will cause damage to Plaintiffs' property interests due to the presence of PFCs in their water supply.

401. As a result of Manufacturers' negligent, reckless and/or intentional acts and omissions alleged herein, groundwater in the Widefield and Windmill Gulch aquifers has been contaminated with PFCs.

402.    Manufacturers' acts were willful, wanton or reckless and conducted with a reckless indifference to the rights and property of Plaintiffs.

403.    As a result of Manufacturer's conduct and the resulting contamination of the Widefield and Windmill Gulch aquifers by the chemical components of the Manufacturers' AFFF, the Plaintiffs have or will incur costs to secure and deliver alternate water supplies, including costs of installing pipelines and other infrastructure and of assuring water quality through the delivery system; costs of sampling and analyzing groundwater and other media; costs of responding to public inquiries and managing public relations regarding the contamination; costs of treatment of groundwater, including treatment systems, operations and maintenance, and treatment media management and disposal; loss of rents and revenue; loss of crops; loss of an ability to carry on an economic enterprise; and other response costs.  In addition, the Plaintiffs have lost the value and marketability of their property and property rights, including appropriated water rights.  As a result of the contamination, Plaintiffs have lost use and enjoyment of their properties, including appropriated water rights, and have suffered annoyance, discomfort, and inconvenience.

## FIFTH CLAIM FOR RELIEF

## DEFECTIVE PRODUCT – FAILURE TO WARN

### (Manufacturers)

404.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were fully set forth herein.

405.    At all times relevant, Manufacturers were in the business of, among other things, manufacturing and/or selling and distributing AFFF or the toxic PFC components thereof.

406.     As manufacturers and/or sellers and distributors of a commercial product, the Manufacturers had a duty to provide adequate, full instructions and warnings about the risks of injury posed by their products.

407.     Manufacturers knew or should have known that the foreseeable storage, use, release and disposal of the AFFF that they manufactured and/or sold and distributed to the Air Force, or of the toxic components of AFFF the Air Force used, including at Peterson AFB, had the likelihood of entering the groundwater and household water supplies, to persist there for decades, and to cause risk to human health and the environment and harm to property.

408.     At the time of the design, manufacture and/or distribution and sale of the AFFF or the toxic PFC components thereof, Manufacturers knew or should have known of the dangerous properties of AFFF which contained PFCs.

409.     Upon information and belief, the Manufacturers at significant times failed to provide sufficient instructions and warnings to the users of AFFF, including the Air Force, that use and release of Manufacturers' AFFF, and the toxic components of AFFF, to the environment would result in the contamination of groundwater, including drinking water and agricultural water supplies, and risks to those exposed to the water supplies.

410.     Upon information and belief, the Manufacturers at significant times failed to provide adequate instructions and warnings to the users of the dangers to human health and the environment if AFFF, and the toxic components of AFFF, was permitted to contaminate the groundwater and soil.

411.     Upon information and belief, the Manufacturers at significant times hid the dangers of AFFF to human health and the environment from their customers, including the Air Force.

412.     Manufacturers' failure to provide adequate instructions and warnings constitute a pattern of continuous and ongoing tortious conduct.

413.     Upon information and belief, Manufacturers have and continue to fail to provide adequate instructions and warnings to the date of this Amended Complaint.

414.     Upon information and belief, Manufacturers have not recalled their AFFF product or the toxic PFC components thereof to the date of this Amended Complaint.

415.     Adequate instructions and warnings would have reduced or avoided the foreseeable risks of harm posed by the use and release the AFFF and the toxic PFC components thereof.

416.     Had Manufacturers provided adequate warnings, the Air Force would not have used AFFF containing PFCs or would have taken measures to store, use, discharge, and dispose of AFFF so as to reduce or eliminate groundwater and soil contamination by the components of AFFF.

417.     As a result of Manufacturers' failure to warn against the likelihood of contamination from their AFFF, the groundwater in the Widefield and Windmill Gulch aquifers has been contaminated with the chemical components of AFFF including PFCs.

418.     As a direct and proximate result of Manufacturers' failure to warn of the environmental and health impacts caused by the chemical components of AFFF and the release of PFCs used in AFFF foam, the groundwater in the Widefield and Windmill Gulch aquifers became contaminated with PFCs, causing loss of Plaintiffs' use and benefit of their appropriated water rights and the incurrence, or reasonably certain incurrence, of costs to treat the groundwater and soil on their lands.

419. Manufacturers' failure to provide adequate warnings or instructions renders Manufacturers' AFFF and the toxic components thereof defective products.

420. As a result of Manufacturers' manufacture and/or distribution and sale of defective products, Manufacturers are strictly liable for damages to the Plaintiffs.

421. Manufacturers' acts were willful, wanton or reckless and conducted with a reckless indifference to the rights of Plaintiffs.

422. As a result of Manufacturer's conduct and the resulting contamination of the Widefield and Windmill Gulch aquifers by the chemical components of the Manufacturers' AFFF, the Plaintiffs have or will incur costs to secure and deliver alternate water supplies, including costs of installing pipelines and other infrastructure and of assuring water quality through the delivery system; costs of sampling and analyzing groundwater and other media; costs of responding to public inquiries and managing public relations regarding the contamination; costs of treatment of groundwater, including treatment systems, operations and maintenance, and treatment media management and disposal; loss of rents and revenue; loss of crops; loss of an ability to carry on an economic enterprise; and other response costs. In addition, the Plaintiffs have lost the value and marketability of their property and property rights, including appropriated water rights. As a result of the contamination, Plaintiffs have lost use and enjoyment of their properties, including appropriated water rights, and have suffered annoyance, discomfort, and inconvenience.

<strong>SIXTH CLAIM FOR RELIEF</strong>

<strong>DEFECTIVE PRODUCT - DESIGN DEFECT</strong>

<strong>(Manufacturers)</strong>

423.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

424.     At all times relevant, Manufacturers were in the business of, among other things, manufacturing, selling and/or distributing AFFF or the toxic PFC components thereof.

425.     It was foreseeable that toxic chemicals from the AFFF that Manufacturers manufactured and/or sold and distributed would enter the water supplies of the Plaintiffs and cause damage to their property interests, including appropriated water rights.

426.     Alternative designs and formulations of AFFF and the toxic PFC components thereof were available, technologically feasible and practical, and would have reduced or prevented the reasonably foreseeable risks of harm to Plaintiffs.

427.     Further, design, formulation, manufacture and/or distribution and sale of a product containing toxic chemicals that were so toxic and so mobile and persistent in the environment was unreasonably dangerous.

428.     The AFFF and toxic PFC components of the AFFF manufactured and/or distributed and sold by Manufacturers were defective in design because the foreseeable risk of harm posed by the AFFF and its toxic PFC components could have been reduced or eliminated by the adoption of a reasonable alternative design, and because it was unreasonably dangerous.

429.     Manufacturers' products were defective at the time of manufacture and/or distribution and sale, and thus at the time they left Manufacturers' control.

84

430. Manufacturers' sale and distribution of AFFF, and the toxic PFC components thereof, constitutes a pattern of continuous and ongoing tortious conduct.

431. Upon information and belief, Manufacturers have and continue to sell and distribute AFFF and the toxic PFC components thereof in a tortious manner to the date of this Amended Complaint.

432. Upon information and belief, Manufacturers have not recalled their AFFF product and the toxic PFC components thereof to the date of this Amended Complaint.

433. As a result of Manufacturers' manufacture and/or distribution and sale of a defectively designed product, the Widefield and Windmill Gulch aquifers became contaminated with toxic PFCs and damaged the Plaintiffs.

434. As a result of Manufacturers' design, formulation, manufacture and/or distribution and sale of a defective product, Manufacturers are strictly liable in damages to the Plaintiffs.

435. Manufacturers' acts were willful, wanton or reckless and conducted with a reckless indifference to the rights of Plaintiffs.

436. As a result of Manufacturer's conduct and the resulting contamination of the Widefield and Windmill Gulch aquifers by the chemical components of the Manufacturers' AFFF, the Plaintiffs have or will incur costs to secure and deliver alternate water supplies, including costs of installing pipelines and other infrastructure and of assuring water quality through the delivery system; costs of sampling and analyzing groundwater and other media; costs of responding to public inquiries and managing public relations regarding the contamination; costs of treatment of groundwater, including treatment systems, operations and maintenance, and treatment media management and disposal; loss of rents and revenue; loss of crops; loss of an ability to carry on an

economic enterprise; and other response costs. In addition, the Plaintiffs have lost the value and marketability of their property and property rights, including appropriated water rights. As a result of the contamination, Plaintiffs have lost use and enjoyment of their properties, including appropriated water rights, and have suffered annoyance, discomfort, and inconvenience.

## SEVENTH CLAIM FOR RELIEF

## NUISANCE

### (Manufacturers)

437.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

438.    Manufacturers manufacture and/or sale and distribution of AFFF foam containing PFCs and the toxic components thereof constituted intentional, negligent and/or unreasonably dangerous activity causing the unreasonable and substantial interference with the use and enjoyment of the property interests of Plaintiffs.

439.    Manufacturers knew and/or should have reasonably foreseen that the invasion of the Plaintiffs' property interests, including their water supplies, was substantially certain to result from the use of the AFFF as Manufacturers intended, including at Peterson AFB, given, among other reasons, the chemical properties of the components of the AFFF. Manufacturers participated to a substantial extent in the carrying on of the nuisance by their actions described above.

440.    The unreasonable and substantial interference with the use and enjoyment of the property interests of Plaintiffs includes but is not limited to the contamination of groundwater and soil on Plaintiffs' property, including the source of Plaintiffs' appropriated water rights, the need

to obtain alternative sources of water and expense thereof, and the exposure to known toxic chemicals manufactured and/or sold and distributed by Manufacturers.

441.     Manufacturers' sale and distribution of AFFF, and the toxic PFC components thereof, constitutes a pattern of continuous and ongoing tortious conduct.

442.     Upon information and belief, Manufacturers have and continue to sell and distribute AFFF and the toxic PFC components thereof in a tortious manner to the date of this Amended Complaint.

443.     PFCs continue to contaminate Plaintiffs' properties and continue to migrate to Plaintiffs' properties.

444.     As a result of Manufacturers' creation of a nuisance, the groundwater supply relied upon by Plaintiffs pursuant to their appropriated water rights has been, and continue to be, contaminated with PFCs.

445.     As a result of Manufacturers' creation of a nuisance, the soil of the land on which the Foundation grew crops has been, and continues to be, contaminated with PFCs.

446.     Manufacturers' creation of a nuisance caused and is causing Plaintiffs substantial and unreasonable interference with their property rights.

447.     Manufacturers' acts were willful, wanton or reckless and conducted with a reckless indifference to the rights and property of Plaintiffs.

448.     As a result of Manufacturer's conduct and the resulting contamination of the Widefield and Windmill Gulch aquifers by the chemical components of the Manufacturers' AFFF, the Plaintiffs have or will incur costs to secure and deliver alternate water supplies, including costs of installing pipelines and other infrastructure and of assuring water quality through the delivery

system; costs of sampling and analyzing groundwater and other media; costs of responding to public inquiries and managing public relations regarding the contamination; costs of treatment of groundwater, including treatment systems, operations and maintenance, and treatment media management and disposal; loss of rents and revenue; loss of crops; loss of an ability to carry on an economic enterprise; and other response costs. In addition, the Plaintiffs have lost the value and marketability of their property and property rights, including appropriated water rights. As a result of the contamination, Plaintiffs have lost use and enjoyment of their properties, including appropriated water rights, and have suffered annoyance, discomfort, and inconvenience.

## EIGHTH CLAIM FOR RELIEF

## UNJUST ENRICHMENT

### (Manufacturers)

449. Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

450. Manufacturers profited from the manufacture and/or distribution and sale of AFFF containing PFCs and the toxic PFC components thereof and continued to do so long after they were aware of the health and environmental risks of their products. Further, Manufacturers have failed to recall their products to prevent the further release of their AFFF and PFCs into groundwater and onto Plaintiffs' properties. Through Manufacturers' actions and inaction at the expense of Plaintiffs, Manufacturers have been unjustly enriched.

451. The Court should award as a remedy the expenditures saved and the profits obtained by Manufacturers at the expense of Plaintiffs.

## NINTH CLAIM FOR RELIEF

## VIOLATION OF COLORADO UNIFORM FRAUDULENT TRANSFER ACT

**(E.I. du Pont de Nemours and Company, The Chemours Company,
The Chemours Company FC, LLC, Corteva, Inc., and DuPont de Nemours, Inc.)**

452.    Plaintiff the Foundation hereby incorporates by reference the allegations contained in the preceding paragraphs of this Complaint as if they were fully set forth herein.

453.    Plaintiff the Foundation seeks equitable and other relief pursuant to the Colorado Uniform Fraudulent Transfer Act ("FTA") against E. I. du Pont de Nemours and Company, The Chemours Company, The Chemours Company FC, LLC, Corteva, Inc., and DuPont de Nemours, Inc. (collectively the DuPont Defendants). C.R.S. § 38-8-101, et seq.

454.    Under the FTA, "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (1) with actual intent to hinder, delay, or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." C.R.S. § 38-8-105(1).

455.     The DuPont Defendants have (a) acted with actual intent to hinder, delay and defraud parties, and/or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and (i) were engaged or were about to engage in a business for which the remaining assets of The Chemours Company were unreasonably small in relation to the business; or (ii) intended to incur, or believed or reasonably should have believed that The Chemours Company would incur, debts beyond its ability to pay as they became due.

456.     The DuPont Defendants engaged in acts in furtherance of a scheme to transfer E. I. du Pont de Nemours and Company's assets out of the reach of parties such as Plaintiffs that have been damaged as a result of the FTA Defendants' conduct, omissions, and actions described in this Complaint.

457.     It is primarily E. I. du Pont de Nemours and Company, rather than The Chemours Company, that for decades manufactured, marketed, distributed and/or sold AFFF containing PFCs and PFCs for use in AFFF with the superior knowledge that they were toxic, mobile, persistent, bioaccumulative, and biomagnifying, and through normal and foreseen use, would contaminate the Plaintiffs' drinking and agricultural water supply and injure the Plaintiffs.

458.     As a result of the transfer of assets and liabilities described in this Complaint, the DuPont Defendants have attempted to limit the availability of assets to cover judgments for all of the liability for damages and injuries from the manufacturing, marketing, distribution and/or sale of AFFF containing PFCs and PFCs for use in AFFF.

459.   At the time of the transfer of its Performance Chemicals Business to The Chemours Company, E. I. du Pont de Nemours and Company had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacturing, marketing, distribution and/or sale of AFFF containing PFCs and/or PFCs compounds for use in AFFF.

460.   The DuPont Defendants acted without receiving a reasonably equivalent value in exchange for the transfer or obligation, and E. I. du Pont de Nemours and Company believed or reasonably should have believed that The Chemours Company would incur debts beyond The Chemours Company's ability to pay as they became due.

461.   At all times relevant to this action, the claims, judgment and potential judgments against The Chemours Company potentially exceed The Chemours Company's ability to pay.

462.   Pursuant to C.R.S. § 38-8-108(1), Plaintiff the Foundation seeks avoidance of the transfer of E. I. du Pont de Nemours and Company's liabilities for the claims brought in this Complaint and to hold the DuPont Defendants liable for any damages or other remedies that may be awarded under this Complaint.

## TENTH CLAIM FOR RELIEF

## CERCLA COST RECOVERY

### (United States)

463.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were fully set forth herein.

464.   CERCLA imposes liability upon any person who:

a. currently owns or operates a facility where hazardous substances have been disposed of, 42 U.S.C. § 9607(a)(1);

b. at the time of disposal of any hazardous substance owned or operated any facility where such hazardous substance was disposed of, 42 U.S.C. § 9607(a)(2);

465. The United States is a "person" within the meaning of section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

466. Peterson Air Force Base is a "facility" within the meaning of CERCLA section 101(9), 42 U.S.C. § 9601(9) because it is a "site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located."

467. PFOS and PFOA are "hazardous substances" as defined by CERCLA, 42 U.S.C. § 9601(14) and 40 C.F.R. § 302.4.

468. Hazardous substances, PFOS and PFOA in particular, were "released" within the meaning of § 101(22) of CERCLA, 42 U.S.C. § 9601(22) at Peterson Air Force Base.

469. At the time hazardous substances were released, the United States was, and the United States currently is, the "owner" and "operator" of Peterson Air Force Base within the meaning defined in CERCLA, 42 U.S.C. §§ 9607(a)(1) and (2), 9601(20).

470. Beginning in 2016, Plaintiffs have incurred, continue to incur and in the future will incur necessary "response" costs as defined by CERCLA, 42 U.S.C. § 9601(25), to implement response actions in a manner consistent with the National Contingency Plan, 40 C.F.R., Part 300.

471. The United States is liable to the Plaintiffs under CERCLA, 42 U.S.C. § 107(a), for response costs incurred by Plaintiffs to implement response actions necessitated by the United States' releases of hazardous substances at Peterson Air Force Base.

## ELEVENTH CLAIM FOR RELIEF

## DECLARATORY RELIEF UNDER CERCLA AND 28 U.S.C. § 2201

### (United States)

472.     Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint as if they were fully set forth herein.

473.     An actual and substantial controversy, within the meaning of 28 U.S.C. § 2201, currently exists between Plaintiffs and the United States with respect to the United States' responsibility for past, present, and future response costs and other related costs that have arisen and may yet arise from the alleged presence of hazardous substances at and migrating from Peterson Air Force Base.  Such costs and expenses are neither remote nor speculative.

474.     Absent a judicial declaration setting forth the parties' rights, duties, and obligations with respect to such costs, multiple legal actions may result.

475.     Pursuant to CERCLA, 42 U.S.C. § 9613(g)(2), the Court is authorized to enter a declaratory judgment on liability for past, present, and future response costs to be incurred by the Plaintiffs and the United States in this action, if any.

476.     Therefore, the Plaintiffs request a judicial determination of the rights, duties, and obligations of the Plaintiffs and the United States with respect to the past, present, and future response costs and other related costs that are the subject of this action.


## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Security Water District and Pikes Peak Community Foundation respectfully request that this Court grant the following relief:

a) Award Plaintiffs all damages suffered, or that will be suffered, as a result of Defendants' actions, including, without limitation, the costs of obtaining alternative water supplies, including the costs of installation of pipelines and other infrastructure, the costs of managing water quality, and the costs of acquiring and delivering water; the costs of collecting and analyzing samples of groundwater and other media; the costs of managing public relations and public inquiries relating to the PFC contamination; the costs of treating groundwater contaminated with PFC, including treatment system costs, operation and maintenance costs, and costs of managing and disposing of treatment system media; lost rents or, alternatively, costs of rent on contaminated water rights; lost crops and revenues from crops; the decrease in the value and marketability of their property and property rights; and the loss of use and enjoyment of their properties, and the annoyance, discomfort, and inconvenience caused by the contamination of and interference with their water supplies and properties by Manufacturers PFCs and the United States' actions;

b) An order for disgorgement of the profits and savings which were obtained by the unjust enrichment of Manufacturers through their manufacture and/or distribution and sale of AFFF containing PFCs and through the use and at the expense and marketability of the properties of Plaintiffs;

c) Award Plaintiffs recovery from the United States of Plaintiffs' response costs under CERCLA, 42 U.S.C. § 9607(a), relating to the release of hazardous substances at and from Peterson Air Force Base

d) Enter a declaratory judgment, pursuant to CERCLA, 42 U.S.C. § 9613(g)(2), and 28 U.S.C. § 2201, holding the United States liable for past, present, and future response costs incurred by Plaintiffs to respond to the release of hazardous substances at Peterson Air Force Base;

e) Award Plaintiffs prejudgment and post-judgment interest, as provided by law;

b) Award Plaintiffs their costs incurred in this action; and

c) Award Plaintiffs such other and further relief as the Court deems just.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all claims so triable.

Respectfully submitted this 21st day of January 2025.

SINGLETON SCHREIBER

By: /s/Kevin S. Hannon
Kevin S. Hannon
1641 Downing Street
Denver, CO  80218
(720) 704-6028 - Telephone
Kevin S. Hannon
khannon@singletonschreiber.com>

BURNS, FIGA & WILL, P.C.

By: /s/Scott A. Clark
Scott A. Clark
BURNS, FIGA & WILL, P.C.
6400 S. Fiddlers' Green Circle, Suite 1000
Greenwood Village, CO 80111
Phone Number:    303-796-2626
Fax Number:       303-796-2777
E-mail:            sclark@bfwlaw.com

**Attorneys for Plaintiffs Security Water District and Pikes Peak Community Foundation**